(48)

*Filed 11/21/05*

# TROIANI/KIVITZ, L.L.P.

———————————— ATTORNEYS AT LAW ————————————

DOLORES M. TROIANI, ESQUIRE
BEBE H. KIVITZ, ESQUIRE

38 NORTH WATERLOO ROAD
DEVON, PA 19333

(610) 688-8400
FAX (610) 688-8426

November 21, 2005

**HAND-DELIVERED**
Office of the Clerk of Court
Eastern District of Pennsylvania
United States Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

**RE:  Constand v. Cosby, No. 05-CV-1099**
      **Plaintiff's Motion for Sanctions Concerning Conduct of Defendant**
      **At Deposition and Memorandum of Law in Support of Motion**

To the Clerk:

Enclosed for filing in the above-captioned matter, please find an original and two CD disks.

Thank you for your anticipated cooperation.

Respectfully submitted,

Dolores M. Troiani

DMT:m
Enclosure
cc:    Patrick J. O'Connor, Esquire (Via-hand-delivery)
       Andrew D. Schau, Esquire, (Via first class mail)
       Andrea Constand (Via first class mail)



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ANDREA CONSTAND | : CIVIL ACTION |
| Plaintiff | : |
| v. | : NUMBER 05-1099 |
| | : |
| WILLIAM H. COSBY, JR. | : |
| Defendant | : |

### PLAINTIFF'S MOTION CONCERNING CONDUCT OF
### DEFENDANT'S DEPOSITION AND MOTION FOR SANCTIONS

Plaintiff prays this Honorable Court to Order Defendant to
adhere to the guidelines set forth in *Hall v. Clifton Precision,*
*150 F.R.D. 525 (E.D. Pa. 1993),* and further to order Defendant to
submit to a full and complete deposition at his expense, and to
sanction Defendant and/or his counsel by requiring them to
reimburse Plaintiff for the costs of the Defendant's deposition,
and to impose other sanctions, as the Court deems appropriate,
and in support thereof incorporates herein the Memorandum of Law
which is attached hereto.

Respectfully submitted,

TROIANI/KIVITZ, LLP
BY:  DOLORES M. TROIANI
Attorney I.D. 21283
BEBE H. KIVITZ
Attorney I.D. 30253
Attorneys for Plaintiff
38 North Waterloo Road
Devon, PA 19333
(610) 688-8400

## CERTIFICATE OF SERVICE

I hereby certify that on <u>November 21, 2005,</u> the undersigned were served in the following

manner, a true and correct copy of : **Plaintiff's Motion for Sanctions Concerning Conduct of**

**Defendant at Deposition and Memorandum of Law.**

### NAME

### MANNER

The Honorable Eduardo C. Robreno       Via Hand Delivered by Courier
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

Office of the Clerk of Court            Via Hand Delivered by Courier
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

Patrick J. O'Connor, Esquire            Via Hand Delivered by Courier
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Andrew D. Schau, Esquire                Via First Class Mail
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

TROIANI/KIVITZ, L.L.P.

By: _____
Dolores M. Troiani
Attorney I.D. No. 21283
Attorney for Plaintiff

Date: 11/21/05



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDREA CONSTAND,                    : CIVIL ACTION
            Plaintiff               :
      v.                            : NUMBER 05-1099
                                    :
WILLIAM H. COSBY, JR.,              :
            Defendant               :

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION CONCERNING CONDUCT OF
DEFENDANT'S DEPOSITION AND MOTION FOR SANCTIONS

Plaintiff respectfully requests that this Honorable Court order Defendant to adhere to the guidelines set forth in *Hall v. Clifton Precision, 150 F.R.D. 525 (E.D. Pa. 1993),* and further to order Defendant to submit to a full and complete deposition at his expense, and to sanction Defendant and/or his counsel by requiring them to reimburse Plaintiff for the costs of the Defendant's deposition, and to impose other sanctions, as the Court deems appropriate.

Federal Rule of Civil 30(d)(3) authorizes the imposition of sanctions if the court finds that "any impediment, delay, or other conduct has frustrated the fair examination of the deponent."  Further, this Honorable Court has promulgated certain procedures which state that if a discovery dispute requires the "Court's intervention, the Court customarily imposes sanctions upon the non-prevailing party unless the position of the non-party is found to have been substantially justified."  As is evident below, defense counsel's conduct cannot be justified

-1-

under any circumstances.  Counsel engaged in conduct demeaning to the profession of law, deliberately obstructive, and unnecessarily vexatious, which conduct impeded the fair examination of the deponent.

Defendant was deposed on September 27 and 28, 2005.  Defense counsel was so obstructive in the deposition that he denied Plaintiff her right to an appropriate interrogation.  Defense counsel openly coached the witness; conferred with him about the questions which were being asked; interrupted the questioning with long winded and repetitive speaking objections; directed defendant not to answer questions, (when privilege was not in issue), inappropriately asserted a claim of privilege to numerous questions and lines of questioning; and ultimately improperly terminated the deposition.  Defense counsel's conduct was demeaning and disrespectful and beyond the pall of normal advocacy.  His conduct so far exceeds the bounds of appropriate behavior that the majority, (but not all)[1], of the conduct is reproduced herein so that this Honorable Court may have the full flavor of the obstructive nature of counsel's actions.

A sampling of the actions which are the subject of this

---

[1] The Court has had the benefit of reading both days of the deposition, as well as, the Motion to Compel which has been simultaneously filed with the Motion.  Plaintiff is not waiving her challenges to Defense Counsel's conduct on those days, but respectfully submits that the fifty pages of examples cited herein are sufficient proof to support Plaintiff's request for relief.

motion are as follows:

**1.    QUESTIONS RELATING TO A POLICE DOCUMENT**

Defendant was being questioned about a document which was generated by the police.  It listed two social security numbers and addresses "associated with" defendant.  The questions were directed at defendant's knowledge as to why those items would be "associated with" him.  Prior to the deposition, in open Court, defense counsel had agree to provide plaintiff with information concerning defendant's residences.  He did not provide the information.  The following exchange occurred.

MS. TROIANI:

There can't be an agreement if we both don't agree.

MR. O'CONNOR:

You're never going to learn unless you listen.  The agreement with the court was that I would allow Mr. Cosby to be questioned on residences where he lives.  I indicated to the court in front of counsel that there was a listing of some 20 properties, referenced on a policy of insurance that we blocked out with the understanding that when it came time for his deposition, I would allow counsel to explore with  Mr. Cosby where he lives.  Now, as far as I'm concerned, that's fairly simple questions.  Where do you reside and he would answer those questions.  She is not going to get a listing from Mr. Cosby of other assets and property  which he owns.  And I feel comfortable

-3-

in that direction.

MS. TROIANI:

I asked him what his residences were and he said Massachusetts.  He did not go through which one of these properties and you did not provide it before the deposition.

MR. O'CONNOR:

He told you he resided in Cheltenham.

MS. TROIANI:

No, he did not.

MR. O'CONNOR:

He told you he resided in New York, he told you he resided in Massachusetts.  You asked him with whom he resides in Massachusetts.  I allowed those questions to be asked.  I allowed them to be answered.  If you want to ask  him if he resides in any location in California, I will allow him to answer that.  But you go through this litany,  I'm not going to allow that.  Ask the question, that's the agreement.

(9/29/05, 16-17)

The line of questioning was twofold.  It not only concerned defendant's residences which Defendant had agreed in open court to provide but which were not provided; it also concerned the list generated by the police.  Plaintiff had every right to inquire as to the accuracy of the list, and as to defendant's knowledge of why the addresses appeared on the list.

-4-

Furthermore, counsel misrepresented that his client stated that he resided in New York and Cheltenham, and the record does not comport with that statement.  As is evident below, counsel repeatedly misstated the testimony and the documents provided by the police.

On September 27, 2005, the parties and counsel appeared before this Honorable Court in order to address certain discovery issues which were outstanding, and about which it was anticipated disputes would arise during the deposition.  Plaintiff believed that the issues had been resolved by agreement and the Court issued an order finding that the disputes were moot.  In fact, Defendant simply did not honor the agreements.

**2. QUESTIONS RELATING TO QUAALUDES**

After defendant testified that he obtained seven prescriptions for Quaaludes, the following testimony was elicited:

Q.      You gave them to other people?

A.      Yes.

(9/29/05, 66)

Q.      You gave those drugs to other people knowing that it was --

MR. O'CONNOR: He said he gave it to T--- right now.

MS. TROIANI: He said other people.  He did say other people.

BY MS. TROIANI:

      Q.      Knowing that it was illegal?

 ***MR. O'CONNOR:

    Whatever the legality of it is, it will stand.  I'm
instructing him not to answer.  He gave the Quaaludes.  If it was
illegal, the courts will determine that.

