

# TROIANI/KIVITZ, L.L.P.

—————————————— ATTORNEYS AT LAW ——————————————

DOLORES M. TROIANI, ESQUIRE
BEBE H. KIVITZ, ESQUIRE

38 NORTH WATERLOO ROAD
DEVON, PA 19333

(610) 688-8400
FAX (610) 688-8426

January 4, 2006

**(Hand-Delivered)**

Office of the Clerk of Court
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

**RE:**   **Andrea Constand vs. William H. Cosby, Civil Action No. 05-CV-1099**
**Plaintiff's Motion For Leave To File Reply Memorandum Of Law In Response To**
**Defendant's Memo In Opposition to Plaintiff's Motion to Compel the National**
**Enquirer's Compliance With Subpoena For Documents**

Dear Sir/Dear Madam:

Enclosed for filing in the above-captioned matter, please find an original and a disk.

Thank you for your anticipated cooperation.

Respectfully submitted,

Dolores M. Troiani

DMT:m
Enclosure
cc:   Patrick J. O'Connor, Esquire  (w/enclosure-first class mail)
Andrew D. Schau, Esquire w/enclosure -first class mail)
Andrea Constand (w/enclosure - first class mail)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREA CONSTAND, | : CIVIL ACTION |
| Plaintiff | : |
| v. | : NUMBER 05-1099 |
| | : |
| WILLIAM H. COSBY, JR., | : FILED UNDER SEAL |
| Defendant | : |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE
REPLY MEMORANDUM OF LAW IN RESPONSE TO
DEFENDANT'S MEMO IN OPPOSITION TO PLAINTIFF'S
MOTION TO COMPEL THE NATIONAL ENQUIRER'S
COMPLIANCE WITH SUBPOENA FOR DOCUMENTS**

Plaintiff Andrea Constand respectfully moves for leave to file the attached

Memorandum of Law in response to Defendant's Memorandum in Opposition to Plaintiff's

Motion to Compel The National Enquirer's Compliance with a Subpoena. A reply is necessary

to correct Defendant's misstatement of facts and to respond to legal arguments which have been

asserted by Defendant for the first time in their response.

Respectfully submitted,

TROIANI/KIVITZ, L.L.P.

By: _____

Dolores M. Troiani, Esquire
I.D. No. 21283
Bebe H. Kivitz, Esquire
I.D. No. 30253
38 North Waterloo Road
Devon, Pennsylvania 19333
(610) 688.8400

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREA CONSTAND, | : CIVIL ACTION |
| Plaintiff | : |
| v. | : NUMBER 05-1099 |
| | : |
| WILLIAM H. COSBY, JR., | : FILED UNDER SEAL |
| Defendant | : |

### PLAINTIFF'S REPLY MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MEMO IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL THE NATIONAL ENQUIRER'S COMPLIANCE WITH SUBPOENA FOR DOCUMENTS

Plaintiff Andrea Constand submits this Memorandum of Law in response to Defendant's

Memorandum in Opposition to Plaintiff's Motion to Compel The National Enquirer's

Compliance with a Subpoena.

### I. PLAINTIFF HAS NOT MISCHARACTERIZED HER CLAIM OR THE RECORD

Defendant asserts that the Plaintiff's Motion to Compel the National Enquirer's

Compliance with a Subpoena issued to it by Plaintiff should not be granted because she has

"mischaracterized (sic) her claim and the record." Defendant claims that he does not dispute that

he made the statements in question, and that he had the opportunity to review the article,

(Exhibit A), before it was printed and published.   He then argues that Plaintiff does not need

any additional discovery because the article is not defamatory as it does not apply to Plaintiff,

(Def. Memo, pg. 2). This "defense" is precisely why the documents are critical to Plaintiff's

ability to prove her claim. It is believed that the documents will demonstrate that Defendant was

in fact directing his comments to Plaintiff and that he wanted the public to believe that Plaintiff

1

was attempting to extort him.[1]

The article in question was titled "My Story." It was touted as the first time Defendant spoke out since Plaintiff's allegations became known. The article made clear that it concerned Defendant's response to Plaintiff's claims. It states: "Reacting to the prospect of a civil action from the young Canadian woman, furious Cosby vowed to The ENQUIRER that he would stand his ground against anyone who tried to "exploit" him because he is a celebrity." It is black letter law that a plaintiff does not need to be identified by name in order to be defamed. *Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 182 A.2d 751 (Pa. 1962). As a corollary to that proposition, a defendant cannot escape a libel by the juxtaposition of Plaintiff's name next to statement that he has been the victim of an extortion in the past but he's not going to speculate about Plaintiff's motivation. This is defamation by innuendo, made even more transparent by the statements of Defendant's agents on February 7 and 9, 2005, to Celebrity Justice, including that Plaintiff was engaged in a "classic shakedown." *Cosgrove, id.*

The National Enquirer documents are particularly relevant to the proof of defamation by innuendo because Defendant has admitted that he reviewed and presumably edited the article before it appeared. The subpoena is directed to those documents which will establish what changes, if any, Defendant made to the article prior to publication. Defendant's contract with the National Enquirer will reveal just how much editorial control Defendant exercised over the publication, and forestall any claim that he was not responsible for the version which was published. Defendant hinted at such a defense in his deposition when he claimed that although

---

[1]It should be noted that Defendant is asserting this argument, despite his unequivocal admission to the contrary. The fact that Defendant is willing to now retract his deposition testimony makes the discovery of the documents crucial to Plaintiff's case.

