

# TROIANI/KIVITZ, L.L.P.

———————— ATTORNEYS AT LAW ————————

DOLORES M. TROIANI, ESQUIRE
BEBE H. KIVITZ, ESQUIRE

38 NORTH WATERLOO ROAD
DEVON, PA 19333

(610) 688-8400
FAX (610) 688-8426

January 4, 2006

**(Hand-Delivered)**

Office of the Clerk of Court
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

**RE:**   **Andrea Constand vs. William H. Cosby, Civil Action No. 05-CV-1099**
**Plaintiff's Memorandum Of Law In Support Of The Lifting Of the Seal Established**
**By Case Management Order 2**

Dear Sir/Dear Madam:

Enclosed for filing in the above-captioned matter, please find an original and a disk.

Thank you for your anticipated cooperation.

Respectfully submitted,

Bebe H. Kivitz

BHK:m
Enclosure
cc:    Patrick J. O'Connor, Esquire  (w/enclosure-first class mail)
       Andrew D. Schau, Esquire w/enclosure -first class mail)
       Andrea Constand (w/enclosure - first class mail)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ANDREA CONSTAND, | : |
| Plaintiff | : CIVIL ACTION |
| | : |
| v. | : NO. 05-CV-1099 |
| | : |
| WILLIAM H. COSBY, JR., | : |
| Defendant | : |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THE LIFTING OF THE SEAL ESTABLISHED BY CASE MANAGEMENT ORDER 2

Plaintiff Andrea Constand submits the following Memorandum of Law in support

of Lifting the Seal Established by Case Management Order 2.

### FACTS

Defendant asserts that any pretrial publicity is an abuse of the discovery process

and would embarrass him. What Defendant really means, however, is that any pretrial publicity

that he has disseminated should be condoned, but any pretrial publicity not orchestrated, shaped,

and disseminated by him should be prevented. Defendant's ability to manipulate publicity in this

matter should not be permitted.

When Plaintiff's allegations became public -- through no actions taken by

Plaintiff, but rather through a "leak" from the Philadelphia Police Department to members of the

press -- Defendant immediately began to generate self-serving publicity. First, his agents

referred to Plaintiff's claims, then being investigated criminally, as "bizarre and utterly

1

preposterous". See, Exhibit "A". This characterization was repeated multiple times and in
multiple publications throughout the nation.

Next, Defendant's representative, Martin Singer, Esquire, made statements to
Celebrity Justice on February 7, 2005, and February 9, 2005, including that Plaintiff's allegations
represented a "classic shakedown" of Defendant, and that "Plaintiff's intention … was of
requesting money from Mr. Cosby". See, Exhibit "B", Celebrity Justice publications.

Indeed, Defendant made these statements at a time when he knew that Plaintiff
and her mother had requested only an apology when they had spoken to him in January 2005. In
fact, Defendant admitted to Pennsylvania law enforcement officers as early as January 26, 2005,
that Plaintiff and her mother had requested only that he apologize, and it was Defendant's idea
to contact them again to offer, instead, an "educational trust". Defendant also knew before
February 7, 2005, that Plaintiff had not accepted his offer of money.

Around this time, however, other women had begun to come forward to report
that Defendant had committed similar assaults upon them, including that he gave them
"medication" or spiked their drinks, and then sexually assaulted them when they were under the
influence of the drug he gave them. The first woman's account to be published was Tamara
Lucier Green, Esquire, [1] who revealed that Defendant had given her what he represented to be
"Contac" medication when she felt ill. The "Contac" given to Ms. Green, just as the "Benadryl"
Defendant alleges he gave to Plaintiff here, turned out, instead, to be some other type of
substance, which rendered Ms. Green semiconscious. Defendant then attempted to assault Ms.
Green sexually. When she refused and resisted, Defendant left her residence, leaving two $100
bills on her table. See, Exhibit "C", February 8, 2005, Philadelphia Daily News account.

---

[1] Now a Rule 415 witness in this litigation

2

Another woman, Beth Ferrier, before she became known to Plaintiff's counsel,

contacted the National Enquirer after the Tamara Lucier Green, Esquire, account was published.

Beth Ferrier, too, had been drugged and sexually assaulted by Defendant. The National Enquirer

asked her to be polygraphed as a pre-condition to publishing her account. She agreed to the

paper's polygraph -- and then passed its test. The National Enquirer next contacted Defendant

and/or his agents to advise him that the Ferrier account would be published.

At his deposition, Defendant admitted that he offered his February 21, 2005,

"Exclusive Interview" to the paper in exchange for its express agreement not to publish the

Ferrier account. Indeed, Defendant testified that he did not want the public to hear of the Beth

Ferrier account, because that coupled with the Tamara Green and Andrea Constand claims would

lend credibility to the fact that he had committed these assaults. In fact, he testified that he

wanted the public to believe that Plaintiff was not telling the truth, and he feared that publication

of the Ferrier story would lead the public to believe that Plaintiff was telling the truth. ( National

Enquirer Interview and Cosby deposition, 9/29/05, p.p. 221- 222, attached as Exhibit "D".)

Once given this public forum, Defendant used the National Enquirer to continue

the defamation of Plaintiff he had initiated with Celebrity Justice, claiming that he was "hurt" by

Plaintiff's allegations; [people] were trying to "soil" him because of who he was; and, he would

stand his ground against [anyone] who tried to "exploit" him. See, Exhibit "D", National

Enquirer interview. Although Defendant now claims that Plaintiff's identity could not be

gleaned from his comments, this argument is totally devoid of merit.

Not content, however, with his use of just Celebrity Justice and the National

Enquirer to generate pro-Cosby publicity, defendant also appeared on the television show,

Nightline, on June 29, 2005. In that interview, in which Defendant was discussing his views on

3

morality and values, Defendant was asked whether Plaintiff's allegations would hurt his standing on morality issues. He responded, "If they are not true, what happens if they are not true?" Exhibit "E", summary of Nightline interview. Thus, Defendant affirmatively used the media forum to cast doubt on the truth of Plaintiff's claims against him.

Defendant's suggestion, therefore, that Plaintiff seeks to "sully his reputation with pretrial publicity" is completely disingenuous. Defendant has solicited and invited publicity repeatedly since Plaintiff's allegations were reported, and has shaped and manipulated his own published or televised accounts. Defendant objects only to a contrary version of events -- Plaintiff's -- from becoming public. Thus, where Defendant's own testimony or his prior actions against other women support Plaintiff's allegations, he wants such corroboration kept secret.

Further, Defendant's counsel claims that Defendant will be very embarrassed if details of his deposition testimony surface. He has not submitted an Affidavit to the Court, and his claim is without any factual basis. See, eg., *Constand v. Cosby*, C.A. No. 05-1099, July 6, 2005, Order, N.1 (Robreno, J.) Moreover, defense counsel's claim of embarrassment is not only waived by Defendant's previous acts, it is disingenuous. Defendant opened the door to publicity by inviting the media to entertain his version of events. It is simply unfair to allow Defendant to have curried press favor, and not to allow response, particularly where, as here, fair coverage will allow Plaintiff to publicly vindicate her name in this defamation action. See, *Sprague v. American Bar Association*, 276 F. Supp. 2d 365, 374 (E.D. Pa. 2003). See also, *Gaetano v. Sharon Herald*, 426 Pa. 1791, 231 A.2d 753 (Pa. 1967); *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (Pa. 1975); *Grahm v. Today's Spirit* 503 Pa. 52, 468 A.2d 454 (Pa. 1983),

Finally, Defendant cannot seriously contend he will be embarrassed, when he has continued to joke about this case. Not only did Defendant joke at a public appearance in New

4

Brunswick, New Jersey, on February 26, 2005, about whether a female audience member who came up on the stage, would say he "put anything into [her] drink," he joked more at his deposition. See, e.g. Philadelphia Daily News account of New Jersey appearance, March 8, 2005; Cosby deposition 9/28/05, p.24, pp. 104-105, attached as Exhibit "F".

Accordingly, Defendant's "embarrassment" is not and never was the real issue. Defendant is simply attempting to continue to manipulate media coverage by picking and choosing which portions of his account may be revealed. The fact that Defendant has admitted breaking the law in the 1970's by purchasing Quaaludes to dispense them illegally to women with whom he hoped to "party" is particularly relevant. Not only does it support Plaintiff's claims that Defendant gave her a substance more potent than Benadryl, as he had given to other women before, it is evidence of Defendant's state of mind. Moreover, having told the public himself that he gave Plaintiff Benadryl, the public has a right to know the contradictory information. The National Enquirer agreement and supporting documentation are relevant to Defendant's credibility, or lack thereof, his manipulation of the media, and Plaintiff's defamation claim. The public has a right to know that Defendant deliberately gave his interview to suppress the Beth Ferrier account, and to prevent the public from believing Plaintiff's claims against him.

The facts are no less embarrassing to Plaintiff or the Jane Doe witnesses. That they were duped by Defendant, believing him to be their friend and mentor, when he was grooming them to be his victims, is simply a fact. They have come forward, however -- whether embarrassed or not. The Court denied anonymity to the Jane Doe witnesses, holding that disclosure of their names was important to the public's right to access. The test here should be no different. Defendant's actions, especially in light of his earlier published

5

or televised statements, should not be kept a secret, particularly where he has deceived and

sexually assaulted women, and at least in this case, defamed one.

## ARGUMENT

### A. The Right of Public Access Extends to Discovery Material Appended to Discover Motions In this case.

Defendant's lopsided view turns on the assumption that, as a matter of law, the public has

no right of access to discovery materials appended to discovery motions and, hence, the seal

protecting such materials in this case should remain in place. Defendant, relying upon *Leucadia,*

*Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157 (3d Cir. 1993), characterizes the

principle as an unbending doctrine of Third Circuit jurisprudence that bars public access. A

careful review of the case law, however, does not lead in that direction. The *Leucadia* court

carefully contrasted the "presumptive" public right of access to documents filed with the court

with the "non-presumptive" public right of access to discovery materials, but left open the more

germane issue of when the right of access to discovery materials arises. The Court wrote that

"[w]e need not decide here whether we would interpret the Federal Rules of Civil Procedure to

permit a member of the public to challenge an overly protective sealing order." *Id.* at  165.

Significantly, the Court held:

> We must rely in the first instance on the district courts to protect
> the legitimate public interest in filed materials from overly broad
> and unjustifiable protective orders agreed to by the parties for their
> self-interests. *See United States v. Corbitt*, 879 F.2d 224, 228 (7th
> Cir.1989) ("[T]he public's right to inspect judicial records may not
> be evaded by a wholesale sealing of court papers. Instead, the
> district court must be sensitive to the rights of the public in
> determining whether any particular document, or class of
> documents, is appropriately filed under seal").

6

*Id.* Clearly, the *Leucadia* court's holding opens the door for litigants and interveners to obtain access to discovery materials if it is determined that court imposed protections are over broad and unwarranted.

