IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREA CONSTAND | : |
| Plaintiff | : CIVIL ACTION |
| | : |
| v. | : NO. 05-CV-1099 |
| | : |
| WILLIAM H. COSBY, JR. | : |
| Defendant | : |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO STRIKE PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

Plaintiff, Andrea Constand respectfully submits this Memorandum in Opposition to

Defendant's Motion to Strike Plaintiff's Motion for Injunctive Relief.

**INTRODUCTION**

Defendant has filed a motion seeking to Strike Plaintiff's Motion for Injunctive Relief.

He appears to be objecting to the manner in which the motion was filed. Plaintiff agrees that

allegations of breach of the settlement agreement should be referred to Magistrate Judge Thomas

J. Rueter. Defendant misunderstands the procedure to accomplish this result. The parties need to

submit the appropriate form evidencing their consent to the Clerk who then informs the District

Judge. It is within the District Judge's province as to whether or not the referral is approved.

The Motion to Strike is illustrative of the recent admission by Defendant's latest

spokesperson, that Defendant's purpose in filing the pleadings is to obtain publicity. Aside from

asking that a pleading be stricken and still referred to the Magistrate Judge, (Doc. 114),

Defendant makes allegations against Plaintiff which are extraneous to a motion to strike.

Despite his admitting that he has in fact violated the terms of his agreement with Plaintiff,

1

Defendant has filed a motion to strike Plaintiff's Motion for Injunctive Relief, in which she seeks sanctions for that violation and the others recounted in her motion.  In her Motion (Doc. 107 ) Plaintiff asks the Court's intervention to permit her to respond to Defendant's numerous violations of the settlement  agreement, (the "agreement") entered into by the parties ten years ago.  Defendant asserts that Plaintiff's motion is itself a violation because he imagines that the agreement requires "private arbitration."   Although Defendant reproduces large portions of the agreement in his motion, he omits that section which pertains to the manner in which the parties are permitted to seek redress for a violation.  No doubt he did so, because that portion of the agreement does not support his specious argument.

Defendant further alleges that Plaintiff violated the agreement, and that his violations do not harm her.  In his narcissistic view of the world, Defendant believes that Plaintiff's every tweet must be about him.   He is as perceptive in this belief as he claims to be in his interpretation of non-verbal cues from women he wants to seduce.   The tweets do not include any hash tags and were sent during the time period that there was extensive publicity about gay marriage.  As defendant admits in his deposition, despite his talent for interpreting female reactions to him, he did not realize Plaintiff was gay until the police told him.

Defendant argues that his press statements do not harm Plaintiff because they are about him.  Defendant fails to realize that the settlement in this matter was designed to compensate Plaintiff for the injuries Defendant inflicted upon her and to silence BOTH sides.  In fact, Defendant has openly engaged in a media blitz ( Exhibit A ) , which he has intensified since the filing of his Motion to Strike.   Most disturbing about the "blitz" is the Washington lawyer's admission that her "primary focus" is to call attention to the legal filings.  (Exhibit B)

2

As is evident from his deposition, Defendant believes there are no laws or courts or words of honor whichbind him to silence.  However, if one side either through his own words or the words of his supporters, publicists, representatives and attorneys speaks, then the remedy is not that the injured party returns the compensation she received but rather that she regains her voice.  The punishment should fit the crime. The remedy is to treat both sides equally.  If  Defendant is permitted to speak, personally or through his surrogates, then so is Plaintiff.

**PLAINTIFF SIMPLY ASKS TO BE PERMITTED TO MAKE FAIR RESPONSE TO DEFENDANT'S REPEATED AND NOW ADMITTED VIOLATIONS OF THE CONFIDENTIALITY AGREEMENT.**

Defendant and his representatives continue to put Defendant's spin on all of the allegations ("all of the women consented to drugs and sex"), (which necessarily would include Plaintiff), while arguing that Plaintiff must be silent. Plaintiff sits quietly listening to descriptions fed to the media of celebrity parties and "disco biscuits," knowing that she never attended a celebrity party or requested to take a disco biscuit (or ever even heard that term, for that matter), or any drug or  other medication that would render her unconscious. Still, Defendant suggests that she, not he, has violated the terms of the release.

