IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREA CONSTAND<br>   Plaintiff | :<br>: CIVIL ACTION<br>: |
| v. | : NO. 05-CV-1099 |
| WILLIAM H. COSBY, JR.<br>   Defendant | :<br>: |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION REGARDING PLAINTIFF'S ALLEGED BREACH OF THE PARTIES' SETTLEMENT AGREEMENT**

Plaintiff, Andrea Constand respectfully submits this Memorandum in Opposition to Defendant's Motion Regarding Plaintiff's Breach of the Parties Settlement Agreement.

## INTRODUCTION

Plaintiff agrees that allegations of breach of the settlement agreement should be referred to Magistrate Judge Thomas J. Rueter. Defendant misunderstands the procedure to accomplish this result. The parties need to submit the appropriate form evidencing their consent to the Clerk who then informs the District Judge. It is within the District Judge's province as to whether or not the referral is approved.

Plaintiff denies that she breached the agreement. After initially denying that he did so, Defendant has admitted that on July 6, 2015, he released the following statement to ABC News: "The only reason Mr. Cosby settled was because it would have been embarrassing in those days to put all those women on the stand and his family had no clue. That would have been very hurtful."

At page 11 of the memorandum attached to the Motion to Strike, (doc. 112), in a footnote

1

defendant writes:

> Here, Defendant's July 6, 2015 statement is, at worst, an inconsequential error prompted by a storm of publicity unleashed by the release of the partial transcript. Again, the statement disclosed nothing, offering merely a self serving claim about Defendant's reason for settling..."

Having been caught in an unequivocal violation Defendant has responded by striking out at Plaintiff and her counsel and hiring a Washington attorney to publicize the statements in the pleadings which have been filed by Defendant with this Court. Defendant has gone so far as to allege that Plaintiff should not have filed her Motion, (Doc. 107) on ECF because it is to be heard by the Magistrate Judge.

E.D. Pa. Civ. P.R.5.1.2 requires all pleadings to be filed using the Electronic Case Filing system and specifically states that "Judge" means not only the District Judge but also the Magistrate Judge. As Defendant's counsel acknowledges Plaintiff sent a courtesy copy of the Motion to the Magistrate Judge. The referral to the Magistrate Judge is made by written consent of the parties, not the District Judge. It is communicated to the Clerk, **soley,** through forms available in the Clerk's Office and it is not communicated to the District Judge until all parties consent. The procedure is outlined in the Clerk's manual reproduced below:

REFERRAL TO UNITED STATES MAGISTRATE JUDGE

> In accordance with the provisions of 28 U.S.C. § 636(c) and Local Civil Rule 72.1, U.S. Magistrate Judges may conduct, upon consent of all the parties in a civil case, any or all proceedings, including a jury or non-jury trial, and order the entry of a final judgment. Your decision to consent, or not to consent, to the referral of your case to a U.S.Magistrate Judge for disposition is entirely voluntary and should be communicated solely to the Clerk of Court. Appropriate consent forms for this purpose are available from the Clerk's Office (Appendix Q). Only if all the parties in the case consent to the referral to a magistrate judge will either the district court judge or the magistrate judge be informed of your decision.

The judge will then decide whether or not to refer the case to a magistrate judge Plaintiff requests the Clerk refer the Motion to the Magistrate Judge and that the Court find that Plaintiff is not in breach of the agreement for the following reasons:

## A. PLAINTIFF'S ALLEGED COMMENTS ABOUT THE CASE

Defendant claims Plaintiff "tweeted" about the case. The tweets do not include any hash tags, are not in any type of context and were sent during the time period when there was extensive publicity about gay marriage. As defendant admits in his deposition, despite his talent for interpreting female reactions to him, he did not realize Plaintiff was gay until the police told him. Defendant claims Plaintiff gave an interview to Toronto Sun (Exhibit F to their motion), in which the writer acknowledges that he ambushed her. In the article, she repeatedly states that she cannot talk about the case. She refused to confirm the alleged tweets related to the case and is quoted as saying, "Respectfully, I don't talk about it and I don't plan on talking about it." The ambush occurred on July 8, two days after Defendant told the world that he settled the case out of concern for the witnesses and his family. In view of that obvious violation, Plaintiff demonstrated remarkable restraint.

Again, the "interview" illustrates why the confidentiality provisions of the agreement are not workable. Plaintiff was actually ambushed at her place of business by a writer and cameraman. Attempting to decline to be interviewed and be polite at the same time, Plaintiff, who is not sophisticated in the ways of the media, said but a few words.