BY MS. TROIANI:

      Q.     Did you ever get another prescription for
Quaaludes from another doctor after that time?

MR. O'CONNOR:

    This is in the '70s?

 THE WITNESS:

    A.     No.

 BY MS. TROIANI:

      Q.    Who are the people that you gave the Quaaludes to?

MR. O'CONNOR: Keep it to the Jane Does.  I'm not going beyond it.
I'm instructing him not to answer it beyond the Jane Does.

              (Tr. 9/29/05. 66-68)

BY MS. TROIANI:

      Q.    When you got the Quaaludes, was it in your mind that
you were going to use these Quaaludes for young women that you
wanted to have sex with?

      A.    Yes.

      Q.    Did you ever give any of those young women the

-6-

Quaaludes without their knowledge?

MR. O'CONNOR:   Object to the question.   Restrict it to the Jane

Does, would you, please.

MS. TROIANI:   No, I will  not.

MR. O'CONNOR:  Do not answer it.

MS. TROIANI: It's a discovery deposition.

THE WITNESS:

I misunderstood.  Woman, meaning T-----, and not women.

BY MS. TROIANI:

Q.        Okay.  So, you're saying you never gave the

Quaaludes to anyone other than T-----?

MR. O'CONNOR: Don't answer the question.  You can ask all the

questions you want about the Jane Does.

BY MS. TROIANI:

Q.        Sir, I want to explain to you.  I'm asking you a

question.  You have every right in the world to say, no, you're

misunderstanding me.

A.        I just did.

Q.        Your counsel cannot give you clues, as he is

obviously trying to do, that's inappropriate.

MR. O'CONNOR: I'm not giving him clues.  I'm instructing him not

to answer, except in the context of T-----.  And you keep

violating my objection.  We're going to go to court to resolve

this.  And every time you ask about relationships with other

women with whom he may have had consenting relationships, I'm going to stop it.

MS. TROIANI: That's fine.  You certainly can -- I understand your objection.  There's no other need for you to say except objection.

MR. O'CONNOR:  I'm going to instruct him not to answer.

MS. TROIANI:  And you can tell him not to answer.  That's fine. But the mere fact that you have made an objection and then I continue to ask a question, which I believe is pertinent and relevant and will lead to the discovery of relevant information is not violative of your objection because your objection is not anything but an objection.

BY MS. TROIANI:

Q.    Now, let's get back to my questions.  And certainly your counsel if he chooses to instruct you not to answer, he will do that.  But I need to ask you these questions and I need to understand and the jury needs to understand. Are you saying that you never gave the Quaaludes to any other female but T-------?

MR. O'CONNOR: Don't answer the question.  Rephrase the question.

BY MS. TROIANI:

Q.    Earlier I believe you testified that you had given the Quaaludes to other women; is that correct?

MR. O'CONNOR: Do not answer that question.

(9/29/05, 69-75)

-8-

This is a clear illustration of how counsel's remarks influenced the witness' testimony.  Having unequivocally said that he gave the quaaludes to "other people" upon hearing counsel's thinly veiled clues, the deponent changed his testimony to a claim of having misunderstood the word women for woman.  Further, Counsel appears to believe that he had taken on the role of judge. Asserting that he had made an objection, and that Plaintiff was "violating" his objection by attempting to place her questions on the record.  He seemed to believe that Plaintiff was supposed to abide by his objection and refrain from asking the questions.  In addition, Defense Counsel added the words, "in the 70's" to the question.  There is no legal proceeding in which one lawyer can simply call out an addendum to the opposing lawyer's question.

Defense counsel persisted in his improper conduct as follows:

BY MS. TROIANI:

Q.    You would agree with me that if you got seven prescriptions for Quaaludes you could still keep those Quaaludes for a number of years?

A.    Yes.

Q.    And do you know how long after you stopped getting the prescriptions you still had the Quaaludes in your possession?

MR. O'CONNOR:  You're talking about the 1970s?

MS. TROIANI:  I'm talking about the Quaaludes.

-9-

MR. O'CONNOR:  In the '70s.  That's the only time he got them.

BY MS. TROIANI:

    Q.    Did you get Quaaludes after the '70s?

MR. O'CONNOR:  You asked that and he said no.

MS. TROIANI:  You do not interrupt a deposition to testify, which is what you're doing.  That is a clear violation of a federal rule.

(9/29/05, 90)

    There is no doubt that defense counsel is not permitted to change the meaning of a question, as Mr. O'Connor did in the above sequence.  When the undersigned attempted to continue the questioning the following occurred:

    (At this time, the court reporter read back from the record as requested.)

BY MS. TROIANI:

    Q.    Did you, sir?

    A.    What was my instruction before you all started arguing?  I'm sorry.

    Q.    I don't know.  If your lawyer is instructing you not to answer that, then you can't answer that.

MR. O'CONNOR:  The instruction was, and it's been asked and answered, was with T---- in 1976.  The witness testified he got Quaaludes during that time frame.  There was seven prescriptions over a  period of years.  You're now asking Quaaludes, he kept

-10-

those Quaaludes  I guess in the '80s, '90s and year 2000.    If

that's your question whether he kept any prescriptions from the

'70s filled by this deceased doctor, I'll allow you to answer

because that's a  relevant question.

MS. TROIANI:  That wasn't my question.

BY MS. TROIANI:

      Q.    Did you ever obtain Quaaludes again from any other

source after the ones that you had been given in the prescription

that were no longer available to you?

 MR. O'CONNOR:  What time frame?  Don't answer the question.

 BY MS. TROIANI:

      Q.    Have you ever gotten any  prescriptions from any

other doctor which drugs would have a similar effect to

Quaaludes?

MR. O'CONNOR: During what time frame?

MS. TROIANI:  The time frame we have here is from the 1976 when

we have the first Jane Doe that we've been discussing through the

year 2004.

MR. O'CONNOR:  I think  that's incorrect.  The only Jane Doe that

talks about Quaaludes is T----.   If you have other Jane Does –

MS. TROIANI:  I'm not talking about Quaaludes.

MR. O'CONNOR:  If there are any other Jane Doe that talks about

any other drugs, I will allow that,  but there is none.   And

you're suggesting there is from '76 to 2005.

-11-

MS. TROIANI:  Mr. O'Connor, you're deliberately disrupting this deposition.  Now, you have made that position clear.  I believe that you are wrong.  We do not agree that the drug that was given to our client was Benadryl.  We have the right to explore, especially now that your client has admitted illegally obtaining another drug, which could have a similar effect.  We have the right to explore whether or not he has done that, if that is a pattern in his life.

MR. O'CONNOR:  Here's what you have a right to explore.  You have a right to explore what he gave your client.

MS. TROIANI:  You have made that position clear.  And now let's move on.

MR. O'CONNOR:  I will not interfere.  You do not have a right to suggest that his candid admission in 1976 that he gave this T----Quaaludes, which seems to disturb you, his admission in that regard, continued through 2006.  That I'm not going to allow to happen.  Stick to the Jane Does, ask whatever questions you want and move on to your client.  If you think she got Quaaludes from the '70s, ask the question.

MS. TROIANI:  You have said that several times, sir.  I will ask you to stop disrupting this deposition.  I assure you that all of these interruptions will be brought to the court.  You are clearly in violation of the federal rules.

BY MS. TROIANI:

-12-

        Q.    Have you obtained drugs, any type of drug that would

have the same type of effect as Quaaludes from any source since

the time you got the Quaaludes to the time that you no

longer had an association with our client?

MR. O'CONNOR:  I'm instructing him again not to answer.

MS. TROIANI:  That's fine.  You keep disrupting this deposition.

MR. O'CONNOR:  I have a right --

MS. TROIANI:  No, you do not.  You've done it several times.  We

will move on.

 MR. O'CONNOR:  Let me explain one thing.  You want me to stop

this deposition?  I have a right to put my objection on the

record.

MS. TROIANI:  You have done that.  You do not have that right.

You repeated several times.  This is enough.  Now, let's move on.

MR. O'CONNOR:  No one is going to threaten me, Dolores.

MS. TROIANI:   This is enough.

MR. O'CONNOR:  I've had enough of you with your --

MS. TROIANI:   If you want to walk out, you go ahead.

MR. O'CONNOR:  I'm not walking out.

MS. TROIANI:   Stop interrupting.

MR. O'CONNOR:  Do not ever talk to me that way again.

MS. TROIANI:   Stop interrupting.