2

he told the National Enquirer writer about his conversations with Plaintiff and her mother, it was the writer's choice as to what was published. The documents that Defendant reviewed before giving the interview will be used to contradict Defendant's assertion that he did not intend for the statements Plaintiff alleges are defamatory to be applicable to her. Further, they will establish that Defendant gave the story to the Enquirer to prevent them from publishing Beth Ferrier's story because he believed that Beth Ferrier's story lent credibility to Plaintiff's accusations, that she was drugged and sexually assaulted by Defendant. Obviously, Defendant's intention in this regard is relevant to the intentional tort of defamation. If the purpose of the article was to discredit Plaintiff, then a reasonable fact finder can infer that Defendant is being disingenuous in his current statement that he was not commenting on Plaintiff's motives, and in fact he was intentionally defaming her by innuendo. Any documents evidencing revisions to the article by Defendant before publication will also demonstrate the extent of Defendant's control over the contents of the article.

In his memorandum of law, Defendant claims that he "vigorously denies" that he "killed" the Ferrier story because he believed that it would bolster Plaintiff's allegations against him. (Def. memo, p. 3) Defendant's position in this regard is inexplicable in light of the following excerpts from his deposition:

Q. What is your understanding of the agreement that you had with the National Enquirer concerning the story that appeared in the National Enquirer which was your exclusive interview termed my story?

A. I would give them an exclusive story, my words.

Q. What would they give you in return?

**A. They would not print the story of -- print Beth's story.**

(Cosby dep. 9/29/05, 161)

3

Q.     Did you ever think that if Beth Ferrier's story was printed in the National Enquirer,
       that that would make the public believe that maybe Andrea was also telling the
       truth?

A.     Exactly.

Q.     So that you knew when this article was printed, when you told the Enquirer this,
       that you had to make the public believe that Andrea was not telling the truth?

A.     Yes.

(Cosby dep. 9/29/05, 222)

    The fact, that in his brief, Defendant is willing to make assertions directly contradicted

by his own deposition testimony, emphasizes the need for the requested documents.   In

addition, Defendant's attorneys now claim that Defendant was unclear as to what he told the

National Enquirer. It is undisputed that in the conversation amongst Plaintiff, her mother and

Defendant in January, 2005, Defendant asked Plaintiff and her mother what they wanted. They

replied that all they wanted was an apology. Defendant called Plaintiff's mother after this

conversation, and **he** offered to pay for Plaintiff's "education." In his statement to law

enforcement on January 26, 2005, admitted that Plaintiff and her mother had only asked for an

apology.   Requesting only an apology is not the action of an extortionist or someone who wants

to "exploit" a celebrity.   Certainly, if the National Enquirer knew, as Cosby did, that Plaintiff

had not asked for money, then its publication of the article in question was malicious. *Tucker v.*

*Philadelphia Daily News, et. al.,* 577 Pa. 598, 848 A.2d 113 (Pa. 2004). At his deposition,

Defendant's testimony about whether or not he told the Enquirer that the only thing that Plaintiff

requested was an apology was unclear:

    A.  The answer is no, I did not tell the writer that that was the only thing.  I explained to
the writer what Andrea's mother said, which means that a writer can go off and do anything he
wants to do after that.

4

Q.  What did you tell the writer that Andrea's mother had said?

THE WITNESS: Andrea's mother said that's all I wanted, Bill.  Twice.

BY MS. TROIANI:

Q.  And you told that to the National Enquirer?

A.  Yes.

Q.  You told the National Enquirer?

A.  How many times -- do you have something where I'm lying or some proof or something?  Because I can't answer it any other way.  That's what I said to the fellow sitting in the suite.

Q.  I want to make sure because you're talking about you told the National Enquirer that the mother only asked you to give her an apology.

THE WITNESS: Look, once again, you've got to understand what I say and what a writer puts --

MS. TROIANI: I understand that fully.

THE WITNESS: If it's not  here, if it isn't here, then I believe that it's null and void.  If it isn't here, if it isn't in some newspaper or somewhere, help me where you're having a problem with the writer saying that I told him something or somebody said I told them something when it isn't in print.  I think I have the right to say something to someone and then they write down, I say, give me a head of lettuce and the guy says, two tuna fish sandwiches.  That's not what I said.  I know what Andrea's mother said to me.  And I have no problem saying at least, Bill, that's all I wanted to hear.