Contrary to Defendant's suggestion, the United States Supreme Court in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984), does not hold that there is no absolute right of public access to discovery materials, only that "restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information." *Id.* The Court does not address the issue here, which is whether the a defendant has a right to be protected from public disclosure of documents that are protected by an overly broad order to seal discovery documents. Similarly, other precedents relied upon by Defendant do not extend to that question or acknowledge that the right of access is not absolute but governed by a "good cause" standard. *See, e.g., Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir. 1986) ("good cause" standard applied to question of whether the public may have access to sealed discovery materials); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001) (common-law right of access to discovery documents governed by Rule 26 good cause balancing test).

As a consequence, the analysis of whether the seal protecting discovery materials should be lifted turns upon whether Defendant has shown good cause to deserve such protection and not whether there is a presumption of public access. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994).

## B. Defendants Allegations of Public Embarrassment are Neither Supported by his Own Conduct nor by any *Per Se* Legal Standard.

7

Defendant contends that "private" matters related to his health, medical history, and business and financial practices should be protected from disclosure because of the embarrassment that would cause of him if they were made public, an implicit acknowledgement of his public stature and the interest that his circumstances engender among the public. These kinds of matters are, of course, the subject of everyday litigation, and hardly distinguish the Defendant's situation from that of any other civil litigant. The distinguishing factor, from Defendant's point of view, is that defendant is a celebrity. Yet, courts do not give celebrities special consideration and Defendant cites to none that do.[2]  *But see Willie Nelson Music Co. v. Commissioner of Internal Revenue*, 85 T.C. 914, 916 (1985) (motion for protective order denied despite assertions by singer/celebrity that criminal liability may subject him to embarrassment and emotional distress); *Condit v. Dunne*, 225 F.R.D. 113 (S.D. N.Y. 2004) (court refused to impose protective order on discovery where former Congressman sued television commentator about statements made about possible involvement in a woman's disappearance); *Flaherty v. Seroussi*, 209 F.R.D. 295, 300 (legitimate public interest to have access to court proceedings outweighed embarrassment that might be caused by release of video-taped deposition).

The real issue here is not Defendant's financial and health "secrets," it is Plaintiff's allegations concerning drugs and sexual misconduct Following *Shingara v. Skiles*, 420 F.3d 301 (3d Cir. 2005) and *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994), a party seeking protection from potential embarrassment must show it to be "particularly serious." *Shingara*, 420 F.3d at 307.   Other than to vaguely restate the facts contained in discovery, Defendant fails to specify the serious harm that will occur from their disclosure.  How serious can such facts be if he pokes fun of the Plaintiff's allegations in stand-up comedy routines?

---

[2] Defendant reliance upon *Jones v. Clinton,* 993 F. Supp. 1217 (E.D.Ark.1998) and *People v. Jackson*, 27 Cal. Rptr. 3d 596 (Cal. Ct. App. 2005) is misplaced.  In *Clinton,* the issue was the protecting of the Jane Doe witnesses, not the Defendant; and in *Jackson*, a criminal matter, the court was concerned about harm to child victims.

Defendant contends that he deserves special protection from disclosure because his "reputation is his livelihood," as if to trivialize the Plaintiff's reputation.   Underlying his rhetoric is not the issue of "embarrassment", it is "control." Defendant wants to control – personally and with his public relations machine – how and what is said about him to the public, leaving the plaintiff without a voice.   These arguments do not form the grounds for maintaining a seal on discovery. To the contrary, they demand that the seal be lifted.

Defendant also makes a sweeping and unsubstantiated claim that release of discovery papers could make it impossible for him to receive a fair trial.  Defendant's Brief at 11.  The law does not support his contention and even *Shingara,* relied upon by Defendant, rejects the notion that such assertions are dispositive of "good cause".  The court held

> To start with, the concern that the disclosure of discovery materials
> to the media could unduly prejudice the public is exactly the type
> of broad, unsubstantiated allegation of harm that does not support a
> showing of good cause. *See Glenmede Trust Co.*, 56 F.3d at 483.
> We ordinarily are confident that a district court will be able to
> select a fair and impartial jury in cases even where there has been
> pre-trial media attention to the case and we see no reason to
> believe that this case would present an exception to the usual case.
> *See United States v. Gilsenan*, 949 F.2d 90, 96 (3d Cir.1991).
> Therefore, we fail to see how jury selection will be a serious
> concern, let alone good cause for a broad and sweeping protective
> order, in this case. After all, the defendants did not present any
> evidence to support their argument, drawn from the information
> already published, that there will be difficulty selecting a jury in
> this case or evidence that if additional information is published
> there would be such difficulty.

*Shingara* at 307.  On these grounds, the defendant's request should be rejected.

## C. Under Defamation Law, Plaintiff has a Right to Vindicate Her Reputation

Defendant wants to maintain a seal of secrecy of discovery materials that relate directly to the public comments he has made about the Plaintiff and her motivations.  His contacts with

9

*Celebrity Justice* and his exclusive agreement with the *National Enquirer*, is a case in point.

Defendant has testified that he agreed to speak to the National Enquirer so it would "kill" a

similar story about Beth Ferrier, another accuser, and publish his story instead. The intent, of

course, was to suggest Plaintiff was trying to "exploit" Defendant and to prevent the Ferrier story

from being made public, thereby, undermining the credibility of plaintiff's own story.

Maintaining the seal on discovery documents, including the Defendant's deposition, undermines

one of the basic principles of Pennsylvania defamation law, that is, public vindication. The

Supreme Court of Pennsylvania has held:

> Moreover, in determining where a cause of action for libel arises,
> we must keep certain fundamental points in mind. The most
> important function of an action for defamation is to give the
> innocent and injured plaintiff a public vindication of his good
> name. Its primary purpose is to restore his unjustly tarnished
> reputation, and 'reputation is the estimation in which one's
> character is held by his neighbors or associates. 'Restatement,
> Torts s 577, comment b (1938).

*Gaetano v. Sharon Herald Co.*, 426 Pa. 179, 183, 231 A.2d 753, 755 (1967). *See also Sprague v.
American Bar Association,* 276 F. Supp.2d 365, 374 (E.D. Pa. 2003)

Defendant argues that this principle is irrelevant to the issue before the Court because a

trial will determine whether Plaintiff is vindicated or not. Courts, however, do not limit the

principle of public vindication to the results of trial – and Defendant cites to none – rather, it is

through the litigation process that public vindication is obtained. Notwithstanding, in view of the

Defendant's continued efforts at public damage control, sealing the documents renders the

Plaintiff powerless to publicly demonstrate her good name, while permitting the Defendant to

continue to manipulate the press and public opinion for his own benefit. This should not be

countenanced by permitting the seal to remain in place.

## D. Defendant has Failed to Show "Good Cause" for keeping His Deposition Under Seal.

Defendant claims this deposition testimony provides the required nexus between his concern with embarrassment and public disclosure that this Court requires under *Pansy, supra*, to maintain the seal of confidentiality. He speculates that disclosure of his testimony would be "terrible" because his social, sexual, and medical history would be revealed leading to inevitable "scandal". He claims that these broad, speculative and unsubstantiated claims rise to the level of specificity required under *Pansy, supra*. Plaintiff vehemently disagrees because: (1) this Court has already held that such broad assertions do not rise to the level of the required specificity; (2) Defendant's privacy interest is not the same as that of a general member of the public; (3) by his own conduct, he has waived his expectation of privacy; and (4) his privacy interest is reduced by the likelihood that it will be eventually disclosed.

This Court, following *Pansy, supra* and *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986), has held that "[b]road allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not support a good cause showing." *Constand v. Cosby*, C.A. No. 05-1099, Order, July 6, 2005, Document 37, filed 7/7/05 at n. 1 (E.D. Pa.) (Robreno, J.). In earlier briefing in this case, on the motion of the Jane Doe witnesses to protect their identities, the witnesses submitted to the Court examples of how each would suffer harm by the disclosure of their relationships with the Defendant. *See* Motion of Jane Doe Witnesses to Protect Disclosure of Their Names Outside of this Litigation and Supporting Memorandum of Law *Constand v. Cosby*, C.A. No. 05-1099, Document 33, filed 6/13/05 (E.D. Pa.). The witnesses asserted that disclosure would adversely effect health and mental problems and conditions – bipolar disorder in one case; effect their employment and careers; and cause humiliation and harassment by media attention. These assertions are not unlike those of the

11

Defendant who alleges harm from the media and damage to his career which "would quickly become the subject of scandal." With regard to the Jane Doe witnesses, this Court held that

> the allegations of harm by each of the Jane Doe witnesses are
> unsubstantiated broad allegations insufficient to establish good
> cause. First, no affidavits have been provided by any of the Jane
> Does to support their counsels' description of the possible harm
> from disclosure. Thus, the allegations are factually unsupported.
> Second, while disclosures may prove annoying and potentially
> embarrassing, these factors do not supply the requisite quantum to
> trump the public interest in access to court proceedings.

*Constand v. Cosby*, C.A. No. 05-1099, Order, July 6, 2005, n. 1 (E.D. Pa.) (Robreno, J.) The Defendant has provided less support for his broad allegations of harm than the Jane Doe witnesses. His assertions of scandal are at best speculative and his motion is unsupported by either specific reference to the testimony or by affidavit alleging specific harm He provides no basis for continuing protection of his deposition transcript or other documents.

Defendant claims that his is not a "public figure" merely because he is a celebrity and entertainer. He neglects, however, to point out that he is much more than just a celebrity. It is a matter of public record that he is a community leader, serves on boards of major universities, takes public stands on important issues, and is frequently interviewed by the press for his opinions, not his jokes. Albeit he is not an elected official, it is beyond dispute that he is a public figure who generates intense and legitimate public scrutiny and interest. As a result, his expectation of privacy cannot be equivalent to that of a private citizen. *Pansy,* 23 F.3d at 787 (privacy interests of a public person are diminished). The cases cited by Defendant are limited to individuals who are *only* entertainers and have not risen to the heights of public service either by choice or by election. *See, e.g., Paisley Park Enters. v. Uptown Prods.,* 54 F. Supp. 2d 347 (S.D.N.Y. 1999) (Court protects Prince, a musician and recording artist); *Condit v. Dunne,* 225 F.R.D. 113 (S.D.N.Y. 2004). The court's words in *Condit v. Dunne,* 225 F.R.D. 113, 120

(S.D.N.Y. 2004) – quoted by Defendant – are, indeed relevant here: "[m]ore than mere celebrity interest is involved in this case." By injecting himself into the public eye, Defendant must accept the consequences. *See Leverton v. Curtis Pub. Co.,* 192 F.2d 974 (3d Cir. 1951) (right of privacy is waived by individual voluntarily getting into the public eye). Defendant is more than just a celebrity and as a consequence, he has diminished privacy interest.

Defendant's expectation of privacy has necessarily been diminished by his own conduct. His contacts with *Celebrity Justice* and his exclusive contractual interview with the *National Enquirer* were all attempts at using his public stature to persuade the public about his side of the story. It is not just the Plaintiff who has placed his conduct at issue. Defendant, on his own behalf, has reached out to the media about his "innocence" at the same time defaming his accuser. Now he wants the Court to protect him from publicity, which is not under his control. This simply is not "good cause" for protecting his deposition from disclosure.