The media maelstrom that erupted in November 2014 has never quieted. Plaintiff has done her best to "tolerate" Defendant's statements[1], even when they have been damaging and stressful to her,and/ or the Rule 415 witnesses, because of the confidentiality portion of the agreement.    It is inherently unfair to allow Defendant and his representatives to continue making

---

[1] Including those of his New York lawyer, his California lawyer, his Philadelphia lawyer, his wife and now his Washington, DC counsel who seems unaware of any prohibitions against her making any statements as Defendant's representative.

all of the above comments, and still suggest that there is the type of confidentiality which was in effect from the date of the settlement through November 2014. There is not.

There is no way Plaintiff can level the playing field in dealing with Defendant. She does not have a legion of lawyers throughout the country. She does not have publicists and agents and the resources available to Defendant. Plaintiff will not repeat the various examples of Defendant's violations cited in Plaintiff's motion, except that the final and so- to- speak "last straw", occurred on July 6, 2015, after the Honorable Court unsealed the pleadings in this case. That evening, ABC News reported that "Cosby's Camp" had issued the following statement: "The only reason Mr. Cosby settled was because it would have been embarrassing in those days to put all those women on the stand and his family had no clue. That would have been very hurtful."

Plaintiff's counsel immediately contacted ABC News and requested a copy of the statement. In response, counsel received the e-mail which is attached to the Motion (Doc.107 ), as Exhibit G. Incredibly, ABC News, a respected news outlet, claims it cannot determine the author of the statement. Defendant's California lawyer claimed that Defendant he did not authorized the release of the statement. However, in their Motion to Strike, Defendant's Philadelphia lawyer claims it was an "error."

On July 9, 2015, Plaintiff notified Defendant that she wished to take the deposition of the author of the statement. A copy of the letter is attached hereto as Exhibit C. It strains credulity to believe that someone other than Defendant would be able to express Defendant's reasons for settling this case.

At page 11 of the memorandum attached to the Motion to Strike, (doc. 112), in a footnote

4

defendant writes

> Here, Defendant's July 6, 2015 statement is, at worst, an inconsequential error prompted by a storm of publicity unleashed by the release of the partial transcript. Again, the statement disclosed nothing, offering merely a self serving claim about Defendant's reason for settling..."

Apparently, Defendant is now acknowledging that he did in fact make the statement which is at the heart of Plaintiff's motion. But true to form, he cannot take any responsibility for his actions, claims his wrongdoing is of no consequence to those he has wronged and now he seeks to destroy the reputations of anyone willing to stand up to him.

There is no doubt that the Motion For Sanctions filed by Plaintiff was prompted by an unequivocally clear violation of the confidentiality agreement. In the agreement, the only statement which the parties had agreed to make was a mutual one, stating that the case had been "resolved." In Defendant's view, his transgressions must be overlooked and anyone who gets in his way must be branded a liar but more importantly those who oppose him must be silenced.

There is further no doubt that the circumstances prompting the confidentiality provisions of the settlement no longer exist. At the time the settlement was made, there was little media coverage and both sides believed that the pleadings would be sealed. Plaintiff was not aware that there were more than the 14 woman who had come forward to act as witnesses in her case. Now, that the number of accusers has reached 49, Defendant issued a statement feigning concern for his accusers, i.e he settled because it would be "hurtful."

There is no question that the above quoted statement is a direct violation of the confidentiality portion of the agreement which prohibits comments about the case. After initially denying the unquestionable breach emanated from defendant or his representatives, defendant

now agrees that it was in fact "his error." He seeks to bury that admission in a footnote. Yet, having admitted the violation he still seeks to strike Plaintiff's motion in which she seeks redress for the violation.

Even more disturbing, is defendant's "media blitz". Defendant is openly defying the agreement by retaining counsel to appear on various media outlets to discuss the deposition. This new Washington DC lawyer has openly commented about allegations and admitted that her purpose is to bring attention to the legal filings. She stated that Defendant speaks through his lawyers. (Exhibit B). The attorney has appeared on numerous television shows and contends that obtaining a prescription drugs with the intention of dispensing the drug to others is "not a crime." She implies that all of the women took drugs because that's what they did. She never distinguishes what happened with Plaintiff.

While appearing on Good Morning America, the Washington lawyer was asked why Defendant has not made any public statements and she responded, "There are 1000+ pages available in Mr. Cosby's own words...." (Exhibit D) That statement certainly appears to be an invitation for the world to read the transcript, Defendant bemoans was released. Again, it is evident that Defendant believes the he is free to comment about Plaintiff and the 415 witnesses but that Plaintiff is violating the agreement if she makes a fair response.