The media maelstrom that erupted in November 2014 has never quieted. Plaintiff has

done her best to "tolerate" Defendant's statements[1], even when they have been damaging and stressful to her, and/ or the Rule 415 witnesses, because of the confidentiality portion of the agreement. It is inherently unfair to allow Defendant and his representatives to continue commenting , and still suggest that there is the type of confidentiality which was in effect from the date of the settlement through November 2014. There is not.

There is no way Plaintiff can level the playing field in dealing with Defendant. She does not have a legion of lawyers throughout the country. She does not have publicists and agents and the resources available to Defendant, which permit him to wage a campaign to defame plaintiff and her counsel.

In 2005, when Plaintiff was interviewed by the Montgomery County District Attorney's Office concerning possible criminal charges against Defendant, then District Attorney Bruce Castor determined that he would not press charges. Castor did not notify Plaintiff or her counsel of his decision. Instead he issued a press release. Plaintiff's counsel learned of the decision from newscasters who came to her office. Counsel and plaintiff's mother began a frantic search to find Plaintiff so that she could be told. Neither plaintiff nor her counsel would inflict the hurt of being blind sided in that manner upon the 415 witnesses. Notifying the 415 witnesses that their names may possibly be released and that they may possibly be identified in the press is not a violation of the agreement. Contacting the 415 witnesses was not a surreptitious act and it was not done with any belief that it violated the agreement. Telling someone that they may soon endure the same type of media attention inflicted upon Plaintiff is simply common decency.

---

[1] Including those of his New York lawyer, his California lawyer, his Philadelphia lawyer, his wife and not his Washington, DC counsel who seems unaware of any prohibitions against her making any statements as Defendant's representative.

Defendant has openly engaged in a media blitz ( Exhibit A ), which he has intensified since the filing of his Motion to Strike. Most disturbing about the "blitz" is the Washington lawyer's admission that her "primary focus" is to call attention to the legal filings. (Exhibit B) Reading his motions directed against Plaintiff one can clearly see that the intention here is not to seek redress in the courts but rather a misguided attempt to manipulate public opinion.

Plaintiff has not asked "to ignore" the confidentiality agreement. Plaintiff has simply requested relief from the prohibition that she refrain from public comment in view of Defendant's total abandonment of the confidentiality portions of the agreement.

### B. THERE IS NO BREACH OF THE DISPUTE RESOLUTION PROVISION

In her Motion (Doc. 107 ) Plaintiff asks the Court's intervention to permit her to respond to Defendant's numerous violations of the settlement agreement, (the "agreement") entered into by the parties ten years ago. Defendant asserts that Plaintiff's motion is itself a violation because he imagines that the agreement requires "private arbitration." Although Defendant reproduces large portions of the agreement in his motion, he omits that section which pertains to the manner in which the parties are permitted to seek redress for a violation. No doubt he did so, because that portion of the agreement does not support his specious argument.

While acknowledging that Plaintiff's counsel had previously engaged in private discussions <u>with opposing counsel</u>, Defendant fails to recognize that it was his statement of July 6 which prompted the filing of Plaintiff's Motion. Despite the best efforts of counsel the November statement which was retracted continued on in its internet life. Even if Defendant retracted his July 6 statement–which he feebly did, claiming it was unauthorized- it continued to be repeated in the media.

Defendant laments that plaintiff did not seek to privately resolve the issues. There are no less than four (4) written communications in which Plaintiff's counsel asked to discuss resolving the issue which arose after November, 2014 and/or requested that the parties seek judicial intervention. Defendant chose the public forum. ( Exhibit C)

Exhibit H to the Motion to Strike reads, "Once again, we are open to a civil and courteous discussion about amending the settlement agreement in light of recent events." Earlier in the day, Mr. O'Connor had called counsel to "rant" but hung up when plaintiff's counsel attempted to speak. In previous correspondence, attached hereto as Exhibit C, plaintiff's counsel had offered to speak privately with defendant's counsel to achieve some common ground. In fact, as the torrent of publicity became a tsunami, counsel did confer with defendant's New York counsel. It was agreed that defendant's initial statement would be withdrawn. However, despite counsels' efforts to substitute an new joint statement, the media continued to report the first one. When plaintiff's counsel was approached by counsel for the Massachusetts plaintiffs, plaintiff's counsel informed defendant's New York counsel. It was agreed that plaintiff's counsel would accept service of a subpoena and not require formal service. In Philadelphia counsel's pleadings, this agreement becomes " a friendly subpoena." The agreement was confirmed by e-mail.