                    (9/29/05, 92-98)

        The issue of Defendant's willingness and ability to obtain

-13-

an illegal drug for sexual purposes is crucial to Plaintiff's case.  Defense counsel was unscrupulous in his total disregard for not only the Federal Rules of Civil Procedure but also the Pennsylvania Code of Civility.  Counsel's conduct does not represent advocacy.  It is turning a deposition into a carnival and in that sense it is a degradation of the process which lawyers take an oath to uphold.  At this point in time, despite a previous written agreement to the contrary, counsel took the position that he would not permit the deposition of the defendant to continue beyond 4:00 p.m. that day.  It was clearly his intention to consume large periods of time by incessant and repetitive speaking objections.

3.    **STATEMENT TO POLICE OF RULE 415 WITNESS**

Defendant was questioned about a Rule 415 witness' statement, in which she stated that at age 19, she met defendant who had sex with her after giving her Quaaludes.  Her statement was ambiguous about whether or not they continued to see each other or simply met again two years later.  Defense counsel repeatedly interjected himself into the testimony, giving his version of the incident and once again denying the applicability of Rule 30 (c) to the proceedings.

THE WITNESS:

A.    That's her statement.  I  don't know.  How many years ago are we talking about? 197 what?

-14-

MR. O'CONNOR:  6.

BY MS. TROIANI:

    Q.   You thought it was later than that?

MR. O'CONNOR:  He met her two years later.

THE WITNESS:

    A.   I meet Ms (Redacted) in Las Vegas.  She meets me back stage.  I give her Quaaludes.  We then have sex.  I do not -- I can't judge at this time what she knows about herself for 19 years, a passive personality.

(9/29/05, 76-77)

    A.   T----- was sweet in her  personality.  As far as I was concerned was well-mannered, didn't demand or give a feeling that she was above anyone.  If anything, I think she may very well have been very happy to be around the show business surroundings.

    Q.   Star struck?

    A.   You'll have to ask her.

    Q.   So, you wouldn't disagree with her when she says in the report that she was star struck?

MR. O'CONNOR:  Object to the form.  He just answered the question. He said ask her.  Then you asked the same question again.  I object to the form of the question.

MS. TROIANI:

    Q.  You can answer.

-15-

THE WITNESS:

    A.    What am I doing?

MR. O'CONNOR: You can answer.  I objected to the form.  You already answered it.  She said do you agree with her after you already said you have to ask her.  I think he's answered your question.

THE WITNESS:

    A.    Yes, you have to ask her, please.

 BY MS. TROIANI:

    Q.    Now, she seems to say in this report that after that initial meeting she did not see you again until she was 21; is that correct?

    A.    I have no idea.

MR. O'CONNOR: The question seems she unequivocally states.  It's an incorrect statement.  She states she spent a two-week period with Mr. Cosby at Lake Tahoe when she was 21.

BY MS. TROIANI:

    Q.    I don't think it's clear whether or not you saw her in between that time.  And you don't know if you saw her from the time of the initial contact until when she met you in Lake Tahoe?

MR. O'CONNOR: I don't even think he testified he met her at Lake Tahoe.  I'm reading the statement.

MS. TROIANI:  It's cross-examination.

MR. O'CONNOR: I object to the form of the question because it
assumes he testified to that.

(9/29/05, 78-80)

In this instance, counsel gives his opinion of the question,
coaches his client with an answer, which the Defendant
immediately adopts and then recaps his version of the previous
testimony.

**4.   DEFENDANT'S RELATIONSHIP WITH WILLIAM MORRIS AGENCY**

Defendant testified that he called Tom Illus of the William
Morris Agency and asked him to send money to one of the Rule 415
witnesses.  He testified that Mr. Illus did not ask him why.  He
then testified:

Q.  Have you ever asked him in the past to send money to
women?

A.   I'm not sure.

Q.   Had you ever had a discussion with him concerning this
process where he would act as a conduit for you to send funds to
other people?

MR. O'CONNOR: If you restrict it to Jane Does, I'll allow him to
answer the question or to Andrea.

MS. TROIANI: I believe the court said we can delve into other
issues in his life concerning other women that he may or may not
have paid.

MR. O'CONNOR: I don't believe so.  The problem is it's a question

-17-

of privacy for other consenting adults, if it's occurred. I don't

think it would be appropriate.  The judge says it is, we'll

abide.  I  don't think it's appropriate to bring, if there are

other women with a consenting relationship, into the situation.

MS. TROIANI: You don't know that they're consenting adults.  Mr.

Cosby believes Andrea consented.  She does not.  That's your

issue.  We've got to know who they are so we can find out from

them.

MR. O'CONNOR: We do know who they are.  There's 11 of them and

you're on the second one.

                    (9/29/05, 83-84)

     In this passage, counsel was clearly cluing the witness to

only testify about the 11 women, they believe are known to the

Plaintiff, and to not reveal any others. He also gave Defendant

the clue concerning "consenting adults", which Defendant then

used in his responses.

**5.   QUESTIONS REQUESTING EXPLANATION OF PREVIOUS ANSWER**

BY MS. TROIANI:

     Q.   Mr. Cosby, did you believe that T------ P-----would go

to the press with her story when you sent her the money?

     A.   No.

     Q.   You said that after you got off the phone you were

angry and you thought about it. What were the possibilities that

you thought about?

                              -18-

MR. O'CONNOR:  Object to the form of the question.  You can certainly ask him what went through his mind if he recalls.

BY MS. TROIANI:

Q.    What did you think about?

MR. O'CONNOR: If anything.

MS. TROIANI: He just said he did.

(9/29/05, 86-87)

Although defendant eventually answered the question, it was improper for defense counsel to interject himself into the questioning.  If he had an objection to form, he need only have said the one word.  It is then Plaintiff's counsel's decision as to whether or not to rephrase the question.  In addition, Defendant had just testified that he thought about the call after he got off of the phone and he decided to send the caller money. In view of that testimony Defense counsel's comment, "If anything" cannot be defended under any circumstances.

6.   **QUESTIONS REGARDING STATEMENT TO POLICE OF ANOTHER RULE 415 WITNESS**

BY MS. TROIANI:

A.    She says she met you 24 years ago at a health club in Las Vegas where she worked as a masseuse. Do you recall meeting a woman who was a masseuse?

A.    No.

Q.    She was about 27 years old.  You have no recollection of this woman at all?

-19-

A.    No.

MR. O'CONNOR:  It says she was 25.

MS. TROIANI:  I'm looking at her statement.

          (9/29/05, 99-100)

After the interruption, the questioning continued as follows:

A.    I don't understand what I'm supposed to say never happened.  How do I know she was in a dream-like state?  Isn't that introspective?

MR. O'CONNOR:  Do you recall this woman or not?

THE WITNESS:  No.

MS. TROIANI:  Sir, do not interrupt my cross-examination.

MR. O'CONNOR:  Will you please stop telling me what my rights   I resent it.  He answered he didn't recall this woman and yet you go on.

MS. TROIANI:  You're not to interrupt my cross-examination.  You could not do it in court, you can't do it here.

MR. O'CONNOR:  Of course I could do it in court.

MS. TROIANI:  No, you couldn't.

MR. O'CONNOR:  I don't know the last time you've been in court.

MS. TROIANI:  Please do not get personal.

          (9/29/05, 103-104)

Again, defense counsel chose a very low road.  Undoubtably frustrated by his client's apparent inconsistencies, he resorted to personal attacks which increased in frequency, as his client's

-20-

testimony become more and more unbelievable.

BY MS. TROIANI:

    Q.    Are you telling us that this woman has made up this story about you having sex with her?

MR. O'CONNOR:  Don't answer.  I object to the form of that question.  He doesn't recall the woman.  If that's his testimony, then he can't testify to what you asked.

        (9/29/05, 104)

There can be no justification for counsel actually answering the questions.

BY MS. TROIANI:

    Q.    So, you are saying then that you never encountered a woman, whether or not you remember what her name was, in Las Vegas that you had dinner with her, gave her a shot of alcohol and that you had sex with her after that?

MR. O'CONNOR:  That wasn't your earlier question that he said no to.  It was totally different.  Now you've rephrased it to a whole different situation.  So, in fairness to the witness, you can answer.  That's a totally different question.

      (9/29/05, 106)

The Defendant obediently followed his counsel's lead and responded by dissecting the two questions.

**7.    DEFENDANT'S REFERENCE TO PREVIOUS TESTIMONY**

The deposition began in the afternoon of September 28, 2005.

Defendant was questioned about a dinner party he had at his home. The dinner guests included Plaintiff and high level administrators from Swarthmore College and the University of Pennsylvania.  Defendant, at first stated that he did not want to reveal the names of the other dinner guests.  Upon further questioning, he stated that he did not know the names of the guests other than Plaintiff. The undersigned's tone of voice was incredulous and the following day Defendant appeared to imply that he did know the names and that I was correct that he deliberately withheld the names, and the following occurred:

THE WITNESS:

    A.    People come to my house what?

    Q.    People come to your house whose names you don't know. You told us yesterday that you didn't know the names of the people who were at the dinner.  So, people do come to your house that you don't know or remember at this point?