(9/29/05, 231-232)

Apparently, Mr. Schmitt, one of Defendant's four attorneys who attended the deposition, was present during the discussions with the National Enquirer and he properly requested a recess to alert opposing counsel, so that he could remonstrate upon hearing his client testify to what did not occur. The following stipulation was then entered into the record:

MS. TROIANI:

We have agreed based upon representations of counsel, it is agreed that Mr. Cosby did

5

not tell the National Enquirer that all Andrea or her mother asked for was an apology.

Is that agreed, Mr. O'Connor?

(9/29/05, 232)

The material sought by Plaintiff from the National Enquirer will clarify this issue, establish the extent of Defendant's editorial control on the publication, prove Plaintiff's defamation claim and the corollary, disprove defendant's defense to the defamation claim, (as that defense is now characterized in Defendant's memorandum), and provide support for Plaintiff's punitive damages claim in that it will reveal the malicious nature of Defendant's actions.

## II.  THE INFORMATION SOUGHT IS RELEVANT.

Defendant contends that the information sought in the subpoena is irrelevant. First, the standard is not relevance, but rather whether or not the information sought is likely to lead to relevant and admissible evidence. In his memorandum, Defendant states, "No reasonable trier of fact could conclude that Defendant's refusal to characterize Plaintiff's motives amounted to an accusation that she was attempting to extort him, or that he intended to make such an accusation." As indicated above, the materials sought are relevant to Plaintiff's claim and establish Defendant's intentions, which are clearly in issue.  Rather than reproduce the above, Plaintiff incorporates by reference her previous arguments.

Further, Defendant has waived this argument. In his attempt to conduct this litigation in secret so that the public will only be aware of the information, which he chooses to feed them, Defendant insists upon submitting letter requests to the Court. Plaintiff has objected to this procedure, asserting that it is prejudicial to her, in that Defendant is not required to fully brief issues or to clearly define them. This issue is a case in point.

6

On November 15, 2005, Defendant wrote to the Court asking for a limited protective order as to Defendant's agreement with the National Enquirer. In that letter, Defendant agreed to produce the contract but requested only that it be kept confidential. If Defendant were required to file a motion for protective order, then he waived any argument as to relevance by failing to raise it in his motion. Additionally, Defendant is attempting to benefit from his own misconduct. Defendant asserts that Plaintiff is aware of the terms of the agreement from Defendant's own testimony. In fact, the misconduct of Defendant's counsel prohibited Plaintiff from questioning Defendant about the agreement. Further, as is evident from the memorandum of law filed by Defendant, Plaintiff cannot rely upon either Defendant's deposition testimony or letters from counsel to the Court. Defendant has reversed both his assent to release the agreement, albeit with confidentiality, ( to which Plaintiff will not agree), and his clear and unequivocal testimony that 1) he gave his interview to the Enquirer in exchange for their agreement to not print the Ferrier article; 2) he knew if the Ferrier article were published it would make the public believe that Plaintiff were also telling the truth, and 3) his motivation in granting the interview was that he wanted the public to believe that Plaintiff was not being truthful in her allegations against him. Plaintiff has the right to question Defendant about this testimony and to use the documents to determine if that testimony is inconsistent with those documents.

## III.  DEFENDANT'S MOTION FOR PROTECTIVE ORDER SHOULD BE DENIED

Once again Defendant requests secrecy and, in addition, despite the above arguments, he asserts that he has agreed to release the National Enquirer agreement on the condition of confidentiality. He takes the absurd position that revealing the circumstances of his quest for world wide publicity is an invasion of his privacy. Compounding these irreconcilable positions,

7

is Defendant's insistence upon ascribing improper motives to Plaintiff for her articulation of the legal principles enunciated by the Pennsylvania Supreme Court that the most important function of a defamation action, is the **public** vindication of the defamed person, *Gaetano v. Sharon Herald,* 426 Pa. 1791, 231 A.2d 753 (Pa. 1967); *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (Pa. 1975); *Graham v. Today's Spirit,* 503 Pa. 52, 468 A.2d 454 (Pa.1983); *Sprague v. ABA, et al.,* 276 F. Supp 2d 365 (E.D.Pa. 2003), as well as his insistence that the article in question is not about Plaintiff.

What Defendant claims is private, is the deal he orchestrated to prevent the public from knowing that Plaintiff's claims were supported by similar claims of another woman that she too was drugged and sexually assaulted by Defendant. Defendant claims a privacy interest in this information but he doesn't explain what that interest is. He sought and obtained worldwide publicity.[2] When he did that, he proclaimed to the world that he did not have any interest in his own privacy.

Defendant's claims of embarrassment are disingenuous. His behavior on the first day of his deposition was jocular. He gestured wildly as he explained his patting the "butts" of high schoolers at the Penn Relays. He joked and made faces. More importantly, he has publicly joked about this case. On February 26, 2005, while performing in New Brunswick, New Jersey, Defendant asked a woman to come onto the stage. He then asked, "Before I get started, let me ask you: Did I put anything into your drink?" Just as he is denying that his National Enquirer article concerned Plaintiff, Defendant denied that the joke applied to Plaintiff. As indicated in the attached newspaper article about the incident, (Exhibit B), the audience perceived that

---

[2] The header on the article reads: "enquirer world exclusive."