It is also important to recognize that the matters of concern to the Defendant, to the extent that facts are not already the subject of public knowledge, will eventually be disclosed, a fact that also diminishes his privacy interest. In a case very close on point, *Koster v. Chase Manhattan Bank*, 93 F.R.D. 471, 472 (D.C.N.Y. 1982), a former bank employee commenced an action against Chase Manhattan Bank and a former vice-president alleging that while she and former vice-president were employed by bank, he forced her to engage in a sexual relationship with him, abused her, and interfered with her career. The lawsuit generated a considerable amount of publicity in newspapers, television, and radio. The *Koster* court wrote that "[a]ccording to the defendants, the widespread and, at times, somewhat sensationalized coverage has resulted in injury to the reputations of Ross, the Bank and its employees." *Id.* at 472-73. As a consequence the defendants moved for a protective order to seal information obtained through

13

discovery. The court performed a detailed "good cause" analysis, denied the defendant's motion,

and held the following about the his concerns of embarrassment:

> The relative importance to this lawsuit of information concerning
> any sexual relationship between Koster and Ross is another factor
> that leads us to deny the defendants' motion. Ordinarily, one's
> privacy interest in preventing the public disclosure of the details of
> a sexual relationship might be viewed as a reason for granting a
> protective order. In this instance, however, the information is not
> irrelevant matter that was revealed as a by-product of the liberal
> discovery rules. Rather, the facts underlying the plaintiff's
> allegations that Ross forced her to have sex for the purpose of
> "safeguarding her career" and that he abused her when she
> terminated the relationship must be proven if the plaintiff is to
> prevail on her cause of action. *In other words, this information is*
> *highly relevant to the issues in the lawsuit and will be revealed at a*
> *trial on the merits, assuming that there is one. Thus, the*
> *defendants' privacy interest in the information is significantly*
> *reduced by the likelihood that the information will eventually be*
> *disclosed. See Protective Orders, supra*, at 1663 ("If the
> information will be disclosed eventually in any case, there is no
> reason to prevent disclosure at the discovery stage." (footnote
> omitted)); cf. *Lucido v. Cravath, Swaine & Moore, supra*, 25
> F.R.Serv.2d at 1051 (protective order covered only that
> information that "would, or at a minimum, might not be admissible
> at trial").

*Id.* at 482 (emphasis added). Similarly, the issues raised in the Defendant's deposition are at the

heart of Plaintiff's claims. As a practical matter, placing the deposition and other discovery

materials under seal now will not protect the Defendant from its eventual disclosure, nor is it fair

to Plaintiff or the public. As a consequence, the Defendant's expectation of privacy is both

diminished and ephemeral. Accordingly, his request to that his deposition and other documents

be kept confidential before trial should be denied.

## **CONCLUSION**

For all the above reasons, Defendant's Opposition to Lifting of the Seal Established by

Case Management Order 2 should be rejected, and the seal lifted.

Respectfully submitted,
TROIANI/KIVITZ, L.L.P.

By: _____
Bebe H. Kivitz
I.D. No. 30253
Dolores M. Troiani
I. D. No. 21283
Attorneys for Plaintiff
38 North Waterloo Road
Devon, Pennsylvania 19333
(610) 688.8400

15

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2006, the undersigned were served in the following

manner, a true and correct copy of : *Plaintiff's Memorandum Of Law In Support Of the Lifting*

*Of The Seal Established By Case Management Order 2.*

| **NAME** | **MANNER** |
| --- | --- |

Patrick J. O'Connor, Esquire                    Via United States First Class Mail
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Andrew D. Schau, Esquire                        Via United States First Class Mail
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY  10036

Respectfully submitted,
TROIANI/KIVITZ, L.L.P.

By:_____

Bebe H. Kivitz
I.D. No. 30253
Dolores M. Troiani
I.D. No. 21283
Attorneys for the Plaintiff
38 North Waterloo Road
Devon, Pennsylvania  19333
(610) 688.8400



 <<back to home | Investigators

✉ EMAIL THIS STORY | 🖨 PRINT THIS STORY

# Investigators Uncover New Information In Cosby Case

### Comedian Accused Of Sexual Assault

POSTED: 8:07 am EST January 25, 2005

**CHELTENHAM, Pa.** -- The NBC 10 Investigators have learned authorities are moving ahead with their investigation of Bill Cosby.



FeedRoom

Investigation Moves Ahead

📺 NBC10 FEEDROOM

A former Temple University employee claims the comedian fondled her at his Cheltenham home back in January of 2004.

Sources told NBC 10 that investigators at the Montgomery County District Attorney's Office interviewed the accuser Monday.

NBC 10 contacted the District Attorney's office but was told, "No comment."

Cheltenham Township's police chief would not confirm or deny the meeting but did say his office is still investigating.

Sources also told NBC 10 Montgomery County prosecutors are also reviewing the case.

NBC 10 first reported last week that Canadian police confirmed a Toronto woman filed a complaint with them on Jan. 13, alleging Cosby gave her pills that made her dizzy and later touched her breasts and placed her hand on his genitals.

The woman said the alleged incident happened at Cosby's Cheltenham home last January while she worked at Temple.

**Philadelphia:**
40°F, Light Rain

1 county is now under an advisory, watch, or severe weather warning.

## NBC10 Highlights

**Homework Helpline**
Become Involved In Kids Education!

**more categories:**

Submit Your Picture For Frontyard Weather!

Dog Show

Longwood Gardens Special

Stockings For Kids

Let Philly Entertain You!

Clinical Research Studies

Wednesday's Child

Recipes

Adventure Aquarium

Advertise With Us

Time Out Leisure Guide

RSS Feed Now Available

Looking For A New Recipe?

**sponsor:**



EXHIBIT

"A"

No charges have been filed.

Cosby's attorneys say the allegations are "utterly preposterous and plainly bizarre... and we'll vigorously defend."

*Copyright 2005 by NBC10.com. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*



**Two Great Weather Tools
From NBC 10!**

**Weather Plus**
Get the latest weather updates
24 hours a day with NBC
Weather Plus!
**Watch Now!**

**My-Cast**
Find out what the weather is
doing outside your home! Zip-
code level forecasting.
**Sign up for NBC 10 My-Cast!**



✉ **EMAIL THIS STORY** | 🖶 **PRINT THIS STORY**

**Most Popular Stories**
**Black-Tie Party Turns Ugly In Philly**
**Andy Reid Out As Eagles' GM**
**Woman Charged With Fatally Scalding Son**
**Reaction Mixed To Dick Clark's TV Return**
**Teen Killed While Walking To Party**



Case 2:05-cv-01099-ER   Document 67   Filed 01/04/06   Page 20 of 44

**CLICK TO SAVE**  Play with me!



**NEED ADVICE? WE'VE GOT IT!**

REGISTER | HEADLINES

**DAILY NEWS**
# The Front Page



DAI DIS

Search for                    Current  **go**                CLAS

| Home | News & Views | Sports | Entertainment | Biz/Money | Boroughs | City Life |

DAI
Me

# Woman: Cosby groped and drugged me
**BY LEO STANDORA**
**DAILY NEWS STAFF WRITER**

A female acquaintance has accused Bill Cosby of drugging and groping her in his suburban Philadelphia home a year ago, the comedian's lawyer said yesterday.

Attorney Walter Phillips called the allegation "utterly preposterous" and said Cosby denied it.

A law-enforcement source said the unidentified woman claimed the comedian knocked her out with drugs, touched her breasts and put her hand on his genitals, according to one published account.

When the woman awoke she found her bra undone, the source said.

Philadelphia cops began investigating after the women told her story to police in Ontario, where she now lives, and they passed the charges on.

The woman is said to be a former athletic department employee of Temple University, Cosby's alma mater.

Phillips said the 67-year-old Cosby hasn't talked to police yet.

But the lawyer called the allegations "truly bizarre" and noted they come a year after the alleged incident occurred.

"I would say they're false and utterly preposterous," he said.

Cosby, who's been married to his wife, Camille, for 41 years and has five kids, has faced scandalous allegations before.

In 1997, Autumn Jackson, a 22-year-old Los Angeles woman, claimed to

be Cosby's illegitimate daughter. She and two cohorts eventually were
convicted of trying to extort $40 million from the entertainer to buy his
silence.

**Originally published on January 21, 2005**

XML  Fresh stories hot off the site every day via RSS!

Have stories like this emailed right to your inbox!

✉  Email this story

🖨  Printer-friendly version



LEFT

All contents © 2006 Daily News, L.P.
Disclaimer and Copyright Notice | Our Privacy Policy





**01.03.2006**    NEWS   FEATURES   GOSSIP   TV   MOVIES   MUSIC   CELEBS   FUN   SHOP

**Headlines**  •  **First Look**  •  **The Dotted Line**  •  **E! News**  •  **Top 5 Clips**

 LATEST NEWS

tonight

*101 Sexies*
*Celeb Bodi*
Mmmm, mn
good! 8-10p

# Trouble for the Cos?

**by Sarah Hall**
Jan 21, 2005, 11:00 AM PT

Television's favorite sweater-wearing dad may be in hot water.

An allegation made against Bill Cosby by a female acquaintance who claims she was drugged and groped by the entertainer has touched off a police probe in Pennsylvania, where Cosby owns a home.

**TODAY'S**

**FIRST LOOK**
News in Brie

"Narnia" Us
"King"

"Lost" Stars
for DUIs

"South Park
by Complair

The alleged victim is said to be a former athletic department employee of Temple University, Cosby's alma mater, who moved back to Canada nine months ago after living in Pennsylvania for two years.

According to published reports, the woman claims that she met Cosby for dinner last January at a Pennsylvania restaurant where he gave her pills that made her dizzy after she complained of stress and tension.

advertisement



The woman said she accompanied Cosby home where he allegedly proceeded to fondle her breast and place her hand on his genitals.

Though the woman reportedly admits that her memory of the night's events is fuzzy, she claims she woke at 4 a.m. the next morning with her clothing in disarray and her bra unfastened.

She allegedly told police that she did not immediately come forward about the incident because of Cosby's fame and fear for her position at Temple University. She reportedly resigned from her job in April.

Cosby's attorney, Walter M. Phillips Jr., called the allegation "utterly preposterous" and "truly bizarre" and noted that it came a year after the alleged incident occurred.

"It will be vigorously defended," Phillips told E! Online Friday.

Phillips said he did not know if the woman had been contacted by authorities.

Pennsylvania law officials picked up the case after the woman made her complaint to police in Ontario on Jan. 13.

Canadian authorities passed the information on to Philadelphia police who directed the case to the police in Cheltenham Township, where Cosby's home is located.

The Cheltenham Township Police Force had no comment Friday on the allegation or any pending investigation.

Perhaps bowing to pressure, Cosby canceled a raft of personal appearances, including a town hall appearance in Cleveland, Ohio Thursday night and three upcoming appearances in Florida--two in Fort Lauderdale and one in Daytona.