## DEFENDANT'S ASSERTION OF A PRIVATE ARBITRATION PROCEDURE IS DEMONSTRABLY FALSE.

Because the confidentiality portion of the agreement has proven unenforceable, Plaintiff sought redress from the court as required by the settlement agreement. In an attempt to deflect attention from his own guilt Defendant will stoop at nothing including fictionalizing a private

arbitration procedure in the face of documentary evidence to the contrary.  Defendant alleges that by filing her motion for sanctions, plaintiff has violated the agreement. At page 13 of the Motion, to Strike, (Doc. 112) defendant states, "... Plaintiff ignored the requirement to submit her dispute in private to Judge Rueter, before invoking her right to "further review by he courts." At page 7, defendant calls the agreement to submit disputes to the Magistrate Judge "akin to private arbitration."[2]

     In paragraph 29 of the agreement, the parties agree if a dispute arises as to enforcement of the agreement " that the "United States District Court for the Eastern District of Pennsylvania shall be the exclusive forum for any such proceeding." It is inconceivable that defendant believed he was entering into a private arbitration agreement, particularly in light of the next sentence which reads, "Should such a dispute arise, the parties agree to submit the dispute for initial resolution to the Honorable Thomas J. Rueter, provided Judge Rueter is still, at that time, serving as a Magistrate Judge of the United States District Court for the Eastern District of Pennsylvania, with their default rights to further review by the courts preserved. " The next sentence provides for the parties to agree to discuss an alternate dispute resolution, i.e. private arbitration, should Judge Reuter no longer be serving. The default rights are the right to appeal from the Magistrate Judge's ruling.   Had defendant prevailed in his motion to maintain the seal, the Motion for Injunctive Relief would have been filed under seal.

     Furthermore, E.D. Pa. Civ. P.R.5.1.2 requires all pleadings to be filed using the Electronic Case Filing system and specifically states that "Judge" means not only the District

---

[2] When Plaintiff's counsel was subpoenaed for information in the above captioned matter, Defendant filed a miscellaneous action, although the parties had specifically reserved the right to return to the Magistrate Judge.

Judge but also the Magistrate Judge.    As counsel acknowledges Plaintiff sent a courtesy copy of

the Motion to the Magistrate Judge.

## DEFENDANT'S ACCUSATIONS OF MISCONDUCT ON THE PART OF PLAINTIFF AND HER COUNSEL ARE UNFOUNDED

Defendant, having been subjected to international disparagement due to the multitude of

women who allege that he raped them, and his counsel, having been subjected to disapproving

comments due to his behavior at defendant's deposition, now seek to discredit plaintiff and her

counsel by asserting baseless half-truths and accusations of misconduct. The very pleading to

which Plaintiff now responds supports Plaintiff's position that the confidentiality provisions of

the Settlement Agreement entered into 10 years ago have become unenforceable. Plaintiff simply

asks to be able to make a fair response to defendant's spin machine.  In fact, it appears from the

actions cited above, that Defendant has totally abandoned any pretext of abiding by the

agreement.

Defendant laments that plaintiff did not seek to privately resolve the issues. Yet Exhibit H

to the Motion to Strike reads, "Once again, we are open to a civil and courteous discussion about

amending the settlement agreement in light of recent events." Earlier in the day, Mr. O'Connor

had called counsel to "rant" but hung up when plaintiff's counsel attempted to speak. In previous

correspondence, attached hereto as Exhibit C,  plaintiff's counsel had offered to speak privately

with defendant's counsel to achieve some common ground. In fact, as the torrent of publicity

became a tsunami, counsel did confer with defendant's New York counsel. It was agreed that

defendant's initial statement would be withdrawn. However, despite counsels' efforts to

substitute an new joint statement, the media continued to report the first one. When plaintiff's

counsel was approached by counsel for the Massachusetts plaintiffs, plaintiff's counsel informed

defendant's New York counsel. It was agreed that plaintiff's counsel would accept service of a

subpoena and not require formal service. The agreement was confirmed by e-mail.

**From:** Dolores M. Troiani
**Sent:** Tuesday, March 03, 2015 9:16 AM
**To:** Schmitt, John P. (x2849)
**Cc:** Joe Cammarata
**Subject:**

Jack

I received that attached letter from Joe Cammarata yesterday.  I explained that I would be sending
the letter to you in accordance with the confidentiality agreement, which I believe provides you
with five days to object.

Please acknowledge that you have received this as the agreement calls for notice by fax and let
me know if you want me to fax it to you or any of the other signatories.