**From:** Dolores M. Troiani
**Sent:** Tuesday, March 03, 2015 9:16 AM
**To:** Schmitt, John P. (x2849)
**Cc:** Joe Cammarata
**Subject:**

Jack

I received that attached letter from Joe Cammarata yesterday. I explained that I would be sending the letter to you in accordance with the confidentiality agreement, which I believe provides you with five days to object.

Please acknowledge that you have received this as the agreement calls for notice by fax and let me know if you want me to fax it to you or any of the other signatories.

Frankly, I don't think we contemplated this circumstance and **as I mentioned before I would prefer to have some guidance from the Court or a written agreement from you and your client, but I don't want to expend more of my time on this.**

**I further explained to Joe that I had discussed the possibility of a subpoena with you and that we agreed that I would simply accept service, in order to minimize the disruption to me.** I do want to make clear that should this come to a subpoena, I do not do cold or snow well and have no desire to go to Boston.

My only solace is that you are in New York and Joe is in Washington so the neutral ground is obviously Philadelphia.

Please advise.

Dolores                                                          (Emphasis added)

When the Massachusetts plaintiff's counsel sent a letter to plaintiff's counsel, the letter was promptly forwarded to defendant's New York counsel. It was at that time, that there was a discussion about whether or not the identities of the Rule 415 witnesses could or should be confirmed. The discussion was prompted because a news agency called plaintiff's counsel to confirm a name that she did not recognize. At that point, counsel was confronted with a difficult choice. If she refused to answer and the person asserted a false claim, defendant would be unfairly accused and without a doubt Philadelphia counsel would have claimed that plaintiff had injured his client by participating in the unsubstantiated accusation. Plaintiff's counsel chose what she believed to be the ethical route and decided to confirm the 415 witnesses as 415 witnesses and expose anyone who claimed to be a Jane Doe but was not.

The event was the subject of a discussion amongst two of Cosby's attorneys and one of Plaintiff's counsel. The following email exchange occurred after the discussion:

**From:** Dolores Troiani
**Sent:** Thursday, March 05, 2015 11:08 AM
**To:** Schmitt, John P. (x2849)
**Subject:** A lttle steamed

I'm a little annoyed.

I want to make my position clear. Lawyers are under a particular obligation to abide by the rules of professional conduct requiring candor in their dealings. I am not lying to anyone. This particular person claimed to be a Jane Doe and she was not. Confidentiality is one thing but permitting someone to make a public allegation I knew was not true is not in my ethical playbook. I have no intention of participating in whatever scheme that person was doing, even though I believe your client is a serial molester. My thought process then became if I say someone is not a Jane Doe then I have to say if they were. Really did your partner want me to say of course she was a Jane Doe or no comment so she could say whatever it was she planned ?

Talk about no good deed going unpunished.

.Okay I just deleted the last sentence, may be I am more than a little annoyed.

Defendant's counsel responded:

Dolores – we had no intention to offend you. We were taken by surprise when you said you were commenting on whether a particular person was or was not a Jane Doe. In fairness, I don't think that anything Bob or I said could be construed as a suggestion that you should or would lie to anyone. We would not suggest anything of the kind and, of course, would never expect you to do that. Dolores, I think that our dealings on this matter have been cordial and respectful, and I hope you feel that I have been sensitive to the fact that you have been pulled into the middle of something you would understandably prefer not to have to deal with. All that said, we need to review the settlement agreement because at the end of the day we will all be better off if everyone does his or her best to comply with its terms. We will be back to you with our thoughts. Best regards. JACK

John P. (Jack) Schmitt
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

On March 5, 2015, Plaintiff's counsel again suggested in an e-mail that seeking guidance from the court was the appropriate way to resolve the issues.

8

**From:** Dolores Troiani
**Sent:** Thursday, March 05, 2015 12:25 PM
**To:** Joe Cammarata; Schmitt, John P.
**Subject:**

Gentlemen

I have been thinking that I really want to be out of the middle of **this. I propose submitting my documents under seal to the Federal Court there and letting you duke it out without me. The Judge can decide what gets revealed.**

In the alternative Gloria Aldred's suggestion of a Cosby victim fund similar to the asbestos fund also sounds good and I think Jack and I should be point and counterpoint and we could get a neutral to referee.