    A.    Yes.  I said that yesterday, but you know what I was doing yesterday.

    Q.    No, I don't.  What were you doing yesterday?

    A.    Never mind if you don't know.  I don't know this man. This man came to my house.  I don't know him.

    Q.    Are you suggesting that yesterday you were deliberately not telling us the names of the people at Swarthmore?

-22-

A.    I'm not suggesting anything.

MR. O'CONNOR:  That is so outrageous and inappropriate.  I'm
going to take a break.  I may call the judge on this.  I'm not
going to put up with this **crap**, okay?  I am tired of you
insulting this witness and his voracity (sic).  And if you
continue with it, I'm shutting it down.

MS. TROIANI:   I'm here to test his voracity(sic).

MR. O'CONNOR:  You better not challenge it in this fashion.

MS. TROIANI:   He just said I knew what he was doing yesterday.
And I asked him a follow-up question.

MR. O'CONNOR:  He answered your question about who attended
dinner parties and he identified what their position was and then
he couldn't recall their names.  And you're suggesting there's
some linkage here.

BY MS. TROIANI:

Q.    What did you mean by I knew what you were doing
yesterday?

MR. O'CONNOR:  Who was doing?  What you were doing?

MS. TROIANI:   You understand my question.  I'll have her read it
back.

(9/29/05, 116-118)

It was apparent that defense counsel was concerned as to
what his client was about to admit; however, that does not
justify his language, nor is it appropriate advocacy to attack

-23-

opposing counsel personally.

**8. COUNSEL'S MISSTATEMENTS OF EVIDENCE**

BY MS. TROIANI:

     Q.   So, this would have then occurred in the 1990s; is that correct?

     A.   I'm not sure about the year or the decade of the Turn of the Century engagements.

MR. O'CONNOR:  You know that's 21 years ago.  Why would you say that?  I don't get this.

MS. TROIANI:  Sir, please do not give clues to the client.

MR. O'CONNOR:  I have to read the statement, because as you well know that we put on the record –

MS. TROIANI:  I'm done.  You cannot interrupt the deposition.  Stop interrupting the deposition.

MR. O'CONNOR:  I apologize.  I'm sorry.

MS. TROIANI:  Thank you.

MR. O'CONNOR:  Should I go to my corner?

BY MS. TROIANI:

     Q.   Let's get back to Beth Ferrier.

MR. O'CONNOR:  Don't mislead this witness.  You know when she met him.

MS. TROIANI:  I am not misleading a witness.

MR. O'CONNOR:  You're deliberately misleading the witness on Beth Ferrier.  It's over 20 years ago.

-24-

BY MS. TROIANI:

     Q.   Did you not tell me that you knew Jo Farrell in the 1990s?

          (9/29/05, 121-122)

    Defense counsel heard Defendant claim to have meet Jo Farrell in the 1990's.  Beth Ferrier was introduced to Defendant by Jo Farrell.  Again, counsel's method of cluing the Defendant that he was being inconsistent was to attack opposing counsel and once again provide counsel's version of the events.

    Thereafter, Defendant was questioned about an newspaper article in which Beth Ferrier revealed her encounter with Defendant.

BY MS. TROIANI:

     Q.   So, you know that she's stating that you gave her drugs in order to have sex with her?

MR. O'CONNOR:  Point that out, please.  Give me a reference before we allow the question.

MS. TROIANI:  Here's your favorite coffee, something I made for you to relax you.

MR. O'CONNOR:  This is the quote she gave to the newspaper.

          (9/29/05, 126)

BY MS. TROIANI:

     Q.   Do you recall doing that?

     A.   And what happened?

Q.   Do you recall that?

A.   Excuse me.  I gave her drugs, you said, am I correct?

Q.   Yes.

A.   Okay.  Then you read, here's your favorite coffee.

Q.   That's because your counsel said he wanted it pointed out to him, not to you.

MR. O'CONNOR:  Because the report never said that.  Okay.  That's the fairness that's not going on here.

MS. TROIANI:  I'm reading from the newspaper article.

MR. O'CONNOR:  It doesn't say drugs, it says coffee, then she passed out.

MS. TROIANI:  It says, about 21 years ago after she ended a month long consensual affair with the entertainer, she said, he **drugged** her when she visited him before a performance in Denver. Is that not what it says, Mr. O'Connor?

MR. O'CONNOR:  Give me the reference.

THE WITNESS:  What paper is it?

MR. O'CONNOR:  Nicole Egan, the Daily News.  Which reference are we here so I can follow this?  She talks about coffee.

MS. TROIANI:  I'm looking at the fourth paragraph.  You have the article in your own folder.  I've given you another copy.

MR. O'CONNOR:  I have it now.

BY MS. TROIANI:

Q.   I'll read this to you.  About 21 years ago after

-26-

she ended a month long consensual  affair with the entertainer,
Beth Ferrier says he drugged her when she visited him before a
performance in Denver.   Do you agree with that?

     A.   No.

MR. O'CONNOR:  Read on.

BY MS. TROIANI:

     Q.   He said, here's your favorite coffee, something I made
to relax you.   Do you recall saying that?

     A.   No.

     Q.   She says she drank the coffee, became woozy and next
thing she knew several hours had passed and she had no memory of
what happened.   Did an incident like that ever occur with Beth
Ferrier?

           (9/29/05, 126-128)

    It is extremely doubtful that Mr. O'Connor had such
difficulty reading the newspaper article.   Further, this is
another illustration of the Defendant's strategy, that is,
attempt to divert attention from his misdeeds by constantly
accusing opposing counsel of imagined misconduct, in this case
claiming the question was unfair because the article did not say
that Defendant drugged Ms. Ferrier when in fact it did.   Lawyers
should address one another with appropriate decorum and not
disparage their profession with wild and unfounded accusations
against one another.   To advocate on a client's behalf is to

address the facts of the case, not to lodge unfounded accusations at opposing counsel.

**9.   DEFENDANT'S VIEW OF THE DAILY NEWS**

The Beth Ferrier article was read to Defendant and he was given the opportunity to admit or deny what Ms. Ferrier said. Instead, he attempted to digress from that line of questioning by claiming that the article was written so as to engender pity for Ms. Ferrier.  He was questioned as follows:

Q.   So, your objection is that they put it in the newspaper?

A.   No, my objection is that this is a newspaper piece as told to and it's her description of whatever it is at the end of something.

MR. O'CONNOR: He's denied under oath the bagel story.  That's the point.  He's already testified to that.

(9/29/05, 140)

In fact, that was not the point that his client was making. This time Mr. O'Connor was unsuccessful in re-focusing his client and the following ensued:

Q.   So, am I understanding that your point is that the press is manipulating public opinion with this story?

A.   Don't say that.  Say trying to, because when you leave it, it's sort of like this sorrow story of a woman, she left without saying good-bye.  The good-bye could have been when he

-28-

said you have to leave.

     Q.   So, the story is accurate, you're just objecting to
what?

 MR. O'CONNOR:  Object to the form.

MS. TROIANI:  I want to understand what you're saying.  You don't
have to testify to what he's saying.

BY MS. TROIANI:

     Q.   Can you answer that question?

MR. O'CONNOR:  No.  Wait.

MS. TROIANI:  You do not testify, Mr. O'Connor.  That's enough of
your testifying.

MR. O'CONNOR:  **Young lady.**

MS. TROIANI:  **Thank you, but  no.**

MR. O'CONNOR:  What occurred here is Mr. Cosby has already --

MS. TROIANI:  **Call me counselor or Ms. Troiani.**

MR. O'CONNOR:  Ms. Troiani, he testified already that he --

MS. TROIANI:  Oh --

MR. O'CONNOR:  Let me finish.

MS. TROIANI:  He's going to testify, you're going to tell him
what to say.  I will not let you finish.  Do you object to my
question?

MR. O'CONNOR:  Yes.

MS. TROIANI:  Fine.

                  (9/29/05, 141-143)

Again, in the context of a legal proceeding, it is improper for counsel to address one another except by terms which emphasizes their professionalism.  Certainly, "young lady" is not one of those terms.

On this occasion, the undersigned prevented Mr. O'Connor from testifying and obtained an answer to the question, but defense counsel simply seethed and reloaded:

Q.    What happened when you saw her in Denver?

A.    I guess we met.  I can only imagine that we met and had --

MR. O'CONNOR:  Don't guess.  If you have a recollection of what occurred, tell her.

THE WITNESS:  I don't recall.