8

Defendant was referencing the charges brought by Plaintiff. Regardless, this incident illustrates the relief which Defendant seeks. In reality, what he says to this Court is that he is the only one who can speak publicly about this case and when he does, he will be demeaning and dismissive of the claims of Plaintiff and the other women, and the public will never know the truth because he will use the court system to silence them.

Defendant asserts that his private life is not the subject of public scrutiny. Taking to the stage to joke about drugging women and giving an "exclusive interview" to the National Enquirer hardly support that assertion. Defendant's alleges that he has never commented about this case. Presumably, he makes this assertion because the article preceded the filing of the lawsuit. Defendant misperceives Plaintiff's claim. She is not asserting a defamation claim because "Defendant defamed her by questioning her veracity and motivation in filing this suit..." (Def. memo p. 8) Plaintiff's claim is that Defendant had spoken to Plaintiff and her mother and knew that they had not asked him for money or attempted to exploit or extort him. They had only asked for an apology. Defendant also knew that he had drugged and had sexual contact with Plaintiff while she was unconscious and that another woman had also made a similar claim and was prepared to reveal that claim, publicly. He deliberately and intentionally defamed Plaintiff by causing the public to believe that he was once again the victim of an extortion plot perpetrated by Plaintiff and similar to the one which resulted in the conviction and incarceration of a woman claiming to be his daughter. He wanted the public to believe that Plaintiff was just another criminal. The Celebrity Justice article, (Exhibit C), was ascribed to Defendant's agents; it unequivocally states that Plaintiff was attempting to " shakedown" Defendant.

In his memorandum, Defendant states, " Plaintiff only *alleges* that Defendant spoke about her to the media. Defendant denies that he ever did so, and the article proves him right."

9

(Def. memo, p. 8).   The National Enquirer article which is the subject of Plaintiff's defamation

claim reads, *inter alia*:

 "Because of the looming civil suit, Cosby stressed to the ENQUIRER that he could speak only
in broad terms **about the case.**" (Emphasis added)

"These allegations have caused my family great emotional stress."

"Reacting to the prospect of a civil action from the young Canadian woman, furious Cosby
vowed to The ENQUIRER that he would stand his ground against anyone who tried to "exploit"
him because he is a celebrity."

"Responding to the charge by the Canadian woman, Cosby declared...."

"Cosby told The ENQUIRER that when he heard police had launched an investigation, "My
heart sank. I was at home, and these claims hurt me.""

After the allegations surfaced, the accuser's family described Cosby as a friend and "mentor" to
the woman. But Cosby told The ENQUIRER that celebrities are often put in the positions where
their roles as mentors can lead to trouble. "Sometimes you try to help people and it backfires on
you and then they try to take advantage of you." he said. "People can soil you by taking
advantage."


Defendant acknowledges that pursuant to *Pansy v. Borough of Stroudsbourg*, 23 F.3d 772

(3d Cir. 1994), this Court must find that good cause exists in order to enter a protective order.

To grant Defendant's motion, the Court must accept Defendant's version of the facts which are

simply not true. The first "fact" is that Defendant has a privacy interest in that which he has

made public. The second is that despite his joking and public statements critical of Plaintiff, he is

now somehow embarrassed. He argues that the release of the National Enquirer agreement will

draw further attention to Ms. Ferrier's allegations. In other words, Defendant wants a protective

order for that which is already in the public domain, and further,  the Court is supposed to ignore

his role in placing it in the public domain. Defendant asserts that the information he seeks to

make confidential does not concern public health or safety issues. He argues that unlike a public

10

official the public does not have any interest in his integrity or lack thereof. In fact, the public does have such an interest. Defendant has used his celebrity status to place himself in the position where he can deceive woman into believing that they can trust him and that he is a mentor, when in fact, it is evident that their trust in him is misplaced.

Defendant contends that "private" matters related to his health, medical history, and business and financial practices should be protected from disclosure because of the embarrassment that would cause him if they were made public, an implicit acknowledgment of his public stature and the interest that his circumstances engender among the public. These kinds of matters are, of course, the subject of everyday litigation and hardly distinguish the Defendant's situation from that of any other civil litigant. The distinguishing factor, from Defendant's point of view, is that defendant is a celebrity. Yet, courts do not give celebrities special consideration and Defendant cites to none that do. *Willie Nelson Music Co. v. Commissioner of Internal Revenue*, 85 T.C. 914, 916 (1985) (motion for protective order denied despite assertions by singer/celebrity that criminal liability may subject him to embarrassment and emotional distress); *Condit v. Dunne*, 225 F.R.D. 113 (S.D. N.Y. 2004) (court refused to impose protective order on discovery where former Congressman sued television commentator about statements made about possible involvement in a woman's disappearance); *Flaherty v. Seroussi*, 209 F.R.D. 295, 300 (legitimate public interest to have access to court proceedings outweighed embarrassment that might be caused by release of video-taped deposition).