Cosby's rep would not say whether the cancellations were related to the allegation against the comedian.

The Jell-O-loving Cosby, who has been married to his wife, Camille, for 41 years, has faced scandal before. In 1997, Autumn Jackson, a 22-year-old Los Angeles woman, claimed to be the entertainer's illegitimate daughter and forced Cosby to admit in court to having an affair with her mother.

However, Cosby denied that he was Jackson's father, and she and two cohorts were eventually convicted of trying to extort $40 million from him in order to buy her silence.



✉ email this story   ✱! message board   🖶 print this story   ⟨XML⟩

 **Related Links**

- **News: Bill Cosby strikes again**
- **News: Bill Cosby on witch-hunt?**
- **E! Online's fact sheet for Bill Cosby**

all news stories ⟫

**FRESH F**

**Answer B!t**
new Hollywo
trend, plus p
for 2006!

**Tab Fab:** Ch
hot box of in
people please

**Party Girl:** I
gossip, glam,
greed of soir
2005

**Fashion Pol**
Lindsay's in a
mood, Nicole
more pin thir

Case 2:05-cv-01099-ER   Document 67   Filed 01/04/06   Page 24 of 44

• **help**   • **about E! Online**   • **site map**   • **membership**   • **newsletter**
Use of this site signifies your acceptance of the Privacy Policy and
Terms of Use. Copyright © 2006 E! Entertainment Television, Inc. All rights reserved.



we've got all the answers

Register & Login

Nick     Password     Login >>

> Create new account > Recover lost password

Writing > Writing Screenplays > **Bill Cosby accu...**

Latest [ Topics | Posts ]     Archive     **Post A N**

<< Topic     < Post     Post 1 of 5 Topic 1805 of 3

# Bill Cosby accused of raping woma

by ienjball@[EMAIL PROTECTED] Jan 20, 2005 at 07



Cosby hires lawyer after groping allegation

By Keith Herbert and Thomas J. Gibbons Jr.

INQUIRER STAFF WRITERS

Entertainer Bill Cosby has hired an attorney
allegations that he drugged and then groped a
Cheltenham home.

Attorney Walter M. Phillips Jr. said today th
defend himself against the alleged incident,
place in January 2004.

"I can say that I've been retained by Mr. Cos
Philadelphia criminal defense attorney.

A law enforcement source said tonight that th
drugged her, touched her breasts and put her
she later awoke, her bra was undone, the sour



Last week, the woman contacted Durham Regiona
there forwarded the complaint to Philadelphia
it to Cheltenham Township officers earlier th

The woman, a former athletic department emplo
now living in Canada, is expected to be inter
Township investigators in the near future, th

Phillips said that the allegations of what he
touching" were "truly bizarre." He noted that
incident occurred.

"I would say they're false and preposterous,"

Cosby hasn't spoke to police about the compla

"My understanding is that they haven't even s
and they may never," Phillips said. "They may
it's an utterly preposterous allegation."

David Brokaw, a spokesman for Cosby in Los An
cancelled appearances for "personal reasons"
Music Center and Sunday at the Broward Center

No other appearances had been canceled, Broka

When asked about the allegations, Montgomery
District Attorney Risa V. Ferman refused to c

A Philadelphia native and Temple graduate, Co.
the university's sporting events. He has been
Camille, for 41 years.

The 67-year-old father of five has faced sala

In July 1997, a jury in U.S. District Court i:
22-year-old woman, who claimed to be Cosby's .
trying to extort $40 million from Cosby to bu:

Autumn Jackson and two co-conspirators were c
sell the story of a waif spurned by a famous
tabloid unless they were paid millions.

On the witness stand at Jackson's trial, a soi
Las Vegas tryst in the mid-1970s with Jackson
He acknowledged having provided more than $10
support to the mother and daughter.

Cosby said he did not believe the young woman
refused to take a blood test.

But the tryst with Jackson rocked Cosby's rep
who dispenses sage fatherly advice on and off

**5 Posts in Topic:**

| | |
|---|---|
| **Bill Cosby accused of raping woman** | ienjball@[EMAI PROTECTED] |
| Re: Bill Cosby accused of raping woman | Jon Green <jons; |
| Re: Bill Cosby accused of raping woman | "Michael Rosen' |
| Re: Bill Cosby accused of raping woman | "Giuditta" < |
| Re: Bill Cosby accused of raping woman | "Michael Rosen' |

**Post A Reply:**

**Sign Up Now** and receive benefits of the talkab

Post replies, new topics, bookmark post, email post to friends and much more.

About - Advertising - Contact - Frequently Asked Ques
of Use - Signup

Case 2:05-cv-01099-ER   Document 67   Filed 01/04/06   Page 27 of 44

All trademarks and copyrights on this page are owned by their respective owners. The
of the author of the post and are not necessarily the view of the Talk About Network. If
message is objectionable, you are encouraged to contact us immediately by email.

Developed and Powered by MediaGlitch.com. Copyright © 2003-2005 Talk About Netw
reserved. Talk About Network® is a registered trademark.

tan5V112 Wed Jan 4 9:51:57 CET 2006.



# Woman Accuses Cosby; Cops Investigating

**Friday, January 21, 2005**

Associated Press

LOS ANGELES — A female acquaintance of comedian **Bill Cosby** (search) has leveled an allegation against him that has prompted a police investigation in Philadelphia, the entertainer's attorney said Thursday.

Attorney **Walter Phillips** (search) wouldn't discuss the specifics of the allegation but said it amounts to, at the most, "inappropriate touching."

No charges have been brought against Cosby, but Phillips said authorities have begun an investigation. He said the accuser, who lives in Canada, knows Cosby and the alleged incident in question happened about a year ago. He called the allegation "utterly preposterous."

"I know the person making the accusation hasn't been contacted by authorities," Phillips said in a telephone interview with The Associated Press. "We are hopeful and optimistic that no charges will be brought forward."

Philadelphia police and Canadian authorities declined to comment.

Meanwhile, Cosby postponed a town hall meeting in Cleveland on Thursday and has postponed three upcoming shows — two in Ft. Lauderdale and one in Daytona, both in Florida, Cosby's publicist, David Brokaw, said.

Brokaw wouldn't say whether the postponements have anything to do with the recent allegation.

About 3,600 people, including many Cleveland public school students and their parents, received free tickets for the event at the downtown Music Hall, part of the **Cleveland Convention Center** (search).

"I feel awful about it," said Sam Fulwood, a (Cleveland) Plain Dealer columnist, who said he received a personal call from Cosby requesting help organizing the event.

Fulwood said he has not heard from Cosby directly since learning of the postponement Wednesday night.

"He's not talking right now," Fulwood said.

SEARCH                                                              GO

**Click here for FOX News RSS Feeds**

**Advertise on FOX News Channel, FOXNews.com and FOX News Radio**
Jobs at FOX News Channel.
Internships at FOX News Channel (Accepting Fall Applications Now).
Terms of use. Privacy Statement. For FOXNews.com comments write to
foxnewsonline@foxnews.com;  For FOX News Channel comments write to
comments@foxnews.com
© Associated Press. All rights reserved.
Copyright © 2005 ComStock, Inc.
This material may not be published, broadcast, rewritten, or redistributed.

Copyright 2005 FOX News Network, LLC. All rights reserved.
All market data delayed 20 minutes.

## Celebrity Justice

**SEARCH**

Breaking News | Archives | Court Documents | Message Boards

Home | There Oughta Be A Law | Local Listings | About the Show | FAQ's



### Cosby Accuser's Mom Contacted Cosby Before Cops?

February 7, 2005

*A "Celebrity Justice" Exclusive.*

Sources connected with Bill Cosby tell "CJ" that before his accuser went to police, her mother asked the comedian to make things right with money.

Cosby has been accused of sexual assault by a woman who played basketball for the University of Arizona before taking a job at Temple University in Philadelphia. She has claimed that Cosby drugged and then fondled her. The incident in question took place a year ago January at Cosby's home in Philadelphia.

Cosby has told police that there was a sexual encounter, but that it was consensual.

According to "CJ" Executive Producer Harvey Levin, "Sources tell us that Cosby and his accuser had a cordial relationship throughout 2004, but we're told her mother contacted Cosby last month and complained."

Sources say Cosby was under the impression the mother wanted money, so to keep the encounter quiet, he called the mother back. We're told she asked Cosby to help pay for her daughter's education and to generally help her out financially, and this conversation occurred before the accuser ever contacted police.

It appears the accuser and her mother may have taped at least one conversation with Cosby.

As police continue to investigate, a Cosby rep call this a classic shakedown.



**{ ONLINE VIDEO }**

**Click to Watch the Video**

### TOP STORIES

Robin Williams Sues Impersonator for Alleged Imposter Scam

Mindy McCready Suffers Brutal Beating

Robert Blake Explodes in Charged Deposition

Brad Pitt Lawyers Up for Divorce

Robert Blake's Freedom Style

Prison Tapes Reveal Blake Craved Celeb Support

James Denton's 'Desperate' Move

terms of use | privacy policy | rss | © 2005 TTT West Coast Inc.



EXHIBIT "B"



WARNER BROS. STUDIOS    HOME    MOVIES    TELEVISION    DVD    MOBILE    GAMES    VOD    KIDS    MUSIC    VOD PPV

# Celebrity Justice

▶ SEARCH

Breaking News | Archives | Court Documents | Message Boards

Home | There Oughta Be A Law | Local Listings | About the Show | FAQ's



## Cosby's Attorney Claims Accuser After Cash

February 9, 2005

Bill Cosby is facing accusations of sexual assault, and now his lawyer is firing back big time. The comedian's Los Angeles based attorney, Marty Singer spoke with "CJ" about alleged tape-recorded phone calls in which, he says, his client was approached for money.

A Canadian woman has accused Cosby of sexually assaulting her. Sources tell "CJ" that the accuser and her mother had at least two phone conversations with Cosby during the same week that she went to police. Sources also tell us they believe those phone conversations were taped.

CJ contacted the accuser's mother by phone. The mother would not comment on the alleged phone calls, but she insisted to the "CJ" producer that neither she nor her daughter ever asked Cosby for money or other assistance. Cosby's attorney strongly disputes that. Marty Singer tells "CJ." "These people contacted Mr. Cosby with the intention of requesting money from Mr. Cosby. It is very obvious."

Meanwhile, the DA in the case is speaking out on Philly talk-radio. On Tuesday, District Attorney Bruce Castor of Montgomery County, Pennsylvania, told talk show host Michael Smerconish on 1210 AM that his public statements about the strength of the case have been misunderstood. "You'll find no place where I said the case was weak or anything of that nature," Castor insisted.

### TOP STORIES

Robin Williams Sues Impersonator for Alleged Imposter Scam

Mindy McCready Suffers Brutal Beating

Robert Blake Explodes in Charged Deposition

Brad Pitt Lawyers Up for Divorce

Robert Blake's Freedom Style

Prison Tapes Reveal Blake Craved Celeb Support

James Denton's 'Desperate' Move

terms of use | privacy policy | rss | © 2005 TTT West Coast Inc.