Frankly, I don't think we contemplated this circumstance and **as I mentioned before I would
prefer to have some guidance from the Court or a written agreement from you and your
client, but I don't want to expend more of my time on this.**

**I further explained to Joe that I had discussed the possibility of a subpoena with you and
that we agreed that I would simply accept service, in order to minimize the disruption to
me.** I do want to make clear that should this come to a subpoena, I do not do cold or snow well
and have no desire to go to Boston.

My only solace is that you are in New York and Joe is in Washington so the neutral ground is
obviously Philadelphia.

Please advise.

Dolores                                                    (Emphasis added)


When the Massachusetts plaintiff's counsel sent a letter to plaintiff's counsel, the letter was

promptly forwarded to defendant's New York counsel. It was at that time, that there was a

discussion about whether or not the identities of the Rule 415 witnesses could or should be

9

confirmed. The discussion was prompted because a news agency called plaintiff's counsel to

confirm a name that she did not recognize. At that point, counsel was confronted with a difficult

choice. If she refused to answer and the person asserted a false claim, defendant would be

unfairly accused and without a doubt Philadelphia counsel would have claimed that plaintiff had

injured his client by participating in the unsubstantiated accusation. Plaintiff's counsel chose

what she believed to be the ethical route and decided to confirm the 415 witnesses as 415

witnesses and expose anyone who claimed to be a Jane Doe but was not.

      The event was the subject of a discussion amongst two of Cosby's attorneys and one of

Plaintiff's counsel.   The following email exchange occurred after the discussion:

**From:** Dolores Troiani
**Sent:** Thursday, March 05, 2015 11:08 AM
**To:** Schmitt, John P. (x2849)
**Subject:** A lttle steamed

I'm a little annoyed.

I want to make my position clear.  Lawyers are under a particular obligation to abide by the rules
of professional conduct requiring candor in their dealings. I am not lying to anyone.  This
particular person claimed to be a Jane Doe and she was not.  Confidentiality is one thing but
permitting someone to make a public allegation I knew was not true is not in my ethical
playbook.  I have no intention of  participating in whatever scheme that person was doing, even
though I believe  your client is a serial molester.  My thought process then became if I say
someone is not a Jane Doe then I have to say if they were.  Really did your partner want me to
say of course she was a Jane Doe or no comment so she could say whatever it was she planned ?

Talk about no good deed going unpunished.

.Okay I just deleted the last sentence, may be I am more than a little annoyed.

Defendant's counsel responded:

Dolores – we had no intention to offend you. We were taken by surprise when you said you were
commenting on whether a particular person was or was not a Jane Doe. In fairness, I don't think
that anything Bob or I said could be construed as a suggestion that you should or would lie to

anyone. We would not suggest anything of the kind and, of course, would never expect you to do that. Dolores, I think that our dealings on this matter have been cordial and respectful, and I hope you feel that I have been sensitive to the fact that you have been pulled into the middle of something you would understandably prefer not to have to deal with. All that said, we need to review the settlement agreement because at the end of the day we will all be better off if everyone does his or her best to comply with its terms. We will be back to you with our thoughts. Best regards. JACK

John P. (Jack) Schmitt
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036


       On March 5, 2015, Plaintiff's counsel again suggested in an e-mail that seeking guidance

from the court was the appropriate way to resolve the issues.

**From:** Dolores Troiani
**Sent:** Thursday, March 05, 2015 12:25 PM
**To:** Joe Cammarata; Schmitt, John P.
**Subject:**

Gentlemen

I have been thinking that I really want to be out of the middle of **this.  I propose submitting my documents under seal to the Federal Court there and letting  you duke it out without me.  The Judge can decide what gets revealed.**

In the alternative Gloria Aldred's suggestion of a Cosby victim fund similar to the asbestos fund also sounds good and I think Jack and I should be point and counterpoint and we could get a neutral to referee.


Dolores                             (Emphasis added)

       It appears at the point that we agreed to disagree, which makes Defendant's baseless

accusations, all the more troubling.   These cordial discussions which illustrate the ambiguities in

the 2006 agreement, now become nefarious deeds in the hands of Philadelphia counsel.[3] Even
seeking the judicial intervention Plaintiff requested is somehow sanctionable in the minds of
Defendant and his Philadelphia counsel.   Defendant appears to be the victim of the old adage,
"Be careful what you wish for, you may get it."