Dolores                                        (Emphasis added)

It appears at the point that we agreed to disagree, which makes Defendant's baseless accusations, all the more troubling. These cordial discussions which illustrate the ambiguities in the 2006 agreement, now become nefarious deeds in the hands of Philadelphia counsel.[2] Even seeking the judicial intervention Plaintiff requested is somehow sanctionable in the minds of Defendant and his Philadelphia counsel.

**B. PLAINTIFF'S ECF FILING**

In his motion, Defendant claims there is an agreement to submit disputes concerning the agreement to the Magistrate Judge "for initial –and private- resolution." Plaintiff agrees that the parties have agreed to refer disputes to the Magistrate Judge. Plaintiff denies that there is any agreed upon procedure to accomplish that referral "privately."

---

[2] One need not speculate that Defendant is using the guise of court filings to promote his agenda to smear Plaintiff and her counsel. Defendant's Washington attorney admits that her job is to call the media's attention to Defendant's court filings.

9

In paragraph 29 of the agreement, the parties agree if a dispute arises as to enforcement of the agreement " that the "United States District Court for the Eastern District of Pennsylvania shall be the exclusive forum for any such proceeding." It is inconceivable that defendant believed he was entering into a private arbitration agreement, particularly in light of the next sentence which reads, "Should such a dispute arise, the parties agree to submit the dispute for initial resolution to the Honorable Thomas J. Rueter, provided Judge Rueter is still, at that time, serving as a Magistrate Judge of the United States District Court for the Eastern District of Pennsylvania, with their default rights to further review by the courts preserved. " The next sentence provides for the parties to agree to discuss an alternate dispute resolution, i.e. private arbitration, should Judge Reuter no longer be serving. Having never agreed to seeking judicial guidance privately, Defendant now complains because his July 6 statement prompted Plaintiff's filing.

Defendant states that Plaintiff did not submit her request for relief to Judge Rueter "but to this Court." The parties are bound by E.D. Pa. Civ. P.R.5.1.2, which requires all pleadings to be filed using the Electronic Case Filing system and specifically states that "Judge" means not only the District Judge but also the Magistrate Judge and that "Court" shall mean the United States District Court for the Eastern District of Pennsylvania. The referral to the Magistrate Judge requires both parties' written consent and is communicated to the Clerk only. The District Judge does not rule on it until the forms are completed by both sides.

Defendant's assertion that the previous practice of discussions amongst counsel was working well, is inexplicable since he now claims that everything plaintiff did in consultation with his counsel is now a violation of the agreement.

10

## C. RELEASE OF THE DEPOSITION

Armed with the Court Reporter's admission that he released the deposition transcript, without consulting Plaintiff or her counsel, Defendant nonetheless complains that Plaintiff's counsel released it. Prior to the start of the deposition, it was Mr. O'Connor who placed the following on the record,

MR. O'CONNOR:

I want to put something on the record. Yesterday we agreed that the depositions taken in this case heretofore would remain confidential and under seal until the court rules otherwise. (N.T. 9/29/05, p.   )

The independent court reporter is a judicial officer and he has confirmed that he believed he was free to release the transcript after the Court issued its order unsealing the record. The reporter has stated that he released the deposition relying upon his belief, as confirmed by various lawyers who represented the entities requesting the deposition, that the deposition was a public record which had been unsealed by the Court. The court reporter has stated that he did not contact Plaintiff's counsel prior to doing so nor was Plaintiff's counsel aware of the release until after it occurred.

The court reporter's code of ethics permits the disclosure of the deposition without notifying the parties in such a circumstance. Again, the confusion stems from Defendant's advocacy in the unsealing proceedings. Plaintiff was not a party to those proceedings. Defendant argued that the excerpts of the deposition were taken out of context. Because Defendant's litigation strategy is to slander anyone disagreeing with him, he claimed that Plaintiff's counsel had made misrepresentations to the court. Consequently, in the footnotes on

11

page 13 of the Court's decision, the Court opines that there is no dispute that the transcript itself is accurate. A careful reading of the memorandum decision at pages 18 and 19, certainly lends credence to the court reporter's reliance on the decision. The Court noted that Cosby had diminished his right to privacy by joining the debate about the merits of the allegations against him. The Court then wrote, "Moreover, the AP's interest in obtaining Defendant's depositions is legitimate. The purpose for which the deposition is sought (and surely will be distributed to the world) is not merely commercial gain or prurient interest in exposing the details of Defendant's personal life." (Op. P. 19) Indeed the court reporter wrote directly to the Court, seeking to clarification, when challenged by Defendant's counsel.