BY MS. TROIANI:

Q.    You don't recall what happened?

A.    I don't.

Q.    She says what happened is that you gave her coffee, which she believed was drugged and that somehow she ended up in a car in a parking lot and that she believes that you had had sexual contact with her while she was unconscious?

MR. O'CONNOR:  That was already asked and answered.  You want him to go over it again?

MS. TROIANI:  He said he doesn't remember.

BY MS. TROIANI:

-30-

Q.     You don't remember that occurring?

MR. O'CONNOR:  Don't answer that question.  You've answered that question and we're not going to answer it again.  I'll stand on that.  You didn't like his first answer, now you're trying to get another.

BY MS. TROIANI:

Q.    Do you remember being in a car with her?

MR. O'CONNOR: He's already answered that.

MS. TROIANI:  No, he has not.

THE WITNESS:  No.

MR. O'CONNOR:  The record will reflect that you answered all those questions.

BY MS. TROIANI:

Q.    Do you know whether or not you had sexual contact with her at that time in Denver when she came to meet you in Denver?

A.    Probably.

(9/29/05, 144-146)

It is conceded that asking the same question repeatedly can become oppressive.  But to ask the same question twice, particularly in this case where the answers were often inconsistent, is simply an appropriate form of clarification.

**10.   DEFENSE COUNSEL'S ASSERTION OF ATTORNEY-CLIENT PRIVILEGE**

Defense counsel inappropriately asserted the attorney-client privilege in circumstances when it clearly did not apply.  After

-31-

lunch he reversed his position somewhat, but by then Plaintiff had incurred the expense of the court reporter and her attorney's time as Defendant wasted almost an hour by asserting a privilege when he knew it was improper to do so.

BY MS. TROIANI

     Q.    When was the first time that you knew that Beth Ferrier would give a statement to the press?

     A.    Maybe about eight, nine months ago.

     Q.    How did you know that?

     A.    I got a call about it.

     Q.    From whom?

     A.    I hope I'm accurate, counsel.

     Q.    You have four counsel sitting here.  Which counsel was it?

     A.    It was Marty Singer.

     Q.    What did he say to you in that call?

 MR. O'CONNOR:  Please don't answer that.  It's attorney-client privilege.  **You know it is.  It's absurd**.

THE WITNESS:  Would she do that?

          (9/29/05, 147-148)

     An attorney telling his client what a third party said is not privileged; however, even if defense counsel believed that he was correct, he should be prohibited from making remarks such as the one reproduced above.

BY MS. TROIANI:

    Q.   What was Mr. Singer representing you in when he called you?

MR. O'CONNOR:  Don't answer That.  It's an attorney-client privilege.

MS. TROIANI:  What he was representing him in?

MR. O'CONNOR:  Yes.

BY MS. TROIANI:

    Q.   How long has Mr. Singer represented you?

    A.   Certain cases.

    Q.   What was the case that was occurring at the time that he called and told you about the Beth Ferrier account?

***MR. O'CONNOR:  It's attorney-client privilege.

    Q.   What did you do as a result of phone call from Mr. Singer?

MR. O'CONNOR:  Don't get into that if it was pursuant to his advice.  It's attorney-client privilege, as you well know.  It's a very clever way of piercing it, but we're not going to allow him to divulge those confidences.  So move on.

MS. TROIANI:  I need a response from him.  You told him if it was as a result.

MR. O'CONNOR:  Your question was as a result.

MS. TROIANI:  What he did after that?

MR. O'CONNOR:  Yes.  He was acting pursuant to counsel

-33-

presumably.

BY MS. TROIANI:

    Q.   Were you acting pursuant to counsel's advice, Mr. Cosby, whatever you did?

MR. O'CONNOR:  Whatever you did without saying what it was.

THE WITNESS:   I don't even know what the question was.

BY MS. TROIANI:

    Q.   I asked you how did you find out about Beth Ferrier going public with her statement and you told me you got a call from Marty Singer?

    A.   Right.

    Q.   I asked you what you did after that phone call?

MR. O'CONNOR:  It was objected to.

MS. TROIANI:  Counsel is saying if you acted pursuant to his advice, then what you did he believes you cannot tell us.

THE WITNESS:  That is correct.

BY MS. TROIANI:

    Q.   Would you agree to waive your attorney-client privilege in this regard?

    A.   Can we go to lunch?

    Q.   I take that you will not?

    A.   I refuse to waive.

    Q.   After you received the phone call from Marty Singer, did you make any arrangements with the National Enquirer to give them

-34-

an interview?

MR. O'CONNOR:  Don't answer any question about whatever you and Mr. Singer discussed or what you did as a result of those discussions.

MS. TROIANI:  I didn't ask him that.  You may answer the question.

MR. O'CONNOR:  No, you may not.

MS. TROIANI:  Are you telling me that I cannot ask him about his Enquirer article, which is the subject of the defamation claim?

MR. O'CONNOR:  I didn't say that.  I said you cannot invade the attorney-client privilege.

MS. TROIANI:  No one is telling him to invade the attorney-client privilege.

MR. O'CONNOR:  Listen to your question.

MS. TROIANI:  Would you read back my question?

  (At this time, the court reporter read back from the record as requested.)

MR. O'CONNOR:  Don't answer the question as phrased.  It's clearly pursuant to advice.

MS. TROIANI:  It is not pursuant to his advice.

MR. O'CONNOR:  Rephrase your question because the way that question is phrased it would be, after you talked to him, what did you do.  We're not going to allow him to do that.

BY MS. TROIANI:

Q.  Did you know about Beth Ferrier's intention to give a story to the National Enquirer at any time in your entire life?

MR. O'CONNOR:  If you did not learn about it through your attorneys.  If you learned about it through another source, I will allow you to answer.

MS. TROIANI:  I disagree with that.

BY MS. TROIANI:

Q.  I need to know, did you learn from any source that Beth Ferrier was going to give a story to the National Enquirer?

MR. O'CONNOR:  You can only answer if you learned from a source other than your attorney.  We're not going to allow the attorney-client privilege to be pierced.

BY MS. TROIANI:

Q.  Can you answer that?

A.  No.

(9/29/05, 150-154)

Q.  Did someone negotiate your interview with the Enquirer?

MR. O'CONNOR:  Don't answer that question if it was an attorney. If it was not an attorney, you can answer the question.

Q.  You did have -- then my question was can you answer the question.  You do have a written contract with the Enquirer then?

A.  Yes.

BY MS. TROIANI:  Are you taking the position that that is also

-36-

privileged, Mr. O'Connor?

MR. O'CONNOR: Yes, just like Ms. Ferrier's contract was. I would consider exchanging her contract and her payment.

MS. TROIANI: I don't have anything from her.

MR. O'CONNOR: I'm not going to allow anything like that to get in. I allowed him to answer the question it was a contract. I'm not going to allow him to divulge the discussions he and his attorney had with the Enquirer in connection with the article.

BY MS. TROIANI:

Q. Was there anyone else present -- now your present attorney has just said that there were -- he will not allow you to reveal discussions that you and your attorney had with the Enquirer. Was there anyone else present when these discussions occurred?

A. No.

Q. Wasn't there a representative from the Enquirer present?

MR. O'CONNOR: Of course.

THE WITNESS: Not wait a minute. What did I just tell you?

BY MS. TROIANI:

Q. No, sir, you have to answer my question.

A. No, I just told you no. And then you said, now wait a minute, wasn't there.

Q. Did you ever negotiate with anyone from the

-37-

Enquirer about this article?

MR. O'CONNOR:  If you did so without an attorney.

MS. TROIANI:  If he did so with an attorney present and there's a

third party, there's no attorney-client privilege and you know

that.

MR. O'CONNOR:  That's a false statement of the law.

MS. TROIANI:  Okay.  If  that's your position, that's your

position.

MR. O'CONNOR:  It's an incorrect statement of the law.

BY MS. TROIANI:

Q.  Were you paid for the article that appeared in the

National Enquirer?

***MR. O'CONNOR:  If it's pursuant to negotiation you and your

attorney had, I'm not going to allow the him to answer.

BY MS. TROIANI:

Q.  Did you make any agreement with the Enquirer that if

they didn't print Beth Ferrier's story you would give them an

interview?

MR. O'CONNOR:  Don't answer the question if it was pursuant to

discussions between your attorney.

BY MS. TROIANI:

Q.  Are you not answering the sir?

MR. O'CONNOR:  He's instructed not to.

BY MS. TROIANI:

-38-

Q.  Had you at any point threatened to sue the National Enquirer?

A.  Yes.

Q.  Did you sue them?

A.  No.

Q.  What prompted you then to give this newspaper this story?

\*\*\*MR. O'CONNOR:  If it's pursuant to instructions from your attorney, do not answer.  You can phrase questions that would stop this objection.