The real issue here is not Defendant's financial and health "secrets," it is the allegations of sexual misconduct and drugs. Following *Shingara v. Skiles*, 420 F.3d 301 (3d Cir. 2005) and *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994), a party seeking protection from potential embarrassment must show it to be "particularly serious" . *Shingara*, 420 F.3d at

11

307.   Other than to vaguely restate the facts contained in discovery, Defendant fails to specify

the serious harm that will occur from their disclosure.  This Court has already held that such

broad assertions do not rise to the level of the required specificity.  This Court, following *Pansy,*

*supra* and *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986), has held that

"[b]road allegations of harm, unsubstantiated by specific examples of articulated reasoning, do

not support a good cause showing." *Constand v. Cosby*, C.A. No. 05-1099, Order, July 6, 2005,

Document 37, filed 7/7/05 at n. 1 (E.D. Pa.) (Robreno, J.).  In earlier briefing in this case, on the

motion of the Jane Doe witnesses to protect their identities, the witnesses submitted to the Court

examples of how each would suffer harm by the disclosure of their relationships with the

Defendant.  *See* Motion of Jane Doe Witnesses to Protect Disclosure of Their Names Outside of

this Litigation and Supporting Memorandum of Law *Constand v. Cosby*, C.A. No. 05-1099,

Document 33, filed 6/13/05 (E.D. Pa.).  The witnesses asserted that disclosure would adversely

effect health and mental problems and conditions – bipolar disorder in one case; effect their

employment and careers; and cause humiliation and harassment by media attention.  These

assertions are not unlike those of the Defendant who alleges harm from the media and damage to

his career which "would quickly become the subject of scandal."  With regard to the Jane Doe

witnesses, this Court held that

> the allegations of harm by each of the Jane Doe witnesses are
> unsubstantiated broad allegations insufficient to establish good
> cause.  First, no affidavits have been provided by any of the Jane
> Does to support their counsels' description of the possible harm
> from disclosure.  Thus, the allegations are factually unsupported.
> Second, while disclosures may prove annoying and potentially
> embarrassing, these factors do not supply the requisite quantum to
> trump the public interest in access to court proceedings.

*Constand v. Cosby,* C.A. No. 05-1099, Order, July 6, 2005, n. 1 (E.D. Pa.) (Robreno, J.)  The

Defendant has provided far less support for his broad allegations of harm than did the Jane Does.

Defendant claims that his is not a "public figure" merely because he is a celebrity and

entertainer.  He neglects, however, to point out that he is much more than just a celebrity.  It is a

matter of public record that he is a community leader, serves on boards of major universities,

takes public stands on important issues, and is frequently interviewed by the press for his

opinions, not his jokes.  Albeit he is not an elected official, it is beyond dispute that he is a public

figure who generates intense and legitimate public scrutiny and interest.  As a result, his

expectation of privacy cannot be equivalent to that of a private citizen.  *Pansy,* 23 F.3d at 787

(privacy interests of a public person are diminished).  .

Defendant's expectation of privacy has been diminished by his own conduct.  His

contacts with *Celebrity Justice* and his exclusive contractual interview with the *National

Enquirer* were all attempts at using his public stature to persuade the public about his side of the

story.  It is not just the Plaintiff who has placed his conduct at issue.  Defendant, on his own

behalf, has reached out to the media about his "innocence" at the same time defaming his

accuser.  Now he wants the Court to protect him from publicity, which is not under his control.

This simply is not "good cause" for protecting his the subpoenaed documents from disclosure.

It is also import to recognize that the matter of concern to the Defendant, to the extent

that facts are not already the subject of public knowledge, will eventually be disclosed, a fact

that also diminishes his privacy interest.  In a case very close on point, *Koster v. Chase

Manhattan Bank,* 93 F.R.D. 471, 472 (D.C.N.Y. 1982). a former bank employee commenced an

action against Chase Manhattan Bank and a former vice-president alleging that while she and

former vice-president were employed by bank, he forced her to engage in a sexual relationship

13

with him, abused her, and interfered with her career.  The lawsuit generated a considerable

amount of publicity in newspapers, television, and radio.  The *Koster* court wrote that

"[a]ccording to the defendants, the widespread and, at times, somewhat sensationalized coverage

has resulted in injury to the reputations of Ross, the Bank and its employees." *Id.* at 472-73.  As

a consequence the defendants moved for a protective order to seal information obtained through

discovery.  The court performed a detailed "good cause" analysis, denied the defendant's

motion, and held the following about the his concerns of embarrassment:

> The relative importance to this lawsuit of information concerning
> any sexual relationship between Koster and Ross is another factor
> that leads us to deny the defendants' motion. Ordinarily, one's
> privacy interest in preventing the public disclosure of the details of
> a sexual relationship might be viewed as a reason for granting a
> protective order. In this instance, however, the information is not
> irrelevant matter that was revealed as a by-product of the liberal
> discovery rules. Rather, the facts underlying the plaintiff's
> allegations that Ross forced her to have sex for the purpose of
> "safeguarding her career" and that he abused her when she
> terminated the relationship must be proven if the plaintiff is to
> prevail on her cause of action. *In other words, this information is
> highly relevant to the issues in the lawsuit and will be revealed at
> a trial on the merits, assuming that there is one. Thus, the
> defendants' privacy interest in the information is significantly
> reduced by the likelihood that the information will eventually be
> disclosed. See Protective Orders, supra,* at 1663 ("If the
> information will be disclosed eventually in any case, there is no
> reason to prevent disclosure at the discovery stage." (footnote
> omitted)); cf. *Lucido v. Cravath, Swaine & Moore, supra,* 25
> F.R.Serv.2d at 1051 (protective order covered only that
> information that "would, or at a minimum, might not be admissible
> at trial"). *Id.* at 482 (emphasis added)

Similarly, the issues raised in the subpoenaed documents are at the heart of Plaintiff's claims.

As a practical matter, placing the documents under seal now will not protect the Defendant from

its eventual disclosure.  As a consequence, the Defendant's expectation of privacy is both

diminished and ephemeral.  Accordingly, his motion for Protective Order should be denied.

14

In summary, the documents Plaintiff seeks are relevant to her claim, and Defendant has waived his right to privacy by seeking out publicity which is favorable to him, and failed to establish good cause for the protection he now seeks.

Respectfully submitted,

TROIANI/KIVITZ, L.L.P.

By: _____

Dolores M. Troiani, Esquire
I.D. No. 21283
Bebe H. Kivitz, Esquire
I.D. No. 30253
38 North Waterloo Road
Devon, Pennsylvania 19333
(610) 688.8400

15

3/2/05

"A"



enquirer world exclusive

ENQUIRER writer Barry Levine interviews Bill Cosby in a hotel suite in Houston, Texas.

# Bill Cosby ends his silence:
# MY STORY!

**By BARRY LEVINE**
© 2005 The National ENQUIRER, Inc.

IN A blockbuster exclusive interview with The ENQUIRER, Bill Cosby has spoken out for the first time since he was cleared of the headline-making sexual molestation charges brought by a Canadian woman.

"I'm not saying that what I did was wrong, but I apologize to my loving wife, who has stood by my side for all these years, for any pain I have caused her," the 67-year-old entertainer told The ENQUIRER.

"These allegations have caused my family great emotional stress."

The soul-baring interview took place on February 21 in a hotel suite in Houston, Texas, during Cosby's concert tour.

Reacting to the prospect of a civil action from the young Canadian woman, furious Cosby vowed to The ENQUIRER that he would stand his ground against anyone who tried to "exploit" him because he is a celebrity.

And about the California woman who publicly supported his accuser and claimed Cosby had acted inappropriately with her, too, Cosby told The ENQUIRER: "She is a wrecking ball."

Responding to the charge by the Canadian woman, Cosby declared: "No man wants to see his family put in the position of having (Continued on next page)

THE NATIONAL ENQUIRER    29

NE1129A1    FINAL & ROLL

# BILL COSBY — MY STORY

## 'I apologize to my loving wife for any pain I have caused her'

ENQUIRER WORLD EXCLUSIVE

●COSBY THANKS THE ENQUIRER FOR BRINGING SON'S KILLER TO JUSTICE.
See next page

(Continued from page 29) these kinds of allegations come out and for your loved ones to suffer emotional stress.

"The charge can influence the view that family and friends have of him as a good person, a person to be trusted.

"That's what happened with this.

"Looking back on it, I realize that words and actions can be misinterpreted by another person, and unless you're a supreme being, you can't predict what another individual will do.

"But that's all behind me now, and I'm looking only toward a bright future."

Cosby became a real-life father figure to countless Americans with his portrayal of doting dad Cliff Huxtable on "The Cosby Show" — and the sexual molestation charge from the Canadian woman came as a bombshell.

On January 13, the woman filed a complaint with police saying she was [illegible] attacked by



"I am not going to give in to people who try to exploit me because of my celebrity status."

Cosby in January 2004. The woman told police that after she complained of stress and tension, Cosby gave her pills that made her dizzy.

She said she recalled him touching her and when she awoke at 4 a.m., her clothing was in disarray and her bra was undone. He vigorously denied the woman's allegations.

Cosby told The ENQUIRER that when he heard police had launched an investigation, "My heart sank. I was at home, and these claims hurt me."

And following a five-week investigation, Montgomery County, Pa., District Attorney Bruce L. Castor Jr. said there was "insufficient credible and admissible" evidence to support a charge.

Following the prosecutor's February 17 announcement, the woman's attorney Dolores Troiani said a civil lawsuit would be filed against the star.