# He did exactly the same thing

## California lawyer, a former fashion model, says Bill Cosby drug tried to force himself on her about 30 years ago.

By **NICOLE WEISENSEE EGAN**
weisenn@phillynews.com

A CALIFORNIA LAWYER says she has told Montgomery County investigators who are probing sex allegations against Bill Cosby that the entertainer drugged her and tried to force himself on her about 30 years ago.

Tamara Green, a longtime criminal and civil lawyer and former fashion model, said she decided to tell her story after Cosby's lawyer and the Montgomery County district attorney publicly cast doubt on a former Temple University women's basketball executive's allegations that Cosby drugged and groped her at his Elkins Park mansion last year.

"I realize that him doing it to me 30 years ago doesn't prove he did it to this girl today, but when I heard the circumstances, I felt compelled to call up and say, 'He did exactly the same thing to me,' " said Green, 57, in a phone interview from her Ventura, Calif., home.

"Do I want everybody to know that he had his dirty paws all over me? No," she said.

"But I don't think it's right that they're going to disregard this woman and her allegations. I feel like they should look into it more seriously than I thought they were going to."

The *Daily News* usually withholds the identity of alleged sexual assault victims, but Green said she wants her name used.

What she said convinced her to go public was not any desire for justice for herself or for money or even for publicity. She said she believes it was her "civic duty and moral obligation" to come forward after Cosby's lawyer denounced the Temple woman's claims as "bizarre and preposterous" and Montgomery County D.A. Bruce L. Castor Jr. characterized the case against Cosby as weak.

"I heard his lawyer said her claims were preposterous and basically I thought, 'My eye. He did exactly the same thing to me,' " said Green. "It set my teeth on edge and made my hair stand up.

"Then I heard a press release from the district attorney saying he thought the case was weak and why did she wait so long to come forward?" she said. "I worked in a D.A.'s office and that's D.A.-speak for 'We're not filing charges.' I felt compelled to come forward after I heard that."

Cosby's lawyer, Walter Phillips Jr., denied Green's allegations. He would not answer questions about her story.

"I've spoken with my client," Phillips



> **Bill Cosby's lawyer, Walter Phillips Jr., denied Green's allegations. He would not answer questions about her story. "I've spoken with my client," Phillips said. "Mr. Cosby [above] does not recognize the names Tamara Green [right] or Tamara Lucier (her maiden name). In any event, the incident you described did not happen in any way, shape or form."**

EXHIBIT
"C"

See **COSBY** Next Page

Photos: DAVID MAIALETTI/Daily News & LA Times



By SIMONE WEICHSELB
simone@phillynews.com

## COSBY
*Continued from Preceding Page*

said. "Mr. Cosby does not recognize the names Tamara Green or Tamara Lucier [her maiden name]. In any event, the incident you described did not happen in any way, shape or form."

Cosby has also denied the former Temple executive's allegations. She claims Cosby gave her some pills, then groped her while she was immobilized at his Montgomery County mansion in January 2004.

Castor has said his office would decide this week whether to charge Cosby "or anyone else" in the probe of the ex-Temple employee's complaint.

Green said she gave a statement by phone to a Montgomery County detective on Jan. 28 and told him she would testify if necessary. She also said she spoke to Risa Vetri Ferman, Castor's first assistant, yesterday . Green also spoke to lawyers who represent the former Temple employee.

Neither Castor nor Ferman would comment.

Dolores Troiani, the Devon lawyer who represents the former Temple employee, said she found Green "credible."

"She's an attorney and she seemed to still be angry after all of these years, which is only an indication of how much an attack like this affects somebody's life," Troiani said.

If Cosby is charged with sexually assaulting the former Temple worker, the testimony of someone making claims like Green's might be useful to prosecutors if a judge allows it into evidence,

said Wendy Demchik-Alloy, a retired Montgomery County sex crimes prosecutor.

"It helps to fortify the prosecution because instead of just having one victim, in effect on an island, all by herself, with no other evidence, you have two," said Demchik-Alloy.

Green is a longtime criminal and civil lawyer. She said she is mostly retired now, handling only appeals. In 2002, she represented the elderly Lee Minnelli, Liza Minnelli's stepmother, in a lawsuit that accused Liza Minnelli of elder abuse and breach of contract after Liza tried to sell the house out from under her. Lee Minnelli eventually dropped the lawsuit after she was allowed to remain in her home.

Green said she has told her Cosby story to various friends through the years. But she said she never went to law enforcement because, soon after the encounter, Cosby showed up at Children's Hospital in Los Angeles where her 16-year-old brother, Marc Lucier, was dying from cystic fibrosis.

"My brother just thought it was the bee's knees that the great Bill Cosby was my friend and had come to the hospital to see him and made him a hero and made the other terminal kids happy," she said. "He gave autographs and 'Attaboys' and I just couldn't take that away from my brother."

Her brother died several months after that, she said, but she still didn't go to law enforcement.

"By then I'm in another relationship with a film director," she said. "And there was something

in me that didn't want people to know that that man had his paws all over me."

Three friends, including an estranged second husband, confirmed that Green had told them about the alleged drugging and groping many times over the last 30 years. The husband, Ben Housouer, an attorney, said Green "is not a bulls----er" and wouldn't lie.

Before she became a lawyer, before her first marriage to Walon Green, an Academy Award and Emmy winning Hollywood writer and producer, she was Tamara Lucier.

Back in the early-1970s, she was a model and a starlet, doing television commercials for Coca-Cola, Pontiac and Maybelline, among others, she said, and met Cosby when she auditioned as a singer for his production company. She said Cosby hired her to help him open a club in Los Angeles.

"My function was going to be to go through Cosby's personal phone records and call everyone he knew to get memberships for the club," she said.

She'd had the job only about a week when, one day, she felt sick and called him at Figero, a restaurant in Los Angeles that she said Cosby owned, to tell him she was going home.

"I said, 'I can't work today. I am so sick. I think I've got the flu,'" she said. "He said, 'Come over to Figero's and have lunch. Maybe you'll feel better."

She said she drove to the restaurant and sat at a table with Cosby and six or eight others.

*See* **COSBY** *Page 22*

An unknown savior, dress an Eagles jersey and mat hat, saved a woman from a p ble rape just hours afte team won the NFC cham ship game last month, said yesterday.

Cops said they are tryi find the mystery Eagles' porter — described as a h set white man, 5-foot-8 or who tackled a man in the of an attempted kidnappin 20-year-old woman at a 11:30 p.m. Jan. 23 on Sp Street near Broad.

Police said they are also tigating whether the susp abductor is the same mar attacked three other C City women in the past months.

Lt. Tom McDevitt, of the cial Victims Unit, said would love to talk to the he a press conference, Mc said. "We are hoping to fir brave male."

The "brave male" was a er to the woman he was wi behind that night, police The woman walked past a van driver who was be down near his tire. He po on her and shoved her in faded blue vehicle with gra rior and no back seats said.

But the driver had troubl ing the van's door and tried to slam it shut the fan wrestled him to the ment, cops said.

"He tackled the male a was able to get away," Mc said.

The man broke away a caped in the van, police sa

Cops escorted the back to the scene but co find the suspect or the fan.

The woman's descripti her assailant led a police to draw a sketch simila drawing of a wanted rapi broke into a 21-year-old



**NDERSELLS MARTINS**
**N & BATHROOM**
**NTER SALE!**
ation during every phase of the project!

**30% to 40%**

**REMODELING**
NSHIP FOR OVER 30 YEARS
**CALL FOR FREE ESTIMATE**
**-293-1660**



**AMS**
ET CENTERS

NO PAYMENT UNTIL APRIL, 2005
20% Down Payment with Credit Approval

**3 ROOMS of CARPETS**
**COMPLETELY INSTALLED**
includes Carpet, Pad & Labor
**$398***
*40 SQ. YDS

Plush or Sculptured 3 Rooms $498
Super Velvet Plush 3 Rooms $598
Heavyweight Plush 3 Rooms $698

**RPETS CENTERS**
OUGH        SOUTH PHILA        BENSALEM
of the Wawa)    1632 W. Passyunk Ave.    2066 Street Rd. Bensalem Plaza
00              465-1117              245-4600
SAT. 10-5       M.-W.F. 10-5, T.TH.SAT. 10-5    MON.-FRI. 10-8, SAT. 10-5
                SUN. CLOSED           SUN. 12-5

## FIRE
*Continued from Page 5*

to face."

The children waited at the South Philadelphia Older Adult Center, 1430 E. Passyunk Ave., to be picked up by their parents.

"I'm just glad they're safe," sighed Melony Merritt, 24, as she looked at her daughter Lela Dowdy, 3, and son Elijah Dowdy, 1½. "I was so worried."

Anthony Bonocore raced to the senior center to get his stepson, Nicholas Severino, 2. He praised the day care center staff and mourned the loss of a neighborhood institution.

"I can't say a single bad thing about them. It's a very family-oriented atmosphere and they've been great to everyone," said Bonocore, 39.

The day-care center was fully licensed and met all the fire and zoning code regulations, said Dominic Verdi, the deputy commissioner of Licenses and Inspections.

The fire did underscore the critical need for local ladder companies, according to First District Councilman Frank DiCicco, including one company that responded to the day care fire.

Ladder 11, at 12th and Reed streets, is one of eight companies targeted by Mayor Street for closure because of budgetary constraints.

"I think this was a reality check for all of us," DiCicco said. "I don't want to politicize this, but God only knows what kind of situation we would have had if they weren't here." ★

*Staff writer Catherine Lucey contributed to this report.*

## COSBY
*Continued from Page 4*

"I sat down and said, 'I really feel sick,'" she said. "Cosby said, 'Would you like some Contac?' I thought, 'Well, sure. Contac can't hurt.'"

Cosby disappeared into a restaurant office area and returned with two gray-and-red capsules, which he gave to her, she said. She took them.

"In about 20 minutes I felt like a million bucks," she said. "Well about 10 minutes after that, I'm face-down in my salad. I was really just stoned, I mean, smashed."

Cosby told her she must be sicker than she thought and said he'd drive her home in his car, she said. When they got to her apartment, she said he came inside and began trying to take off her clothes.

"I started fighting him and he's kissing on me, peeling off my clothes," she said. "I'm starting to freak and I'm telling him, 'You're going to have to kill me.'"

She said she screamed, picked up a lamp and threatened to throw it through her window to get somebody's attention. He finally let go of her, she said.

Cosby then dropped two $100 bills on her end table and left.

"That infuriated me," she said. "I put my clothes back on and ran out of my apartment. I fell off my own front porch and was all cut up and beat up. Then I staggered into the street and stopped a car."

She said she convinced the stranger to drive her back to Figero, where she thought she could confront Cosby. She said she was enraged and intended to "rip him up" if she saw him, but he and the other people at the lunch were gone.

The next day, she felt awful.

"I'm hungover from whatever he gave me. I feel terrible and I'm all beaten up from falling off my porch," she said. "And I'm sick because I'd been sick to begin with."

She went to the hospital to visit her brother either that day or the next and discovered that Cosby had been there, she said.