     In his motion opposing the unsealing, defendant asserted that the excerpts were taken out
of context. Plaintiff agreed to the unsealing of the entire deposition. Defendant complained that
the release of his deposition was "one-sided" because plaintiff's deposition was not released.
Plaintiff offered to release her deposition. Defendant claimed he wanted to speak to defend
himself. Plaintiff agreed but simply stated that she wanted to make a fair response.  As the public
scrutiny of defendant's conduct intensified, it became readily apparent that the confidentiality
provisions of the agreement were unenforceable and that Defendant intended to ignore them.

     In 2005, when Plaintiff was interviewed by the Montgomery County District Attorney's
Office concerning possible criminal charges against Defendant, then District Attorney Bruce
Castor determined that he would not press charges.  Castor did not notify Plaintiff or her counsel
of his decision.  Instead he issued a press release.  Plaintiff's counsel learned of the decision from
newscasters who came to her office.  Counsel and plaintiff's mother began a frantic search to
find Plaintiff so that she could be told.   Neither plaintiff nor her counsel would inflict the hurt of
being blind sided in that manner upon the 415 witnesses. Notifying the 415 witnesses that their
names may possibly be released and that they may possibly be identified in the press is not a
violation of the agreement.   It is common decency.

_____

[3] One need not speculate that Defendant is using the guise of court filings to promote his
agenda to smear Plaintiff and her counsel.  Defendant's Washington attorney admits that her job
is to call the media's attention to Defendant's court filings.

... 

Defendant also blames Plaintiff for the release of the deposition transcript.  Prior to the start of the deposition, it was  Mr. O'Connor who placed the following on the record,

MR. O'CONNOR:

I want to put something on the record.  Yesterday we agreed that the depositions taken in this case heretofore would remain confidential and under seal until the court rules otherwise. (N.T. 9/29/05, p.    )

The independent court reporter is a judicial officer and he  has confirmed that he believed he was free to release the transcript after the Court issued its order unsealing the record.   The reporter has stated that he released the deposition relying upon his belief, as confirmed by various lawyers who represented the entities requesting the deposition, that the deposition was a public record which had been unsealed by the Court.  The court reporter has stated that he did not contact Plaintiff's counsel prior to doing so nor was Plaintiff's counsel aware of the release until after it occurred.

The court reporter's code of ethics permits the disclosure of the deposition without notifying the parties in such a circumstance.    Again, the confusion stems from Defendant's advocacy in the unsealing proceedings.  Plaintiff was not a party to those proceedings. Defendant argued that the excerpts of the deposition were taken out of context. Because Defendant's litigation strategy is to slander anyone disagreeing with him, he claimed that Plaintiff's counsel had made misrepresentations to the court.  Consequently, in the footnotes on page 13 of the Court's decision, the Court opines that there is no dispute that the transcript itself is accurate.   A careful reading of the memorandum decision at pages 18 and 19, certainly lends credence to the court reporter's reliance on the decision.  The Court noted  that Cosby had

diminished his right to privacy by joining the debate about the merits of the allegations against him.   The Court then wrote, "Moreover, the AP's interest in obtaining Defendant's depositions is legitimate.   The purpose for which the deposition is sought (and surely will be distributed to the world) is not merely commercial gain or prurient interest in exposing the details of Defendant's personal life." (Op. P. 19) Indeed the court reporter wrote directly to the Court, seeking to clarification, when challenged by Defendant's counsel.

Moreover, Defendant claims that Kaplan, Leaman & Wolfe is Plaintiff's "vendor" subject to her control, citing Paragraph 20 of the release.   Court reporters are independent entities, subject to their own rules and guidelines.   Plaintiff does not control any court reporting service. Again, Defendant's reliance on the agreement is misplaced.   It states that counsel will use their best efforts to ensure that their .... vendors (as applicable) comply with the confidentiality provisions. In that context  vendors are  partisan individuals, employed by the attorney to take some action in a case, e.g.,  someone who is paid, for example, to prepare plaintiff's demonstrative exhibits for trial. A court reporter is obligated to be neutral pursuant to his code of ethics. But if defendant wants to interpret vendor as anyone who was paid, then the stenographer was defendant's vendor just as much as he was plaintiff's, because they paid him for the very same transcript and had equal access to him if they wanted to give him instructions.

Even if Kaplan, Leaman & Wolfe were her vendor, which it is not, Plaintiff made known the confidentiality of the proceedings ten years ago.   Her "best efforts" did not require her to "stay in touch" and continue to reiterate that fact, ten years later.