Moreover, Defendant claims that Kaplan, Leaman & Wolfe is Plaintiff's "vendor" subject to her control, citing Paragraph 20 of the release. Court reporters are independent entities, subject to their own rules and guidelines. Plaintiff does not control any court reporting service. Again, Defendant's reliance on the agreement is misplaced. It states that counsel will use their best efforts to ensure that their .... vendors (as applicable) comply with the confidentiality provisions. In that context vendors are partisan individuals, employed by the attorney to take some action in a case, e.g., someone who is paid, for example, to prepare plaintiff's demonstrative exhibits for trial. A court reporter is obligated to be neutral pursuant to his code of ethics. But if defendant wants to interpret vendor as anyone who was paid, then the stenographer was defendant's vendor just as much as he was plaintiff's, because they paid him for the very same transcript and had equal access to him if they wanted to give him instructions.

Even if Kaplan, Leaman & Wolfe were her vendor, which it is not, Plaintiff made known the confidentiality of the proceedings ten years ago. Her "best efforts" did not require her to

"stay in touch" and continue to reiterate that fact, ten years later.

**REQUEST FOR ATTORNEY'S FEES AND COSTS**

A cursory reading of the Plaintiff's 2006 Motion for Sanctions (Doc. 48) which was unsealed by this Court provides the context for Plaintiff's request for the imposition of attorney's fees against Defendant's attorney, Patrick O'Connor.

28 USCS § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991), the Supreme Court opined: :

> [Where] a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . . The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy...

Defendant through his Washington counsel has publically admitted that her role is to publicize the pleadings filed by Mr. O'Connor. Believing they are protected by the cloak of judicial privilege, O'Connor has used the court system to wage a battle in the court of public opinion. The parties agreed that disputes involving their settlement would be determined by the Magistrate Judge. O'Connor filed this motion to strike because Plaintiff filed her motion on the ECF system as is required. He acknowledges that a courtesy copy was sent to the Magistrate Judge. The allegation that the parties agreed to seek private arbitration is belied by the language of the agreement. In fact, all attempts to by Plaintiff to seek judicial intervention

13

privately were rebuffed by defendant.

O'Connor filed a Motion alleging breaches by Plaintiff (Doc. 114). In that motion, the only remedy sought is referral to the Magistrate Judge.

In a phone "conversation" with plaintiff's counsel, O'Connor ranted and eventually hung up on plaintiff's counsel. His emotional state was such that he memorialized the event in an email, claiming that plaintiff's counsel, (a member of the bar for 40 years) stated that she did not know who Judge Padova is. (Exhibit D).

Defendant repeatedly misrepresents the contents of the subpoena issued to Plaintiff's counsel and a copy is attached hereto as Exhibit E. The Massachusetts plaintiff's did not subpoena the entire deposition. The subpoena is directed only to information about them.

Despite the court reporter's acknowledgment that he did not consult with counsel prior to releasing the deposition, O'Connor has filed a motion (Doc. 10 of 2:15 MC 0144) seeking discovery for a potential violation of the Court's Order. In that Motion, O'Connor alleges that the Massachusetts that counsel was served with "a friendly subpoena for the complete transcript of Defendant's deposition." The subpoena does not request the complete transcript. Further, O'Connor in the certificate of service states that he served plaintiff's counsel by electronic mail on July 24, 2015. To date, neither counsel has received a copy of the motion from O'Connor by electronic mail; however, it was delivered on this date by the U.S. Postal service.

**CONCLUSION**

Plaintiff respectfully requests that upon receipt of the appropriate notice from the Clerk that the Court refer the Motion to Magistrate Judge Thomas J. Rueter for initial determination in accordance with the parties' agreement and that the Court ultimately determine that Plaintiff did

not violate the agreement and further in view of Defendant's counsel's statement that her primary focus is to call attention to Defendant's court filings to find that Defendant's filing was made in bad faith and to award Plaintiff reasonable attorney's fees.

Respectfully submitted,

*/s/ Dolores M. Troiani*
Dolores M. Troiani, Esquire
Troiani & Gibney, LLP
1171 Lancaster Avenue, Suite 101
Berwyn, PA 19312

*/s/ Bebe H. Kivitz*
Bebe H. Kivitz, Esquire
Jacobs Kivitz & Drake LLC
1525 Locust Street
12th Floor
Philadelphia, PA 19102

Attorneys for Plaintiff