BY MS. TROIANI:

Q.  Are you declining to answer?

A.  Yes.

Q.  Without revealing any discussions with your attorney, can you tell me what thoughts went through your mind that caused you to give this interview to the National Enquirer?

A.  No.

MR. O'CONNOR:  If --

MS. TROIANI:  You cannot --

MR. O'CONNOR:  I have a right to object.

MS. TROIANI:  He said he couldn't tell me.

MR. O'CONNOR:  That's  Let's break for lunch.

(9/29/05, 154-161)

Following the lunch break, some of the objections to the line of

-39-

questioning were withdrawn and defendant reversed his earlier position in which he reneged on the agreement to finish his deposition at another date, if we did not conclude on September 29.   However, Plaintiff and her counsel wasted over an hour, while Defense Counsel interposed objections that were so clearly specious that Defendant had to reverse his position.   Plaintiff should not be prejudiced by this behavior and Defendant should be required to reimburse her for the expenses incurred during this exercise.

After the lunch break, Defendant admitted that he agreed to give an exclusive interview to the National Enquirer in exchange for their agreement to not print the Beth Ferrier story.  He was then questioned as to his knowledge of the Beth Ferrier story, as follows:

Q.   Has someone read the story to you, the National Enquirer story?

A.   Yes.

Q.   And how recently was that?

A.   That was with counsel.  Is this the National Enquirer story?

Q.   Yes.

A.   That they never printed?

MR. O'CONNOR:  No, this is my story.

THE WITNESS:  I don't know what she's talking about then.  I

-40-

thought she was talking about Beth Ferrier's story in the

National.   What was the question asked?

    (9/29/05, 166-168)

In fact, the questioning concerned the Beth Ferrier story but

Defense Dounsel interjected "my story," which was the title of

the article that defendant gave to the Enquirer.

BY MS. TROIANI:

    Q.    I'll clarify that.   That's fair.   Did someone read to

you Beth's story that she had given to the National Enquirer?

    A.    Yes.

    Q.    When was that?

    A.    That was before it was supposed to come out.

    Q.    Did she say anything in that story different than

the one that we reviewed this morning?

    A.    I think that I will not say anything because it was

read to me by my counsel.

MR. O'CONNOR:  I was just advised, and I want to put this on the

record, by Mr. Schmitt that his understanding of that article

came through an attorney-client relationship with his counsel.

MS. TROIANI:  Marty Singer?

MR. O'CONNOR:  I think a different lawyer.

MS. TROIANI:   Who is the lawyer?

MR. O'CONNOR:  I think it might be Mr. Schmitt, so let's not try

to go there.        (9/29/05, 169-170)

-41-

Defendant testified that he was given the Beth Ferrier story, which was pending publication in the Enquirer for his review.  It was his reading this story which prompted him to make the deal with the Enquirer to print his story, instead.  It is that story which is the subject of the defamation claim. Incredibly, Defendant asserted the attorney client privilege as to questions about the Beth Ferrier story because it was read to him by his lawyer.  Not only is the privilege not applicable because the Beth Ferrier story is not a confidential communication, it is also not applicable because the privilege cannot be asserted when the attorney is participating in the tort.  *Rhone-Poulenc Rorer, Inc. V. Home Indemnity, Co.,* 32 F.3d 851 (3d. Cir. 1994)

The assertions of privilege to the circumstances surrounding Defendant's National Enquirer story are particularly egregious. At the hearing before this Honorable Court on September 27, 2005, Plaintiff's Interrogatory 21 was addressed.  The interrogatory reads:

> Describe all communications by you with the Enquirer relating to Plaintiff's allegations, including why and when you gave an exclusive interview on February 21, 2005, and any conversations or communications preceding same. Attach a copy of any communications or agreement reduced to writing regarding the exclusive interview.

The Court, in assisting counsel to reach an agreement, determined that this was an appropriate area for inquiry, especially in view of the fact that Plaintiff believed that Defendant had "traded

-42-

up." That is, he used his celebrity status to induce the Enquirer to print the defamatory article rather than the one which by his own admission, lends credibility to Plaintiff's allegations.

## 11. QUESTIONS CONCERNING DEFENDANT'S STORY

The National Enquirer article of Defendant's story was read to Defendant and he was then questioned as to whether or not he had actually made the statements in the article. It was the intention of Plaintiff's counsel to asked Defendant to explain each statement. The article is one of the basis of Plaintiff's defamation claim.

BY MS. TROIANI:

Q. Did you say that the charge can influence the view that family and friends have of him, meaning you, as a good person and a person to be trusted? I'm setting up your quote. It does say the charge can influence --

MR. O'CONNOR: Dolores, with all due respect, it starts, no man wants to see his family.

MS. TROIANI: I'll get there.

BY MS. TROIANI:

Q. Did you tell them, because some of the things you said are in quotes, and some of it is just the story.

MR. O'CONNOR: This is in quotes, too, Cosby declared no man.

MS. TROIANI: It's also in quotes, the charge can --

-43-

MR. O'CONNOR: I want it in context. That's all I'm saying. His quote starts with no one wants to see his family put in the position of having these kinds of allegations come out and for your loved ones to suffer emotional stress, then it goes on.

MS. TROIANI: That's fine. I didn't really care about that quote. I'll ask you about every quote that's in here.

THE WITNESS: Please don't do that. Go ahead. I'm sorry.

MR. O'CONNOR: We're going to stipulate to what's quoted I believe as coming from his mouth; isn't that correct?

MR. SCHMITT: Yes.

MR. O'CONNOR: We'll stipulate that whatever is in quotation marks from Mr. Cosby he said.

MS. TROIANI: That's fine. It doesn't mean I still can't ask him the question.

MR. O'CONNOR: I know that. I was trying to save some time.

(9/29/05, 171-173)

Following this exchange, Defendant promptly denied making one of the statements which was in quotes:

BY MS. TROIANI:

Q. Following what I just read to you, it says, a published report states that the woman's mother called Cosby before her daughter went to the police and the comedian was under the impression she was after hush money. And that is also in quotes.

A. But that's not me, I didn't say that.

-44-

Q.   It says the comedian, quote, was under the impression she was after hush money, end quote.

MR. O'CONNOR:  That's not a correct statement.

MS. TROIANI:  A published report states that the woman's mother called Cosby before her daughter went to the police and the comedian, quote, was under the impression, end quote, she was after hush money.

MR. O'CONNOR:  But the she was after hush money is not in quotes, it's referring not to this article, but another report.  If you have that report, let's look at it.

BY MS. TROIANI:

Q.   Did you say that?

(9/29/05, 183)

Again, Mr. O'Connor interjected himself into the questioning so that it was impossible to obtain an answer to the question being posed.

The next frivolous objection interposed by counsel was that Defendant could not be questioned about what he meant in the defamatory article, as follows:

Q.   Were you saying in this statement that Andrea was trying to exploit you because of your celebrity status?

MR. O'CONNOR:  No.  I'm going to object to the form.  Because the statement speaks for itself.  It clearly excludes Andrea.

MS. TROIANI:  I am absolutely entitled to ask him.

-45-

(9/29/05, 181)

Again, counsel provided a "clue" when he stated that the statement excluded Plaintiff.

      Q.   So, you did not believe that Andrea or her mother wanted money from you at the time they made the phone calls to you?

      A.   No.

      Q.   Then why did you offer them money?

MR. O'CONNOR:  I object to  the form of that question.  I don't believe there's anything in the record.  If you have something, give it to him.

(9/29/05, 187)

There is no requirement that the deponent be given a document during questioning (Federal Rule of Evidence 613) and counsel's demand for such was clearly improper.


**12.   QUESTIONS ABOUT DEFENDANT'S STATEMENT TO THE POLICE**

Thereafter, defendant was questioned about his statement to the police.  During the questioning his counsel was permitted to read the statement to him, (9/29/05, 191).  As plaintiff's counsel attempted to question defendant about the statement, his counsel repeatedly interrupted, in an overt attempt to influence defendant's answers which were inconsistent with the statement he had previously given to the police.  The following occurred:

-46-

Q.   Did that lead you to believe that Andrea or her mother would use the information to either extort money from you or embarrass you?

MR. O'CONNOR:  Object to the form of the question.  There's never been any time that he used the word extort, which is a crime.

MS. TROIANI:  You can answer.

THE WITNESS:  No.

BY MS. TROIANI:

Q.   I'll refer to page 12 of the police statement that you gave, the fifth question down.  At any time because of who you are, did you feel that there was the potential that either Andrea or her mother was going to use this information to either embarrass you or extort you?  Did you have any of these concerns?  And you answered, yes. Do you recall telling the police yes?

A.   Yes.

Q.   So, why is your answer different today?

MR. O'CONNOR:  It's not.  I object to the form of the question. It's either embarrass or extort.