Cosby, who has been the victim of an extortion plot in the past, did not want to speculate as to whether money was the woman's prime motive. "Let's not go there," he told The ENQUIRER.

But he did say: "I am not

'COSBY ACCUSER'

going to give in to people who try to exploit me because of my celebrity status."

A published report states that the woman's mother called Cosby before her daughter went to police and the comedian "was under the impression" she was after hush money.

Because the woman claimed she was the victim of a sex crime, The ENQUIRER is continuing to withhold her name until she goes public in civil action.

She is a 31-year-old former pro basketball player who met Cosby while she worked in the athletic department at Philadelphia's Temple University. Temple graduate Cosby is one of the school's biggest boosters. Because of the looming

'Sometimes you try to help people and it backfires on you'

civil lawsuit, Cosby stressed to The ENQUIRER that he could speak only in broad terms about the case.

But in citing an example, Cosby suggested that the woman might have left out important facts when she made her allegations to authorities.

"Take a kid who comes home from school with a note from the principal," he said.

"The note reads, 'We would like to see you tomorrow to discuss your child's behavior.' So the parent says to the child, 'What did you do?'

"The child says, 'The teacher slapped me, and I kicked her.'

"The parent goes to the school and is angry with the authorities. But as the discussion unfolds, we find that the student has left out the reason for the slap — the child picked up a stick in the classroom and tried to strike the teacher.

"The teacher stepped away and slapped the child in self-defense.

"The child, in talking to the parent, has left out a crucial part of the story — the truth."

After the allegations surfaced, the accuser's family described Cosby as a friend and "mentor" to the woman.

But Cosby told The ENQUIRER that celebrities are often put in

'My problem is how I appeared into Miss Green was allowed to be a wrecking ball.'

positions where their roles as mentors can lead to trouble.

"Sometimes you try to help people and it backfires on you and then they try to take advantage of you," he said.

"People can and you by taking advantage."

Cosby admitted that the recent scandal intensified when a California lawyer, 57-year-old Tamara Green, made additional allegations against him.

The one-time actress and former model told a newspaper that she met Cosby at an audition and worked at his Los Angeles nightclub 30 years ago. She said one day she fell ill and Cosby gave her two drug tablets that left her "stoned."

Back at her apartment, Cosby allegedly tried to take advantage of her. She claims Cosby then dropped two $100 bills on a table and fled.

Green said she told family and friends about

Cosby's alleged assault but didn't go to police. She finally called police on January 28 and told them her story, and said she was speaking out now because she feared prosecutors would dismiss the claims made by the former Temple University employee.

Cosby's lawyers insisted that he did not know Green, and directed the media to important information about the woman's credibility.

According to the State Bar of California, Green entered a program for lawyers with substance abuse or mental health problems in October.

The bar had lodged disciplinary charges against her in March 2004, alleging 12 counts of misconduct involving three clients, spokeswoman Kathleen Beitiks said.

Among the allegations were failure to perform with competence, failure to maintain client funds in a trust account, and failure to refund unearned fees.

"My problem is with some media and how it appeared that Miss Green was allowed to be a 'wrecking ball,'" Cosby said.

"When Miss Green spoke, they pointed out that she was a lawyer. This gives her credibility.

"Anybody could have checked out her credibility and credentials. But it appears that they never checked her — or did check her and found it was convenient to not mention it.

"It's bothersome that when my side revealed her background, we were blamed for throwing dirt.

"Then I was blamed for having a humungous amount of lawyers. That's unfair.

"I guess that a celebrity trying to protect himself is not supposed to

use every ounce of protection."

Cosby added that he doesn't regret having his lawyers reveal information about Green, saying if he didn't, the media onslaught "could have been even worse.

"We're not bringing up something that a cadre of special investigators would have needed to go underground with trench coats and mustaches to find!"

'These allegations have caused my family great emotional stress'

BILL COSBY'S WIFE CAMILLE



Exhibit C

Posted on Tue, Mar. 08, 2005

# Cosby jokes on stage about doping drink

By NICOLE WEISENSEE EGAN
weisenn@phillynews.com

A little over a week after being cleared of doping and groping a former Temple University women's basketball executive, Bill Cosby joked during a performance at the State Theater in New Brunswick, N.J., about whether he had slipped drugs into a woman's drink.

"He brought this woman up from the audience," said Stuart Zakim, a spokesman for the *National Enquirer*, who happened to be in the audience for the Feb. 26 show. "He said, 'Before I get started, let me ask you: Did I put anything into your drink? She said, 'No.' "

She was laughing and the audience was hysterical, Zakim said.

"I laughed, too," Zakim said. "It was very smart on his part. Obviously the people who went to see him are fans and are aware of what's been going on and that the charges were never filed."

On Feb. 17, Montgomery County District Attorney Bruce Castor announced he wasn't filing criminal charges in connection with the Temple woman's complaint that Cosby had drugged and groped her at his Cheltenham Township mansion. The woman quit her Temple job after the alleged assault and returned to her native Canada. A year after the incident, she reported it to the police.