She never returned to her job working for Cosby. She said she saw him about a week later.

"You're lucky you went to see my brother," she said she told him. "I'm not going to make a fuss about this, but I'm going to tell everyone I know what you did to me."

Through the years, she said she told many people, "depending on the company I was in," she said.

She later married, had a child, got divorced and remarried. In 1987 she graduated from Santa Barbara College of Law.

Green said she realizes she'll be attacked for bringing up her story after so much time but said she feels strongly that she should support the former Temple employee.

"Even though she took a long time to do it, she still had to muster up the courage to take on the great Bill Cosby," Green said.

"I never came forward," she added. "It doesn't mean it didn't happen. It just means he wore and bought me off — by going to the children's terminal ward." ★

**the new 'Kids' Talk' book?**





Kids Have All the Answers
And All the Drawings, Too!

Pictures by (from left): Rebecca Le, Susannah Hardy, Alexa Clark (cover), Kristina Romanelli, Nicolle Menendez

1,100 'Kids' Talk' treasures from The Philadelphia Inquirer
Edited by Peter Mucha

**,000 area students are!**
t they wrote. Enjoy 150+ pictures they drew.
76-page collection of *treasures from The Inquirer.*

s that
before.
ok for a
n/store.
s for
n get

Yes, send me 'Kids Have All the Answers'

Mail orders to:
PNI Books, P.O. Box 42949,
Philadelphia, PA 19101

Make checks payable to:

Send _____ copies
at $12.95 each = $_____
Plus tax $.91/copy in Phila.,
$.78/copy in Pa./NJ) = $_____
Plus shipping & handling = $   3.95



**Super Bowl Clearance Sale**
All in Stock Mercandise
**FRIDAY and SATURDAY**
**FEB. 11 & 12**
**Only**
**50% OFF**

3/2/05



# Bill Cosby ends his silence:
# MY STORY!

**By BARRY LEVINE**
© 2005 The National ENQUIRER, Inc.

I N A blockbuster exclusive interview with The ENQUIRER, Bill Cosby has spoken out for the first time since he was cleared of the headline-making sexual molestation charges brought by a Canadian woman.

"I'm not saying that what I did was wrong, but I apologize to my loving wife, who has stood by my side for all these years, for any pain I have caused her," the 67-year-old entertainer told The ENQUIRER.

"These allegations have caused my family great emotional stress."

The soul-baring interview took place on February 21 in a hotel suite in Houston, Texas, during Cosby's concert tour.

Reacting to the prospect of a civil action from the young Canadian woman, furious Cosby vowed to The ENQUIRER that he would stand his ground against anyone who tried to "exploit" him because he is a celebrity.

And about the California woman who publicly supported his accuser and claimed Cosby had acted inappropriately with her, too, Cosby told The ENQUIRER: "She is a wrecking ball."

Responding to the charge by the Canadian woman, Cosby declared: "No man wants to see his family put in the position of having (Continued on next page)

*THE NATIONAL ENQUIRER* 29

NE1129A1  **FINAL & ROLL**

EXHIBIT

"D"

# BILL COSBY — MY STORY

## 'I apologize to my loving wife for any pain I have caused her'

ENQUIRER WORLD EXCLUSIVE



●COSBY THANKS THE ENQUIRER FOR BRINGING SON'S KILLER TO JUSTICE,
See next page

(Continued from Page 29) these kinds of allegations come out and for your loved ones to suffer emotional stress.

"The charge can influence the view that family and friends have of him as a good person, a person to be trusted.

"That's what happened with this.

"Looking back on it, I realize that words and actions can be misinterpreted by another person, and unless you're a supreme being, you can't predict what another individual will do.

"But that's all behind me now, and I'm looking only toward a bright future."

Cosby became a real-life father figure to countless Americans with his portrayal of doting dad Cliff Huxtable on "The Cosby Show" — and the sexual molestation charge from the Canadian woman came as a bombshell.

On January 13, the woman filed a complaint with police saying she was drugged and attacked by



COSBY ACCUSER

woman told police that after she complained of stress and tension, Cosby gave her pills that made her dizzy.

She said she recalled him touching her and when she awoke at 4 a.m., her clothing was in disarray and her bra was undone. He vigorously denied the woman's allegations.

Cosby told The ENQUIRER that when he heard police had launched an investigation, "My heart sank. I was at home, and these claims hurt me."

And following a five-week investigation, Montgomery County, Pa., District Attorney Bruce L. Castor Jr. said there was "insufficient credible and admissible" evidence to support a charge.

Following the prosecutor's February 17 announcement, the woman's attorney Dolores Troiani said a civil lawsuit would be filed against the star.

Cosby, who has been the victim of an extortion plot in the past, did not want to speculate as to whether money was the woman's prime motive. "Let's not go there," he told The ENQUIRER.

But he did say: "I am not



"I am not going to give in to people who try to exploit me because of my status."

who try to exploit me because of my celebrity status."

A published report states that the woman's mother called Cosby before her daughter went to police and the comedian "was under the impression" she was after hush money.

Because the woman claimed she was the victim of a sex crime. The ENQUIRER is continuing to withhold her name until she goes public in a civil action.

She is a 31-year-old former pro basketball player who met Cosby while she worked in the athletic department at Philadelphia's Temple University. Temple graduate Cosby is one of the school's biggest boosters. Because of the looming

civil lawsuit, Cosby stressed to The ENQUIRER that he could speak only in broad terms about the case.

But in citing an example, Cosby suggested that the woman might have left out important facts when she made her allegations to authorities.

"Take a kid who comes home from school with a note from the principal," he said.

"The note reads, 'We would like to see you tomorrow to discuss your child's behavior.' So the parent says to the child, 'What did you do?'

"The child says, 'The teacher slapped me, and I kicked her.'

"The parent goes to the school and is angry with the authorities. But as the discussion unfolds, we find that the student has left out the reason for the slap — the child picked up a stick in the classroom and tried to strike the teacher.

"The teacher stepped away and slapped the child in self-defense.

"The child, in talking to the parent, has left out a crucial part of the story — the truth."

After the allegations surfaced, the accuser's family described Cosby as a friend and "mentor" to the woman.

But Cosby told The ENQUIRER that celebrities are often put in



'Sometimes you try to help people and it backfires on you'



'My problem is how it appeared Miss Green was allowed to be a wrecking ball'

positions where their roles as mentors can lead to trouble.

"Sometimes you try to help people and it backfires on you and then they try to take advantage of you," he said.

"People can soil you by taking advantage."

Cosby admitted that the recent scandal intensified when a California lawyer, 87-year-old Tamara Green, made additional allegations against him.

The one-time actress and former model told a newspaper that she met Cosby at an audition and worked at his Los Angeles nightclub 30 years ago. She said one day she fell ill and Cosby gave her two drug tablets that left her "stoned."

Back at her apartment, Cosby allegedly tried to take advantage of her. She claims Cosby then dropped two $100 bills on a table and fled.

Green said she told family and friends about

Cosby's alleged assault but didn't go to police. She finally called police on January 28 and told them her story, and said she was speaking out now because she feared prosecutors would dismiss the claims made by the former Temple University employee.

Cosby's lawyers insisted that he did not know Green, and directed the media to important information about the woman's credibility.

According to the State Bar of California, Green entered a program for lawyers with substance abuse or mental health problems in October.

The bar had lodged disciplinary charges against her in March 2004, alleging 12 counts of misconduct involving three clients, spokeswoman Kathleen Beitiks said.

Among the allegations were failure to perform with competence, failure to maintain client funds in a trust account, and failure to refund unearned fees.

"My problem is with some media and how it appeared that Miss Green was allowed to be a 'wrecking ball'," Cosby said.

"When Miss Green spoke, they pointed out that she was a lawyer. This gives her credibility.

"Anybody could have checked out her credibility and credentials. But it appears that they never checked her — or did check her and found it was convenient to not mention it.

"It's bothersome that when my side revealed her background, we were blamed for throwing dirt.

"Then I was blamed for having a humungous amount of lawyers." That's unfair.

"I guess that a celebrity trying to protect himself is not supposed to

use every ounce of protection."

Cosby added that he doesn't regret having his lawyers reveal information about Green, saying if he didn't, the media onslaught "could have been even worse.

"We're not bringing up something that a cadre of special investigators would have needed to go underground with trench coats and mustaches to find!"

'These allegations have caused my family great emotional stress'



BILL COSBY'S WIFE CAMILLE

William Cosby, Jr.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

ANDREA CONSTAND          :CIVIL ACTION
     - VS -              :NO. 05-CV-1099
WILLIAM H. COSBY, JR.:VOLUME II
          - - -

     Oral deposition of WILLIAM H. COSBY,
JR., taken pursuant to notice, held at the
Rittenhouse Hotel, 210 West Rittenhouse
Square, Philadelphia, Pennsylvania, on
Thursday, September 29, 2005, beginning at
approximately 9:20 a.m., before Jen
Marchesani, a Certified Professional Reporter
and a Commissioner of the Commonwealth of
Pennsylvania.
          - - -

     KAPLAN, LEAMAN AND WOLFE
     The Bourse Building, Suite 970
     111 South Independence Mall East
     Philadelphia, Pennsylvania 19106
          (215) 922-7112

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

2

1  A P P E A R A N C E S :
2  TROIANI/KIVITZ, LLP
3  BY: DOLORES M. TROIANI, ESQUIRE
4     BEBE H. KIVITZ, ESQUIRE
5  38 North Waterloo Road
6  Devon, Pennsylvania 19333
7  (610) 688-8400
8  Counsel for the Plaintiff
9
10 COZEN O'CONNOR
11 BY: PATRICK J. O'CONNOR, ESQUIRE
12    GEORGE GOWEN, ESQUIRE
13 1900 Market Street
14 Philadelphia, Pennsylvania 19103
15 (215) 665-2024
16 Counsel for the Defendant
17
18 PATTERSON, BELKNAP, WEBB & TYLER, LLP
19 BY: JOHN P. SCHMITT, ESQUIRE
20    ANDREW SHAW, ESQUIRE
21 1133 Avenue of the Americas
22 New York, New York 10036
23 (212) 336-2849
24 Counsel for the Defendant

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

3

1      I N D E X
2  WITNESS          PAGE NO.
3  WILLIAM H. COSBY, JR.
4   By Ms. Troiani       11
5
6
7
8        - - -
9      E X H I B I T S
10       - - -
11 NO.    DESCRIPTION   PAGE NO.
12    NONE MARKED
13
14
15
16
17
18
19
20
21
22
23
24

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

4

1  INSTRUCTION NOT TO ANSWER
2  PAGE NO.   LINE NO.
3  31      15
4  54      6
5  54      18
6  60      16
7  72      16
8  74      18
9  85      4
10 90      9
11 90      15
12 94      1
13 104     13
14 112     18
15 131     12
16 145     15
17 148     15
18 149     1
19 152     6
20 153     8
21 155     8
22 158     22
23 159     13
24 202     1

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

WOOD INDEX

William Cosby, Jr.