Defendant contends that Plaintiff violated the confidentiality portion of the agreement. As proof they attach as Exhibit E, tweets that are not in any type of context.   They cite an article

14

in the Toronto Sun (Exhibit F to their motion), in which the writer acknowledges that he ambushed Plaintif. In the article, she repeatedly states that she cannot talk about the case. She refused to confirm the alleged tweets related to the case and is quoted as saying, "Respectfully, I don't talk about it and I don't plan on talking about it." The ambush occurred on July 8, two days after Defendant told the world that he settled the case out of concern for the witnesses and his family. In view of that obvious violation, Plaintiff demonstrated remarkable restraint.

Again, the "interview" illustrates why the confidentiality provisions of the agreement are not workable. Plaintiff was actually ambushed at her place of business by a writer and cameraman. Attempting to decline to be interviewed and be polite at the same time, Plaintiff, who is not sophisticated in the ways of the media, said but a few words. She had declined hundreds of interviews, but the journalist confronting her attempted to reel her in, trying to get her to agree to statements he made so that he could then attribute them to her. He tried to ingratiate himself with her, claiming he had photos and information of Defendant's sexual misconduct in Canada. It is only the skilled celebrity, who has been in show business for 50 years who can avoid these traps. The novices such as Plaintiff and her counsel, understand that it is a journalistic technique of making a statement and then asking a question which implies the interviewee's assent to the statement. We don't understand how no-comment becomes a story.

**REQUEST FOR ATTORNEY'S FEES AND COSTS**

A cursory reading of the Plaintiff's 2006 Motion for Sanctions (Doc. 48) which was unsealed by this Court provides the context for Plaintiff's request for the imposition of attorney's fees against Defendant's attorney, Patrick O'Connor.

28 USCS § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991), the

Supreme Court opined: :

> [Where] a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . . The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy...

Defendant through his Washington counsel has publically admitted that her role is to publicize

the pleadings filed by Mr. O'Connor.  Believing they are protected by the cloak of judicial

privilege, O'Connor has used the court system to wage a battle in the court of public opinion.

The parties agreed that disputes involving their settlement would be determined by the

Magistrate Judge.  O'Connor filed this motion to strike because Plaintiff filed her motion on the

ECF system as is required.   He acknowledges that a courtesy copy was sent to the Magistrate

Judge.   The allegation that the parties agreed to seek private arbitration is belied by the language

of the agreement.  In fact, all attempts to by Plaintiff to seek judicial intervention

privately were rebuffed by defendant.

O'Connor filed a Motion alleging breaches by Plaintiff (Doc. 114).  In that motion, the

only remedy sought is referral to the Magistrate Judge.  In a phone "conversation" with plaintiff's

counsel, O'Connor ranted and eventually hung up on plaintiff's counsel.  His emotional state was

such that he memorialized the event in an email, claiming that plaintiff's counsel, (a member of

the bar for 40 years) stated that she did not know who Judge Padova is. (Exhibit E).

16

Defendant repeatedly misrepresents the contents of the subpoena issued to Plaintiff's counsel and a copy is attached hereto as Exhibit F. The Massachusetts plaintiff's did not subpoena the entire deposition. The subpoena is directed only to information about them.

Despite the court reporter's acknowledgment that he did not consult with counsel prior to releasing the deposition, O'Connor has filed a motion (Doc. 10 of 2:15 MC 0144) seeking discovery for a potential violation of the Court's Order. In that Motion, O'Connor alleges that the Massachusetts that counsel was served with "a friendly subpoena for the complete transcript of Defendant's deposition." The subpoena does not request the complete transcript. Further, O'Connor in the certificate of service states that he served plaintiff's counsel by electronic mail on July 24, 2015. To date, neither counsel has received a copy of the motion via electronic mail; however counsel did receive it on this date via regular mail.

**CONCLUSION**

Plaintiff respectfully requests that Honorable Court deny the Motion to Strike and further in view of Defendant's counsel's statement that her primary focus is to call attention to Defendant's court filings to find that Defendant's filing was made in bad faith and to award Plaintiff reasonable attorney's fees.

Respectfully submitted,

Dolores M. Troiani, Esquire
Troiani & Gibney, LLP
1171 Lancaster Avenue, Suite 101
Berwyn, PA 19312

Attorneys for Plaintiff

Respectfully submitted,

Bebe H. Kivitz, Esquire
Jacobs Kivitz & Drake LLC
1525 Locust Street, 12th Floor
Philadelphia, PA 19102

Attorneys for Plaintiff

17