MS. TROIANI:  That's exactly what I said.

MR. O'CONNOR:  Which is it, embarrass or extort?

MS. TROIANI:  You can answer now that your counsel gave you a clue.

(9/29/05, 193-195)

Not only was defense counsel blatantly telling Defendant the

-47-

answer, he was telling him the wrong answer because in fact his
statement did include an allegation that Plaintiff was trying to
extort money from him.

**13.  QUESTIONS ABOUT THE OFFER OF A TRUST TO PLAINTIFF**

Defendant testified that even though both Plaintiff and her
mother told him that all they wanted was an apology, he called
Plaintiff's home and spoke to her mother to offer money for
Plaintiff's "education."  The following occurred during
questioning about that event:

Q.    So, are you saying that Andrea would have to prove to
you that she got a 3.0 average wherever she went in order for you
to pay for her education?

A.    She would have to prove to me that while she was at
said university that she was maintaining a  3.0.

Q.    But you didn't require that of T------, did you?

A.    T-----, yes.  How can you say, but you weren't?  Do you
know the deal with T----?

Q.    You told us earlier.

A.    What did I say it was?

Q.    You said that you didn't require her to prove to you
that she got the As.

MR. O'CONNOR:  That wasn't the deal.

MS. TROIANI:  I'm not talking about the deal.

                (9/29/05, 199-200)

-48-

Again, counsel overtly clued in his client as to how counsel wanted his client to answer the question. Defense counsel is not stating an objection, he's merely asserting his opinion as to how the question should be answered. There can not be any justification for this behavior.

**14. QUESTIONS ABOUT WHAT DEFENDANT TOLD THE ENQUIRER.**

BY MS. TROIANI:

Q.   Did you ever tell the National Enquirer that the only thing that Andrea's mother had asked for in that conversation was an apology?

A.   I didn't mean the only thing she asked for. I was coming off of what she said. That's all I wanted, Bill. That's all I wanted.

Q.   So, are you saying, no, you did not tell them that all she asked for was an apology?

A.   I'm trying to get you to understand what I was saying. The answer is yes, because when I said, I apologize. Her mother said -- I said, I apologize. She said, okay, Bill, that's all I wanted.

Q.   Now we're a little confused on this record. Are you telling me that, yes, you did tell the National Enquirer --

A.   I don't know what is there. Read the thing.

Q.   Mr. Cosby, you have to wait for me to finish asking the question. We have to make sure we're on the same page. Because I

-49-

asked you a question and you answered yes.  And I'm not  sure I

know what you answered yes to.  I need to go back and clarify

this. Did you tell the National Enquirer that all that Andrea's

mother had asked for in your conversation was an apology?

 MR. O'CONNOR:  Let me break this down in fairness.

 MS. TROIANI:  I will object to that because you're now coaching

the witness.  The Hall Case, Rule 30, you are not permitted to do

this.

THE WITNESS:  I can't read this.  I would be able to look at

this, wouldn't I?

 BY MS. TROIANI:

     Q.   I will assert to you, and I will read this whole

article to you if you want, that nowhere in this article does it

appear that you said to the National Enquirer that all the mother

asked for was an apology, but that's not my question.

     A.   What is your question?

     Q.   My question is, did you tell the person who wrote

this article or a representative of the National Enquirer that

all Andrea's mother asked for was an apology?

 MR. O'CONNOR:  I'm going to object to the form of the question

because Mr. Cosby has explained that even though the mother

accepted his apology, he read between the lines.

MS. TROIANI:  This is totally unacceptable, sir.  You have to

stop coaching the witness.

-50-

MR. O'CONNOR:  I'll go to my corner later.  It's an unfair question.  I'm instructing him not to answer.  Please rephrase it.

BY MS. TROIANI:

    Q.    Are there things that you told the National Enquirer that did not get into this story?

    A.    I couldn't tell you.  I really could not in honesty.  I don't know.

    Q.    Do you know if you told the National Enquirer that when you spoke to Mrs. Constand all she asked for was an apology?

MR. O'CONNOR:  I object to the form of that question.  She said many other things to you other than that.  And in the context of that question, that's all she asked for.

THE WITNESS:  May I?

MS. TROIANI:  Certainly.

THE WITNESS:  A writer --

MS. TROIANI:  I need you to answer my question.

THE WITNESS:  I'm answering your question.  A writer --

BY MS. TROIANI:

    Q.    May I make a suggestion to you?

    A.    Yes.

    Q.    You can answer my question yes or no and then you can explain it for the rest of the day.

MR. O'CONNOR:  You can answer your question any way you'd like,

Mr. Cosby.  That's not a yes or no question, it's an unfair

question because it mischaracterizes what the conversation was

between them.  If you want to answer that question given that --

MS. TROIANI:  If you want to adopt what your attorney just said -

MR. O'CONNOR:  If you want to adopt what I said, you can.

BY MS. TROIANI:

    Q.   Can you answer my question?

    A.   The answer is no, I did not tell the writer that that

was the only thing.  I explained to the writer what Andrea's

mother said, which means that a writer can go off and do anything

he wants to do after that.

    Q.   What did you tell the writer that Andrea's mother had

said?

MR. O'CONNOR:  If anything.

MS. TROIANI:  He just said he told her.

THE WITNESS:  Andrea's mother said that's all I wanted, Bill.

Twice.

BY MS. TROIANI:

    Q.   And you told that to the National Enquirer?

    A.   Yes.

    Q.   You told the National Enquirer?

    A.   How many times -- do you have something where I'm

lying or some proof or something?  Because I can't answer it any

other way.  That's what I said to the fellow sitting in the

-52-

suite.

Q.   I want to make sure because you're talking about you told the National Enquirer that the mother only asked you to give her an apology.

Mr. O'CONNOR:  I've objected to the form of the question.

THE WITNESS:  Look, once again, you've got to understand what I say and what a writer puts --

MS. TROIANI:  I understand that fully.

THE WITNESS:  If it's not  here, if it isn't here, then I believe that it's null and void.  If it isn't here, if it isn't in some newspaper or somewhere, help me where you're having a problem with the writer saying that I told him something or somebody said I told them something when it isn't in print.  I think I have the right to say something to someone and then they write down, I say, give me a head of lettuce and the guy says, two tuna fish sandwiches.  That's not what I said.  I know what Andrea's mother said to me.  And I have no problem saying at least, Bill, that's all I wanted to hear.

MR. O'CONNOR: There's confusion.

MS. TROIANI:  This is very confused.

MR. SCHMITT:  Can we stop for a second.  Can we go off the record for a second.  (At this time, a discussion was held off the record.)

MS. TROIANI:  We have agreed based upon representations of

-53-

counsel, it is agreed that Mr. Cosby did not tell the National Enquirer that all Andrea or her mother asked for was an apology. Is that agreed, Mr. O'Connor?

MR. O'CONNOR:  Yes.  And the record will stand that my recollection is that Mr. Cosby told you under oath that he did not recall what he told the National Enquirer anyway, except for what was printed and in quotes.  That's my recollection of the record. With that caveat, I agree to that stipulation.  The record will say what it says.

MS. TROIANI:  The record will say what it says.  Let's get moving here.

> (9/29/05, 224-232)

Apparently, Mr. Schmitt was present during the discussions with the National Enquirer and he properly requested a recess to alert opposing counsel, and so that he could remonstrate upon hearing his client testify to what did not occur.  Mr. O'Connor, on the other hand, sought to alert Defendant that he should now change his testimony to a lack of memory of what he told the National Enquirer.

## 15.  TERMINATION OF THE DEPOSITION

Defendant was questioned about his recollection of the night that he gave the drugs to Plaintiff.  For the first time, he recounted that he broke one pill in half and gave Plaintiff three halves.  This story was inconsistent with his prior statement.

Defense Counsel interfered in the questioning, as follows:

 BY MS. TROIANI:

     Q.   So, you broke one pill in half.  Where are the three?
If you have one half and one whole one, that's two.  Are you
saying you broke the whole one so you had three halves?

     A.   Yes.

     Q.   Why would you break the whole pill in half and give
her both halves?

     A.   Because they're long.

MR. O'CONNOR:  Let me read what he said.

MS. TROIANI:  Please do not. I'm not discussing that statement.
I'm talking to him about the incident.

MR. O'CONNOR:  I'm not going allow you.  This is the statement he
gave.

MS. TROIANI:  You may not do this.

MR. O'CONNOR: Of course I can.

MS. TROIANI:  You may not.

MS. KIVITZ:   We're going to have to call the judge.

MR. O'CONNOR: Call the judge.

MS. TROIANI:  If his statement today is inconsistent --

MR. O'CONNOR:  This is unfair because he can't read his
statement.