The Canadian woman's lawyers say she'll soon file a civil lawsuit against Cosby.

Zakim took Cosby's joke to be a reference to the Canadian woman's allegations. Cosby attorney Marty Singer and Cosby spokesman David Brokaw took no issue with Zakim's account of what Cosby had said. But they said Cosby's joke had not been about the Canadian woman.

Brokaw said Cosby's joke referred to a Feb. 14 story in the *National Enquirer* in which Shawn Upshaw was quoted as saying that during an affair she had with the comedian, he had given her "a funny-tasting drink."

"And then she says she woke up, knowing that something funny had happened, knowing she was pregnant. The morning after, so to speak," Brokaw said, ridiculing Upshaw's story.

Singer said Cosby had been joking "about a woman who sold a story to a tabloid" - not about the Canadian woman.

"He's never treated it in a joking or light manner," Singer said, referring to the allegations raised by the Canadian woman. He added that Upshaw's story was false.

Upshaw's daughter is Autumn Jackson, who threatened to tell the world she was Cosby's daughter if the entertainer didn't pay her $24 million. Autumn Jackson was convicted of extortion and sentenced to 26 months in jail. Cosby admitted having had an affair with Upshaw in the early-1970s, but denies having fathered Autumn Jackson.

In a phone interview last week, Upshaw said Cosby's joke had been "in poor taste."

With regard to her story, she said, "He's making light of it as damage control. He's trying to make the community think he didn't do it; that's why he can joke about it."

© 2005 Philadelphia Daily News and wire service sources. All Rights Reserved.
http://www.philly.com

Case 2:05-cv-01099-ER   Document 66   Filed 01/04/06   Page 21 of 22

"C"

CJ - Cosby Accuser's Mom Contacted Cosby Before Cops?                    Page 1 of 1

Exhibit A, p.1

WARNER BROS. STUDIOS · HOME · MOVIES · TELEVISION · DVD · MOBILE · GAMES · SHOP · WIN · MUSIC · VIP/BUY



# Celebrity Justice

▶ SEARCH

Breaking News | Archives | Court Documents | Message Boards

Home | There Oughta Be A Law | Local Listings | About the Show | FAQ's



## Cosby Accuser's Mom Contacted Cosby Before Cops?

February 7, 2005

*A "Celebrity Justice" Exclusive.*

Sources connected with Bill Cosby tell "CJ" that before his accuser went to police, her mother asked the comedian to make things right with money.

Cosby has been accused of sexual assault by a woman who played basketball for the University of Arizona before taking a job at Temple University in Philadelphia. She has claimed that Cosby drugged and then fondled her. The incident in question took place a year ago January at Cosby's home in Philadelphia.

Cosby has told police that there was a sexual encounter, but that it was consensual.

According to "CJ" Executive Producer Harvey Levin, "Sources tell us that Cosby and his accuser had a cordial relationship throughout 2004, but we're told her mother contacted Cosby last month and complained."

Sources say Cosby was under the impression the mother wanted money, so to keep the encounter quiet, he called the mother back. We're told she asked Cosby to help pay for her daughter's education and to generally help her out financially, and this conversation occurred before the accuser ever contacted police.

It appears the accuser and her mother may have taped at least one conversation with Cosby.

As police continue to investigate, a Cosby rep call this a classic shakedown.



**ONLINE VIDEO**

Click to Watch the Video

## TOP STORIES

Robin Williams Sues Impersonator for Alleged Imposter Scam

Mindy McCready Suffers Brutal Beating

Robert Blake Explodes in Charged Deposition

Brad Pitt Lawyers Up for Divorce

Robert Blake's Freedom Style

Prison Tapes Reveal Blake Craved Celeb Support

James Denton's 'Desperate' Move

terms of use | privacy policy | rss | © 2005 TTT West Coast Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREA CONSTAND, | : CIVIL ACTION |
| Plaintiff | : |
| v. | : NUMBER 05-1099 |
| | : |
| WILLIAM H. COSBY, JR., | : FILED UNDER SEAL |
| Defendant | : |

## CERTIFICATE OF SERVICE

I hereby certify that on, January 4, 2006, the undersigned were served in the following manner, a true and correct copy of : **Plaintiff's Motion For Leave to File A Reply Memorandum of Law to Defendant's Memo in Opposition to Plaintiff's Motion To Compel Compliance with Subpoena Issued to the National Enquirer and Memorandum of Law.**

### NAME

### MANNER

Patrick J. O'Connor, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

United States First Class Mail

Andrew D. Schau, Esquire
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

United States First Class Mail

Paul D. Weller, Esquire
Jennifer B. Jordan Esquire
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103

Unites States First Class Mail

TROIANI/KIVITZ, L.L.P.

By:

Dolores M. Troiani, Esquire
I.D. No. 21283
Bebe H. Kivitz, Esquire
I.D. No. 30253
38 North Waterloo Road
Devon, Pennsylvania 19333
(610) 688.8400

16