221

1   gave this article; is that correct?
2   A.   Yes.
3   Q.   And you knew that if Beth
4   Ferrier's story was printed, that
5   would add credence to not only
6   Andrea's story but also to Tamara
7   Green's story?
8   A.   You can't put words in my
9   mouth.
10   Q.   You can say no. This is
11   what is called cross-examination.
12   A.   The answer is no.
13   Q.   Did you ever think that if
14   Beth Ferrier's story was printed in
15   the National Enquirer, that that would
16   make the public believe that maybe
17   Andrea was also telling the truth?
18   A.   Exactly.
19   Q.   So that you knew when this
20   article was printed, when you told the
21   Enquirer this, that you had to make
22   the public believe that Andrea was not
23   telling the truth?
24   A.   Yes.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

222

1   Q.   And part of doing that was
2   to make the public believe that she
3   wanted money from you?
4   A.   I believe that your hometown
5   newspaper upon the time -- the time
6   that the announcement came that a firm
7   representing Andrea said we may have
8   to go to the civil suit.
9   Q.   You wanted the public to
10   believe that at the time that Andrea
11   made the accusations to the district
12   attorney that she did -- that her
13   motivation for doing that was money?
14   A.   Excuse me, when I went to
15   the district attorney?
16   Q.   When she went to the
17   district attorney.
18   A.   You're changing something,
19   but it's the same question.
20   Q.   Yes, I am changing
21   something.
22   A.   You've used district
23   attorney, it's the same answer. When
24   this article had started and what I

KAPLAN, LEAMAN AND WOLFE

William Cosby, Jr.

223

1   was talking about, counsel for the
2   Constands had made it known in print
3   that they were going to go for a civil
4   suit.
5   Q.   At the time that you gave
6   this interview to the Enquirer, you
7   wanted the public to believe that
8   Andrea or her mother had asked you for
9   money in that phone call when you
10   first learned of this incident?
11   A.   No, I did not want them --
12   that they asked for money. You're
13   twisting what is because the three
14   phone calls that are made have to do
15   with -- and I saw in the Daily News or
16   some Philadelphia paper, he offered
17   them money. He offered them money. I
18   don't know how that could come, and
19   I'm not trying to turn your question
20   around, I don't know how that could
21   come out of what I offered in terms of
22   scholarship for Andrea in trying to
23   get an education for her if she wanted
24   it.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

224

1   Q.   If Andrea had not -- if that
2   phone call had not occurred between
3   you and Andrea's mother, would you
4   have out of the blue called up her
5   mother and said, let me pay for
6   Andrea's schooling?
7   A.   No. However, wait one
8   second. I did return the call. I did
9   return the call. It was a call to my
10   house, one, two. Let's say Andrea's
11   mother is calling, I did return the
12   call.
13   Q.   You're talking about the
14   phone call?
15   A.   That Andrea's mother made.
16   Q.   In January?
17   A.   To me.
18   Q.   Did you ever tell the
19   National Enquirer that the only thing
20   that Andrea's mother had asked for in
21   that conversation was an apology?
22   A.   I didn't mean the only thing
23   she asked for. I was coming off of
24   what she said. That's all I wanted.

KAPLAN, LEAMAN AND WOLFE



Please Sign up to receive our FREE, weekly
Food and Dining newsletter or Log in

┌ Real Estate ┐┌ Auto Listings ┐┌ Jobs ┐┌ Calendar ┐┌ Contact Us ┐┌ Home Page ┐

**Nobody Knows The Foot
Like The Athlete's Foot**
**C L I C K   H E R E**

■ School Closings
   Weather



41° F, Clear
5 Day Forecast
Radar
Hurricane Watch
Pollen forecast
■   Traffic
■   Trains

**Search:**



◉ Site   ○ Google

[Go] enhanced by Google
Advanced Search

■   Site Contents
**Features**
• Movies
• TV
• Restaurants
• Lottery
• Travel
• Entertainment
• Wedding Forms
• Astrology

**Classifieds**
• Find a Mortgage
• Personals

**News**
• Local
• National & World
• New York City
• Around the State
• Obituaries

**Your Health**

television

# Cosby says allegations won't stop activism

**By Associated Press**

Published June 29 2005

NEW YORK -- Bill Cosby doesn't believe allegations of infidelity prevent him from speaking out about moral issues.

In an interview that aired Wednesday on ABC's "Good Morning America," Cosby said he should be able to teach others to learn from his mistakes. He likened his mistakes to hitting a pothole while driving on a rainy road and trying to warn others to avoid the same fate.

Cosby, 67, best known as a warm, wisecracking TV dad, sparked debate last year with blunt remarks on personal responsibility aimed at the black community. In 1997, the long-married Cosby acknowledged a brief affair with the mother of Autumn Jackson, a young woman convicted of extorting him.

The entire ABC interview was set to air Wednesday on "Nightline."

Cosby was asked if his own failures of judgment disqualify him from speaking about others.

"No," he replied. "I couldn't care less what you think of me as long as you begin to execute that which will save your children."

Cosby faces a civil lawsuit filed by a former Temple University employee who alleges that he drugged and fondled her at his home in suburban Philadelphia. The woman, who now lives in her native Ontario, Canada, sued

✉ Email this story
🖶 Printer friendly format

■   Photos




Bill Cosby

■   Top Stories

📄 Sleepy-Eyed Dunkin' Donuts Actor Vale Dies

📄 Quinn: 'Book of Daniel' a 'Wholesome Show'

📄 Report: 'Desperate' Bree to Hit Bottle

📄 Officials Backtrack on Oprah Plane Mishap

📄 'Idol' Runner-Up Bice Releasing Debut

**FINDING
YOU WA
PRETT'**


**car**

**FIND T
CAR F**


EXHIBIT

"E"

## Opinions
- Editorial
- Columnists
- Letters from readers

## Business
- Your Money
- National Business
- Computer & Technology
- Investing

## Sports
- Scoreboard
- Baseball
- Yankees
- NFL
- Giants
- Jets
- Patriots
- NBA
- Nets
- Knicks
- Hockey
- UConn
- College
- Tennis

## Community
- Directions
- Maps
- Schools & Kids
- Seniors

## Newspaper Services
- To Subscribe
- Advertise With Us
- Vacation Stop
- Restarts
- Make a Payment
- Change of Address
- Delivery Concerns
- Mail Subscriptions
- Newspapers In Education
- Contact Us

## Online Services
- Advertise With Us
- FAQ/Help
- Register
- Contact Us

Cosby in March. She went to Canadian authorities on Jan. 13, about a year after her alleged encounter with the comedian.

When asked in the interview whether those allegations would hurt his standing on moral issues, Cosby said, "If they are not true, what happens if they are not true?"

Lawyers for Cosby, a Temple University alumnus and booster, have said Cosby considered himself a friend and mentor to the woman. Cosby denied the assault allegation but acknowledged giving her over-the-counter medication after she complained she was stressed and couldn't sleep.

* ___

On the Net:

http://abcnews.go.com/

Ads by Google

**Zicam-Wrongly Attacked?**
Zicam sees 49% sales increase in Q3 Visit Zicam for the whole story!
www.zicam.com

**Comedians For Any Event**
Comedians for Corporate Events, Clubs, Fundraisers, Colleges, etc.
www.CharterTalent.com

**Jewelry pricing frauds**
Law firm recovers price scams for Lord & Taylor, Saks, May Company
www.AttorneyAnnMiller.com/

**Bill Cosby Tickets**
Bill Cosby Comedy Tickets. Where Fans Buy & Sell Tickets.â¸¢
www.StubHub.com

**Comedians For Hire**
Corporate Events, Holiday Parties, Clubs, Private Parties, Colleges
www.summitcomedy.com

*Copyright © 2005, The Associated Press*

Disc



© 2005 Southern Connecticut Newspapers, Inc.
All rights reserved. Reproduction in whole or in part without permission is prohibited.

William Cosby, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDREA CONSTAND        :CIVIL ACTION
    - vs -       :
WILLIAM H. COSBY, JR.:NO. 05-CV-1099
    - - - :

        Oral deposition of WILLIAM H. COSBY,
JR., taken pursuant to notice, held at the
Rittenhouse Hotel, 210 West Rittenhouse
Square, Philadelphia, Pennsylvania, on
Wednesday, September 28, 2005, beginning at
approximately 1:00 p.m., before Jen
Marchesani, a Certified Professional Reporter
and a Commissioner of the Commonwealth of
Pennsylvania.
        - - -
    KAPLAN, LEAMAN AND WOLFE
    The Bourse Building, Suite 970
    111 South Independence Mall East