MS. TROIANI:  If his statement is inconsistent to the police,
like you asked our client --

-55-

MR. O'CONNOR: She was reading it.

MS. TROIANI:  She was not reading it.

MR. O'CONNOR:  Incorrect. It's an unfair examination.  He's entitled to know what he said to the police.  I'm not going to allow this travesty to occur.

MS. TROIANI:  That's why he should have been prepped for more than three hours, if we believe he was prepped for three hours.

MR. O'CONNOR: Are you challenging something here?

MS. TROIANI:  Yes, I am.  I am asking him and I don't want you to interrupt him at this moment.

MR. O'CONNOR: I am asking him if he wants his statement read. He is entitled to it.

MS. TROIANI:  He is not. This is cross-examination.

MR. O'CONNOR:  When I cross-examined your client on the statement, the statement was in front of her.

MS. TROIANI:  I'm not cross-examining him on the statement.

MR. O'CONNOR:  Of course you are.

MS. TROIANI:  I am not.  I'm asking him his recollection of what occurred.

MR. O'CONNOR:  Do you wish to read your statement before you give the answers?

MS. TROIANI:  And I object to your asking him to do that and I will seek sanctions against you.  That is a Rule 30 violation and you know it.

-56-

MR. O'CONNOR:  You have no clue what a Rule 30 violation is.  Do you wish to read your statement again before you answer these questions or not?  If you don't and want to answer them on your own --

THE WITNESS:  Yes, I would like it read to me.

MS. TROIANI:  We object.

MR. O'CONNOR:  Let's call the court.  Get him on the phone. Because he has every right to read his statement.

MS. TROIANI:  He does not, not in the middle of my cross-examination.

MR. O'CONNOR:  It's not cross-examination.

MS. TROIANI:  It certainly is.  It absolutely is.

MR. O'CONNOR:  This is unfair for the witness not to read his statement.  Call the judge, otherwise we're not going to continue.

MS. TROIANI:  Then let's not continue.

MR. O'CONNOR: Why won't you let him read his statement?

MS. TROIANI:  I have never in 31 years allowed a witness to read to me from his statement.  If I want to read his statement, I'll read it. I want to know what he remembers.

MR. O'CONNOR: I allowed  your client to do it.

MS. KIVITZ:   Not true.

MS. TROIANI:  If he's telling the truth, he won't have an issue.

MR. O'CONNOR: Every time I questioned your client she had the

interview in front of her.

MS. KIVITZ:   She was not reading her statement.

MR. O'CONNOR:   The record will reflect that.

(9/29/05, 233-239)

After a failed attempt to speak with the emergency judge, defense counsel improperly terminated the deposition.

**SUMMARY**

Plaintiff urges this Honorable Court to adopt the guidelines set forth in *Hall v. Clifton Precision, 150 F.R.D. 525 (E.D. Pa. 1993)*. As the Court is aware from reading the Defendant's deposition and Plaintiff's Motion to Compel, the above examples of misconduct on the part of Defense Counsel are not all inclusive. If one had the ability to count the words, it would not be surprising to find that Mr. O'Connor spoke more than Mr. Cosby. Federal Rule of Civil Procedure Rule 30(d)provides, in relevant part, that:

> Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion [to protect the deponent or party from annoyance, embarrassment, or oppression].[2]

---

[2] Defendant can hardly claim that the objections sought to protect him from embarrassment. He frequently joked, made comedic faces, and gestured wildly while illustrating how he pats the "butts" of high school students at the Penn Relays. By way of illustration, when asked if employees were required to sign a confidentiality agreement, defendant replied that they had a choice but if they didn't sign..."We kill them..." (Tr. 9/28/05,

-58-

Defense counsel openly and repeatedly violated this rule and as noted above stated to the questioner, "You have no clue what a Rule 30 violation is." (9/29/05, 238).  In fact, it is Defense Counsel who appears to have no familiarity with Rule 30.  It is incumbent upon counsel to be familiar with the Federal Rules and to abide by them. *Getex v. Ohio Casualty Ins. Co.*, 1994 U.S. Dist. Lexis 501, (E.D. Pa. 1944).

It may be that counsel believed that *Hall, supra*, was inapplicable because Rule 30 was amended after the decision; however, the amendment embodies the spirit of *Hall,* and the comment to the rule states that the purpose of the 1993 amendment was to avoid exactly what occurred in this case, "Depositions frequently have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond." In that objections to relevancy; competency and materiality are not waived if not made

---

24) and at one pointed admitted:

THE WITNESS: I'm not making fun of you.

MS. TROIANI: I don't think you're making fun of me.  I think you'r making light of a very serious situation.

THE WITNESS: That may very well be.

MS. TROIANI: It is, sir.

(9/28/05, 104-105)

at the deposition,(Federal Rule of Civil Procedure 32(d)(3)(a)),

counsel's persistence in making these objections could only serve

the purpose of disrupting the deposition, which in fact they did.

Hall has been favorably cited by numerous courts throughout

the country, including this Honorable Court, *Bey v. Pennsylvania

Department of Corrections*, 98 F. Supp. 2d 650, (E.D. Pa. 2000) at

footnote 29.  Although the *Hall* guidelines have not been

considered by the Third Circuit, the guidelines have been applied

to various cases in the Third Circuit, *O'Brien v. Amtrak*, 163

F.R.D. 232, 236 (E.D. Pa. 1995); *Applied Telematics, Inc. v.

Sprint*, 1995 U.S. Dist. Lexis 2192, (E.D. Pa. 1995); *Frazier v.

SEPTA*, 161 F.R.D. 309 (E.D. Pa. 1995); *Lauria v. Amtrak*, 1999

U.S. Dist. Lexis 7562, (E.D. Pa. 1999); *Christy v. Pennsylvania

Turnpike Comm'n*, 160 F.R.D. 51 (E.D. Pa. 1995); *Johnson v. Wayne

Manor Apts.*, 152 F.R.D. 56 (E.D. Pa. 1993).

Counsel's conduct in this matter is strikingly similar to

that detailed in *O'Brien v. Amtrak*, 163 FRD 232 (E.D. Pa. 1995).

In that case, the court imposed the Hall guidelines because of

defense counsel's behavior which included numerous speaking

objections, consultations with witnesses during recesses and

while questions were pending, which allegedly resulted in changes

in testimony, as well as improper instructions not to answer

certain questions, interruptions of Plaintiff's questioning,

Defense Counsel's practice of interjecting his own questions to

-60-

the witnesses and other similar behavior.

In addition to the imposition of the Hall guidelines, Plaintiff herein requests that the Court sanction Defendant by requiring him to 1) to submit to the remainder of the deposition in which inquiry will be made into those areas which were not reached; 2) pay the costs of the deposition and reasonable counsel fees incurred at the time of the deposition and in the preparation of this Motion and Memorandum of Law; and 3) permit the re-examination of defendant in the areas which were obstructed by counsel.

In *Lauria v. Amtrak*, 1999 U.S. Dist. Lexis 7562, (E.D. Pa. 1999), the Court denied a Motion for Protective Order to prevent a third deposition of Plaintiff, allowing the third deposition to proceed because of counsel's obstructive and improper behavior in the second deposition.  It is respectfully submitted that requiring Defendant to be deposed without restrictions as to whether or not he answered the same question in the first deposition is also appropriate in this case.   The interference of counsel was so pervasive that fairness dictates that Plaintiff be given the opportunity to re-depose Defendant at his expense.

It is further requested that this Honorable Court establish a deadline for the date of the continuation of Defendant's deposition and that three (3) days be set aside for that deposition.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to grant the Motion for Sanction and for the imposition of the *Hall* guidelines to depositions.

Respectfully submitted,

TROIANI/KIVITZ, LLP

BY:   DOLORES M. TROIANI
      Attorney I.D. 21283
      BEBE H. KIVITZ
      Attorney I.D. 30253

-62-

## CERTIFICATE OF SERVICE

I hereby certify that on <u>November 21, 2005</u>, the undersigned were served in the following

manner, a true and correct copy of : **Plaintiff's Motion for Sanctions Concerning Conduct of**

**Defendant at Deposition and Memorandum of Law.**

**NAME**                    **MANNER**

The Honorable Eduardo C. Robreno          Via Hand Delivered by Courier
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA  19106

Office of the Clerk of Court               Via Hand Delivered by Courier
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

Patrick J. O'Connor, Esquire               Via Hand Delivered by Courier
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Andrew D. Schau, Esquire                   Via First Class Mail
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY  10036

TROIANI/KIVITZ, L.L.P.

By: _____
Dolores M. Troiani
Attorney I.D. No. 21283
Attorney for Plaintiff

Date: 11/21/05