    Philadelphia, Pennsylvania 19106

        (215) 922-7112

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

3

```
1         I N D E X
2  WITNESS          PAGE NO.
3  WILLIAM H. COSBY, JR.
4   By Ms. Troiani        6
5
6
7
8        - - -
9      E X H I B I T S
10       - - -
11 NO.     DESCRIPTION    PAGE NO.
12 Cosby-1 Investigation Report 56
13 Cosby-2  Photograph      82
14 Cosby-3 Investigation Report 82
15
16
17
18
19
20
21
22
23
24
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

2

1 APPEARANCES:
2 TROIANI/KIVITZ, LLP
3 BY: DOLORES M. TROIANI, ESQUIRE
4    BEBE H. KIVITZ, ESQUIRE
5 38 North Waterloo Road
6 Devon, Pennsylvania 19333
7 (610) 688-8400
8 Counsel for the Plaintiff
9
10 COZEN O'CONNOR
11 BY: PATRICK J. O'CONNOR, ESQUIRE
12    GEORGE GOWEN, ESQUIRE
13 1900 Market Street
14 Philadelphia, Pennsylvania 19103
15 (215) 665-2024
16 Counsel for the Defendant
17
18 PATTERSON, BELKNAP, WEBB & TYLER, LLP
19 BY: JOHN P. SCHMITT, ESQUIRE
20    ANDREW SHAW, ESQUIRE
21 1133 Avenue of the Americas
22 New York, New York 10036
23 (212) 336-2849
24 Counsel for the Defendant

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

4

1 INSTRUCTION NOT TO ANSWER
2 PAGE NO.   LINE NO.
3 24      6
4 29      1
5 40      11
6 91      21
7 93      24
8 98      11
9 101     17
10 102     10
11 183     23
12 185     11
13
14
15
16
17
18
19
20
21
22
23
24

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

21

BY MS. TROIANI:

Q.    Did you have Gladys Rodgers
sign a confidentiality agreement?
        MR. O'CONNOR: Mr. Cosby,
I'm instructing you not to answer.
Frankly, you can do your offer of
proof later. If the judge disagrees,
as he may with mine, I intend to do
the same with respect to the
instructions. We'll deal with this
another day. You don't have to go
through the questions in the effort to
save time. If you can connect any
relevance to Gladys Rodgers to this
case or the circumstance and offer
that on the record now, I will
entertain it.
BY MS. TROIANI:
Q.    Did you ever tell Gladys
Rodgers about any relationship you had
with a woman other than your wife?
        MR. O'CONNOR: Are you
saying -- the one thing I'm going to
put some dampers on here, with all due

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

22

respect, if you have information of
non-consensual relationships, which
this case is about, you can explore
it. I'm not going to allow you to
delve into his personal life with
consensual relations. I will test
that with the court. There are women
involved, if there were such, whose
names should not be disclosed. I'm
not going to allow that. You can go
into any of your Jane Does, any
non-consensual relationships. We're
not going into the man's history.
        MS. TROIANI: With all due
respect, Mr. O'Connor, I think the
court already ruled that the 415
witnesses are relevant and that we can
explore those areas.
        MR. O'CONNOR: I agree. I
will allow you to do that.
        MS. TROIANI: As you know
from certain of the testimony or
certain of the documents that you
have, some of these relationships,

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

23

albeit consensual in some respect,
also involved the aspect of drugging.
        MR. O'CONNOR: I will allow
415 questions.
        MS. TROIANI: I understand
your position. However, I believe at
this point I have the right to explore
it. And if you want to make
objections, go ahead.
        MR. O'CONNOR: I'll make an
instruction, not an objection. I will
allow you to explore the 415 witnesses
with Mr. Cosby.
        MS. TROIANI: Who are you
instructing, sir?
        MR. O'CONNOR: I'm
instructing the witness not to answer
any questions that are a fishing
expedition on your part. I'm not
going to allow fishing in this area
with respect to his personal life.
BY MS. TROIANI:
Q.    Back to my question, sir.
Can you answer that question, or are

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

24

you directing him not to answer?
        MR. O'CONNOR:
Confidentiality as to what?
        MS. TROIANI: A
confidentiality agreement, period.
        MR. O'CONNOR: I'm
instructing him not to answer.
BY MS. TROIANI:
Q.    The employees that you
employ, do you have all of them sign
confidentiality agreements?
        MR. O'CONNOR: Currently?
        MS. TROIANI: At any time
between say the year 1980 to present.
        THE WITNESS: We ask them --
they have a choice. And the answer is
yes, but they have a choice.
BY MS. TROIANI:
Q.    What is that choice?
A.    They can sign or not sign.
Q.    And if they don't sign, what
happens?
A.    We kill them. No, they just
don't sign.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

101

1    ticket and flight and hotel room?
2    A.     No.
3    Q.     How often have you done that
4    in the past?
5    A.     Many.
6    Q.     And what would be your
7    relationship with these women who you
8    had come to your concerts, booked
9    rooms for, provided tickets for?
10    MR. O'CONNOR:  Let's stick
11    within this time frame of the
12    incident.
13    MS. TROIANI:  This is my
14    deposition.  I believe this is
15    absolutely pertinent.  The time frame
16    is enormous.
17    MR. O'CONNOR:  Then I'm
18    instructing him not to answer.  Sorry
19    you want to broaden it that way.  I
20    wish you'd stick to the time frame.
21    BY MS. TROIANI:
22    Q.     As I recall your counsel
23    asked Andrea if she thought it was
24    appropriate for an unmarried woman to

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

102

1    go to the home of a married man alone.
2    Do you believe it's
3    appropriate for an unmarried woman to
4    come to your house when she would be
5    alone with you?
6    A.     No.
7    Q.     And have you in the past
8    asked unmarried women to come to your
9    house?
10    MR. O'CONNOR:  Don't answer
11    the question.
12    BY MS. TROIANI:
13    Q.     Why don't you think it's
14    appropriate?
15    A.     Wait a minute.  What
16    question are we still on?
17    Q.     Your counsel said don't
18    answer the question.  What's going to
19    happen is we're going to file a motion
20    with the court and attach this
21    deposition.
22    A.     I wanted to know what
23    question are you asking me now?  It
24    was so fast.  You're so used to him

KAPLAN, LEAMAN AND WOLFE

William Cosby, Jr.

103

1    now.  You guys have a rhythm and I'm
2    not in it.
3    MS. TROIANI:  Why don't we
4    have the question read back so that
5    you understand it.  Please read the
6    question back.
7    (At this time, the court
8    reporter read back from the record as
9    requested.)
10    MR. O'CONNOR:  If you
11    restrict this question to Andrea, I'll
12    allow him to answer it.
13    MS. TROIANI:  He already
14    said he did not think it was
15    appropriate for an unmarried woman to
16    come to his house.
17    MR. O'CONNOR:  That was in
18    response to a specific question of
19    Andrea.  Unmarried women could be his
20    daughters for crying out loud.  That's
21    why the question, with all due
22    respect, I'm not trying to make it
23    absurd, but you have to be specific.
24    You asked him about Andrea and he

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

William Cosby, Jr.

104

1    answered that question.  You want to
2    explore that, explore it.
3    MS. TROIANI:  I believe that
4    he understands the question.
5    BY MS. TROIANI:
6    Q.     Do you understand the
7    question?
8    A.     No.  I would like her to go
9    back and maybe we can clean it up.  We
10    can start with Andrea.
11    Q.     I understand you want to do
12    what — you're taking the clues from
13    your lawyer.
14    A.     You're kidding?
15    Q.     You are, aren't you?  And
16    you think this is so funny?
17    MR. O'CONNOR:  Don't get
18    sarcastic.
19    THE WITNESS:  I'm not making
20    fun of you.
21    MS. TROIANI:  I don't think
22    you're making fun of me.  I think
23    you're making light of a very serious
24    situation.

KAPLAN, LEAMAN AND WOLFE

William Cosby, Jr.

105

1    THE WITNESS: That may very
2  well be.
3    MS. TROIANI: It is, sir.
4    THE WITNESS: But the
5  question -- the questions that happen
6  to be coming between the two of you
7  happen to be about my answers also.
8  And I'm asking her and I have asked
9  for her to go back as far as Andrea so
10 that I can understand. And it hasn't
11 happened. I'm not a lawyer. I don't
12 have the power to tell you what to do,
13 but I did ask.
14    And in fairness, I think I
15 did tell you earlier that this is a
16 situation for me that has some sort of
17 tension and I want to respect
18 everything here. So, if we can, I
19 would like to go back so that we can
20 hear what it is so I can understand
21 when you get to, do you think it's
22 appropriate.
23 BY MS. TROIANI:
24 Q.    I'll tell you what I'll do

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

106

1  for you. I will rephrase the
2  question.
3  Q.    Do you believe it is
4  appropriate for you, you as a married
5  man, to invite an unmarried woman who
6  is not related to you to have dinner
7  with you alone in your house?
8  A.    Yes.
9  Q.    Why is it appropriate?
10 A.    Because it depends on what
11 business I would have with said
12 unmarried woman.
13 Q.    Why would it be
14 inappropriate for you to invite Andrea
15 to your house?
16 A.    Because Andrea was a
17 romantic issue.
18 Q.    When did you first develop a
19 romantic interest in Andrea?
20 A.    Probably the first time I
21 saw her.
22 Q.    Where was that?
23 A.    Liacouras Center.
24 Q.    When was it?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

107

1  A.    I have no idea.
2  Q.    How were you introduced?
3  A.    Joan Ballast I believe who
4  is a friend of mine at the university.
5  Q.    Did you ask her to introduce
6  you to Andrea?
7  A.    I don't remember.
8  Q.    Did you develop this
9  romantic interest just from seeing
10 her?
11 A.    Yes.
12 Q.    And did you tell her that
13 you had a romantic interest in her?
14 A.    No.
15 Q.    Why not?
16 A.    Can't do it right away.
17 Q.    Why?
18 A.    I don't know her. She
19 doesn't know me.
20 Q.    Everybody knows you, Mr.
21 Cosby.
22 A.    Not really.
23 Q.    What was the plan when you
24 first saw her?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

William Cosby, Jr.

108

1  A.    To meet her.
2  Q.    And then what?
3  A.    And then perhaps to have
4  some moments with her that would have
5  to do with some sort of friendship.
6  Q.    In other words, you had to
7  build her trust up first?
8  A.    I think you're trying to put
9  words in my mouth.
10 Q.    Oh, no. You can say no.
11 A.    If you're married, and I'm
12 sure you are, I'm sure you didn't, the
13 man you met, want to build up his
14 trust in you.
15 Q.    I didn't? I did not want
16 to?
17 A.    To build up his trust in
18 you, that doesn't go. You want to
19 meet someone to get to know them.
20 Q.    Well, you're married,
21 correct?
22 A.    41 years.
23 Q.    You certainly didn't want
24 your wife to know about this

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Posted on Tue, Mar. 08, 2005

# Cosby jokes on stage about doping drink

**By NICOLE WEISENSEE EGAN**
weisenn@phillynews.com

A little over a week after being cleared of doping and groping a former Temple University women's basketball executive, Bill Cosby joked during a performance at the State Theater in New Brunswick, N.J., about whether he had slipped drugs into a woman's drink.

"He brought this woman up from the audience," said Stuart Zakim, a spokesman for the *National Enquirer*, who happened to be in the audience for the Feb. 26 show. "He said, 'Before I get started, let me ask you: Did I put anything into your drink? She said, 'No.' "

She was laughing and the audience was hysterical, Zakim said.

"I laughed, too," Zakim said. "It was very smart on his part. Obviously the people who went to see him are fans and are aware of what's been going on and that the charges were never filed."

On Feb. 17, Montgomery County District Attorney Bruce Castor announced he wasn't filing criminal charges in connection with the Temple woman's complaint that Cosby had drugged and groped her at his Cheltenham Township mansion. The woman quit her Temple job after the alleged assault and returned to her native Canada. A year after the incident, she reported it to the police.

The Canadian woman's lawyers say she'll soon file a civil lawsuit against Cosby.

Zakim took Cosby's joke to be a reference to the Canadian woman's allegations. Cosby attorney Marty Singer and Cosby spokesman David Brokaw took no issue with Zakim's account of what Cosby had said. But they said Cosby's joke had not been about the Canadian woman.

Brokaw said Cosby's joke referred to a Feb. 14 story in the *National Enquirer* in which Shawn Upshaw was quoted as saying that during an affair she had with the comedian, he had given her "a funny-tasting drink."

"And then she says she woke up, knowing that something funny had happened, knowing she was pregnant. The morning after, so to speak," Brokaw said, ridiculing Upshaw's story.

Singer said Cosby had been joking "about a woman who sold a story to a tabloid" - not about the Canadian woman.

"He's never treated it in a joking or light manner," Singer said, referring to the allegations raised by the Canadian woman. He added that Upshaw's story was false.

Upshaw's daughter is Autumn Jackson, who threatened to tell the world she was Cosby's daughter if the entertainer didn't pay her $24 million. Autumn Jackson was convicted of extortion and sentenced to 26 months in jail. Cosby admitted having had an affair with Upshaw in the early-1970s, but denies having fathered Autumn Jackson.

In a phone interview last week, Upshaw said Cosby's joke had been "in poor taste."

With regard to her story, she said, "He's making light of it as damage control. He's trying to make the community think he didn't do it; that's why he can joke about it."

© 2005 Philadelphia Daily News and wire service sources. All Rights Reserved.
http://www.philly.com

